UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                            :

CNAN GROUP S.P.A.,                   :          08 CV 1201 (PAC)
                            :

            Plaintiff,        :

                            :

    -against-               :

                            :

IGEN SEA SHIPPING and HASSAN ALI   :
RICE EXPORT CO.,              :

                            :

           Defendants.     :
-------------------------------------------------------------X

## HASSAN ALI RICE EXPORT CO.'s MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO VACATE MARITIME ATTACHMENT

LENNON MURPHY LENNON, LLC
The Graybar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Phone: (212) 490-6050
Fax:   (212) 490-6070

*Attorneys for Defendant*
*HASSAN ALI RICE EXPORT CO.*

Kevin J. Lennon, Esq.
Anne C. LeVasseur, Esq.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................1

ARGUMENT...........................................................................................................................5

POINT ONE
PLAINTIFF MUST DEMONSTRATE WHY THIS HONORABLE COURT SHOULD
NOT VACATE THE *EX PARTE* ORDER OR GRANT OTHER RELIEF......................................5

POINT TWO
PLAINTIFF'S ALLEGED EVIDENCE OF ALTER EGO AS AGAINST
HAREC IS INSUFFICIENT TO SUSTAIN THE ATTACHMENT ...............................................8

  A.  The Alter Ego Standard.............................................................................................8

  B.  Plaintiff's Inadequate Alter Ego Evidence................................................................10

  C.  CNAN's Alter Ego Allegation Should be Dismissed .................................................17

CONCLUSION.......................................................................................................................19

## PRELIMINARY STATEMENT

Defendant, HASSAN ALI RICE EXPORT CO. ("HAREC"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, submits the within Memorandum of Law and the exhibits attached hereto, and the accompanying declaration of Abdullah Hashwani ("Hashwani Decl."), in support of its motion for an Order vacating this Court's Ex Parte Order for Process of Maritime Attachment and Garnishment dated February 11, 2008. HAREC makes this motion pursuant to Rules B and E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

HAREC is a commodities trader engaged in, inter alia, rice exporting from Pakistan. *See Hashwani Decl. ¶ 5.* HAREC is a sole proprietorship existing under the laws of Pakistan with an office and place of business at Cotton Exchange Building I.I., Chundrigar Road, Karachi, Pakistan. *See Hashwani Decl. ¶ 5.* Igen Sea Shipping ("Igen Sea") is a sole proprietorship existing under the laws of Pakistan with an office and place of business at Iftikar Chambers, Hasrat Mohani Road, Karachi, Pakistan. *See Hashwani Decl. ¶ 6.* As they are both sole proprietorships, HAREC has no ownership interest in Igen Sea and Igen Sea has no ownership interest in HAREC. *See Hashwani Decl. ¶ 7.* HAREC and Igen Sea do not share offices, directors, employees, bank accounts or office space. Each is its own entity, separate and independent of the other. *See Hashwani Decl. ¶ 8.*

Pursuant to a maritime contract of charter dated November 7, 2005 ("the charter party"), the Plaintiff, CNAN GROUP S.P.A. ("Plaintiff" or "CNAN"), owner of the M/V AIN OUSSERA (the "Vessel") chartered the Vessel to Igen Sea for one voyage from Pakistan to West Africa, loading at one safe port/one-two safe berth(s) Karachi, Pakistan, and discharging at

one-three safe port(s) safe berth(s) Douala, Cameroon, to Dakar, Senegal range. Igen Sea

chartered the Vessel to carry a cargo of about 25,000 metric tons of bagged rice. The charter

party did not contain a detention clause. *A copy of the charter party is attached hereto as Exhibit*

*1.* The charter party designated Oceanic Shipping & Trading Co. ("Oceanic") as the broker and

HAREC as the shipper. *See Exhibit 1.* Pursuant to the terms of the charter party, CNAN

deducted as commission 5% of the total cost of freight, despatch and demurrage. CNAN

divided this commission as follows: Igen Sea received 1 ¼ %; HAREC received 1 ¼%; Oceanic

received 1 ¼%; and Helmgale S.A.R.L. ("Helmgale"), owners' broker, received 1 ¼ %. *See*

*Exhibits 2 through 4 attached hereto.* HAREC was not party to this charter party. *See Hashwani*

*Decl. ¶ 9.*

On November 19, 2005, by a Fixture Recap, Igen Sea re-let the Vessel to HAREC on a

back-to-back basis for a cargo of 25,000 MT bagged rice ("the cargo"). *A Copy of the Fixture*

*Recap is attached hereto as Exhibit 5.* The terms of the Fixture Recap were almost identical to

the terms of the charter party, with the exception that HAREC agreed to pay Igen Sea a

commission of 1 ¼% on freight. HAREC was the shipper of the cargo, which was to be sold to

West African merchants and The Rice Company on a cost, insurance and freight basis[1] and cost

and freight basis[2], respectively. The Fixture Recap did not bind HAREC to pay demurrage

and/or detention or to arbitrate disputes with CNAN. *See Exhibit 5.*

After the cargo was loaded onto the Vessel, Igen Sea advised HAREC that it was having

difficulty making timely freight payments to CNAN under the charter party. Via correspondence

---

[1] "cost, insurance and freight" means that the seller pays for cost, insurance and freight of
transporting the goods to the port of destination, however, all risk and additional costs are
transferred to the buyer once the goods pass the ship's rail in the load port.
[2] "cost and freight" means that the seller pays for cost and freight of transporting the goods to the
port of destination, however, all risk and additional costs are transferred to the buyer once the
goods pass the ship's rail in the load port.

2

dated December 14, 2005, Igen Sea therefore requested that HAREC make payments due under the Fixture Note directly to CNAN. *A copy of this correspondence is attached hereto as Exhibit 6; see also Hashwani Decl. ¶¶ 18-19.*   In order to protect its interest in the cargo, and its rights under the Fixture Recap, HAREC made payments directly to CNAN. *See Hashwani Decl. ¶ 20.* HAREC also paid CNAN as per CNAN's invoice to Igen Sea, a copy which is attached hereto as Exhibit 7.

HAREC sold part of the cargo to The Rice Company on a cost and freight basis with The Rice Company to be shown as the shipper on the bill of lading.  Disputes later arose between CNAN's legal department and Igen Sea when CNAN demanded that Igen Sea produce all three original bills of lading before it would allow the cargo to be discharged.  However, the face of the bills of lading contained the following language:

> IN WITNESS whereof the Master or Agent of said vessel has signed the number of Bills of Lading indicated below all of this tenor and date, **any one of which being accomplished the others shall be void**.

*A copy of the Bill of Lading is attached hereto as Exhibit 8 (emphasis added).*  The Rice Company's bank, Societe Generale, released the original Bill of Lading on March 10, 2006. *See email correspondence dated March 13, 2006 attached hereto as Exhibit 9.*  It is the customary shipping practice that where an original bill of lading is surrendered to the Master or Agent of a vessel, the other two originals of the set are therefore rendered essentially superfluous or void. *See Hashwani Decl. ¶ 11.*  Therefore, CNAN's claim that it required all three original bills of lading before discharging the cargo is without merit.  Igen Sea and The Rice Company advised CNAN that they were not required to produce all three original bills of lading. *See Hashwani Decl. ¶ 12; see email correspondences from Igen Sea to Helmgale dated March 15, 2006 and March 21, 2006; attached hereto as Exhibits 10 and 11.*

3

Due solely to CNAN's unnecessary requirement that all three original bills of lading, the cargo was delayed at Takoradi. Certain disputes arose between CNAN and Igen Sea regarding CNAN's allegation that Igen Sea failed to make timely payments of demurrage and damages for detention due and owing under the charter party all of which could have been avoided but for CNAN's position on the bills of lading. CNAN claims that as a result of Igen Sea's alleged breach of the charter party, it has suffered damages in the total principal amount of $443,032.79, inclusive of interest, costs and attorneys fees.

Contrary to CNAN's asserted claims, Igen Sea sent an invoice to CNAN dated March 29, 2006, showing an amount of $99,382.30 due and owing to Igen Sea pursuant to the charter party. *A copy of Igen Sea's invoice dated March 29, 2006 is attached hereto as Exhibit 12.*

Clause 58 of the charter party provides, in relevant part:

> This charter party shall be governed by and construed in accordance with English law and any dispute arising out of this charter party shall be referred to arbitration in London . . .
>
> . . . . .
>
> Any claim must be made in writing and claimant's arbitrator appointed within 12 months of final discharge and where this provision is not complied with, the claim/dispute, whether pertaining to liability or quantum or both shall be deemed to be extinguished and cease to exist.

Pursuant to Clause 58 of the charter party, CNAN appointed an arbitrator against defendant Igen Sea but CNAN has neither commenced arbitration proceedings nor made a claim in writing against Igen.

Although CNAN appointed an arbitrator, to date it has failed to submit a written claim in accordance with the mandatory terms of its charter party with Igen Sea. Cargo discharge was completed on March 26, 2006. *See Hashwani Decl. ¶ 13.* Therefore, any claim arising under the

4

charter party was deemed to be extinguished and ceased to exist as of March 26, 2007.

Accordingly, CNAN is time barred from pursing its underlying claim against Igen Sea in the

arbitration action and thus this ancillary action for security of CNAN's alleged claim arising

under the CNAN – Igen Sea charter party should be dismissed.

In contravention of the mandatory terms of its charter party with Igen Sea, on or about

February 5, 2008, CNAN filed a Verified Complaint in this Court against Defendant "HASSAN

ALI RICE EXPORT CO. d/b/a IGEN SEA SHIPPING" ("Defendant"). CNAN's Verified

Complaint contained a prayer for issuance of an Ex Parte Order for Process of Maritime

Attachment and Garnishment ("PMAG"). CNAN's Verified Complaint sets forth erroneous and

misleading allegations claiming that HAREC and Igen Sea are related companies. Based upon

these erroneous allegations, this Court issued an Ex Parte Order dated February 11, 2008,

authorizing the attachment of HAREC's property in this district in an amount up to $443,032.79,

inclusive of costs and interest.

To date, $443,032.79 of HAREC's property has been improperly restrained in the District

as a result of CNAN's service of the Ex Parte Order and Process of Maritime Attachment and

Garnishment, authorized and issued thereby, that has been served on non-party garnishees

including Habib Bank where HAREC's funds are currently being restrained.

## ARGUMENT

### POINT I

### PLAINTIFF MUST DEMONSTRATE WHY THIS HONORABLE COURT SHOULD NOT VACATE THE *EX PARTE* ORDER OR GRANT OTHER RELIEF.

A Plaintiff that has obtained and an ex parte Supplemental Rule B attachment order

shoulders the burden at the post-attachment hearing to prove *inter alia* that "it has a valid prima

facie admiralty claim against the defendant." *See* <u>Aqua Stoli Shipping Ltd. v. Gardner Smith</u>

<u>Pty. Ltd.</u>, 460 F.3d 434, 445 (2d Cir. 2006). Supplemental Admiralty Rule E(4)(f) of the Federal

Rules of Civil Procedure provides:

> Whenever property is arrested or attached, any person claiming an
> interest in it shall be entitled to a prompt hearing at which the
> plaintiff shall be required to show why the arrest or attachment
> should not be vacated or other relief granted consistent with these
> rules.

In such cases, Local Admiralty and Maritime Rule E.1 provides:

> The adversary proceeding following arrest or attachment or
> garnishment that is called for in Supplemental Rule E(4)(f) shall be
> conducted by a judicial officer within three court days, unless
> otherwise ordered.

Rule E(4)(f) does not mandate the type, or form, of a hearing and rather allows flexibility

depending on the matters placed into issue by the litigation. *See* <u>Salazar v. The Atlantic Sun</u>, 881

F.2d 73, 79 (3d Cir. 1989).

It is the plaintiff's burden to prove that the attachment is proper. The Second Circuit

Court of Appeals commented on Rule E(4)(f) in <u>Aqua Stoli</u> and explained the following

standard:

> [I]n addition to having to meet the filing and service requirements
> of Rules B and E, an attachment should issue if the plaintiff shows
> that 1) it has a valid prima facie admiralty claim against the
> defendant; 2) the defendant cannot be found within the district; 3)
> the defendant's property may be found within the district; and 4)
> there is no statutory or maritime law bar to the attachment.
> Conversely, a district court must vacate an attachment if the
> plaintiff fails to sustain his burden of showing that he has satisfied
> the requirements of Rules B and E. We also believe vacatur is
> appropriate in other limited circumstances. While, as we have
> noted, the exact scope of a district court's vacatur power is not
> before us, we believe that a district court may vacate the
> attachment if the defendant shows at the Rule E hearing that 1) the
> defendant is subject to suit in a convenient adjacent jurisdiction; 2)
> the plaintiff could obtain *in personam* jurisdiction over the

6

> defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n5.

> n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E.  Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

Aqua Stoli, 460 F.3d at 445.

Former Local Rule 12, to which the Second Circuit cited in note 5 of Aqua Stoli,

provides as follows:

> Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the part of the plaintiff, be entitled to an order requiring that plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with these rules or the supplemental rules.

"The Court must vacate an attachment if the plaintiff fails to sustain its burden of demonstrating that the requirements of Rules B and E are satisfied." *See* Mediterranea di Navigazione S.p.A. v. Int'l Petrochemical Group S.A., 2007 U.S. Dist. LEXIS 35869 (S.D.N.Y. 2007).  "[T]he plaintiff has the burden to show that the attachment should not be vacated, and at the hearing the defendant can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the pleading." *See* Dolco Investments, Ltd., Cypress v. Moonriver Developments Ltd., 486 F. Supp. 2d 261, 265-256, (S.D.N.Y. 2007); *see also* Supplemental Rule E(4)(f) Advisory Committee's Note.

"[M]aritime attachment represents an exception to the general rule that in the absence of statutory authorization a plaintiff may not have security for his claim until it is established and

7

reduced to judgment." *See* Thyssen Steel Corporation v. Federal Commerce & Navigation Co.,
274 F. Supp. 18, 21 (S.D.N.Y. 1967). However, in recognition of this departure from the general
rule, a district court has considerable oversight and inherent authority to review the propriety of
such matters. The district court has "discretion to set aside an unfair attachment." *See* Western
Bulk Carriers (Australia), Pty. Ltd. v. P.S. International, Ltd., 762 F. Supp. 1302, 1309 (S.D.
Ohio 1991). "The inherent power to adapt an admiralty rule to the equities of a particular
situation is entrusted to the sound discretion of the district judge." *See* Greenwich Marine, Inc.
v. S.S. Alexandria, 339 F. 2d 901, 905 (2d Cir. 1965). "The district court has wide discretion in
determining whether equitable relief in admiralty cases is appropriate." *See* Mullane v. Adele
Chambers, 438 F.3d 132, 138 (1st Cir. 2006).

## POINT II

### PLAINTIFF'S ALLEGED EVIDENCE OF ALTER EGO AS AGAINST HAREC IS INSUFFICIENT TO SUSTAIN THE ATTACHMENT

#### A.    The Alter Ego Standard

"[T]he first issue under the *Aqua Stoli* standard is whether plaintiff has shown that it has a
valid prima facie admiralty claim against the defendant. The standard most commonly applied in
a Rule E(4)(f) analysis is that the plaintiff must demonstrate that 'reasonable grounds' exist for
the attachment." *See* Williamson v. Recovery Ltd. Partnership, 2007 U.S. Dist. LEXIS 4438, 4-5
(S.D.N.Y. 2007) *citing* Ullises Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318, 322-
23 (S.D.N.Y. 2006), overruled on other grounds by Aqua Stoli, 460 F.3d at 445. Because CNAN
cannot demonstrate 'reasonable grounds' for issuance of the attachment, this Court should vacate
the attachment.

CNAN's claims, as alleged in its Verified Complaint, arise from an alleged breach of a

8

charter party with Igen Sea. HAREC was not a party to the CNAN – Igen Sea charter party

contract. Contrary to CNAN's baseless allegation, HAREC was not "doing business as Igen Sea

Shipping". *See Hashwani Decl.¶ 7.* HAREC may not be held liable for Igen Sea's alleged

breach of this contract and also cannot be compelled to arbitrate disputes which arise under the

charter party.

CNAN is attempting to obtain security from HAREC for its arbitration claim against Igen

Sea. However, HAREC has not been named as a party in that arbitration and has not agreed to

arbitrate with CNAN. *See Hashwani Decl. ¶ 10.* HAREC has not entered into a charter party

with CNAN, is not bound by the terms of the charter party between CNAN and Igen Sea, or by

the arbitration agreement contained therein, or by any award pursuant to the arbitration. As a

result, CNAN should not be allowed to attach HAREC's property for any potential award,

which, in any event, is not possible due to the operation of the time bar therein, issued under the

CNAN - Igen Sea charter party.

Under federal common law, a party's corporate status may be ignored and liability

imposed on another corporate entity or the principals, upon a clear showing of an interconnected

organization used to perpetrate a fraud *or* where one entity or individual(s) can be shown to have

so dominated the other that it was, in effect, carrying on the business of the other. *See* Kirno Hill

Corp. v. Holt, 618 F.2d 982, 985 (2d. Cir. 1980). It is well established in the law that there is a

strong presumption *in favor* of corporate separateness. *See* American Renaissance Lines, Inc. v.

Saxis Steamship Co., 502 F.2d 674, 677 (2d Cir. 1974); *see also* Williams v. McAllister Bros.

Inc., 534 F.2d 19, 22 (2d Cir. 1976). "Absent findings of fraud or bad faith, a corporation . . . is

entitled to a presumption of separateness from a sister corporation . . . even if both are owned

and controlled by the same individuals." *See* American Renaissance Lines, Inc. v. Saxis

9

Steamship Co., 502 F.2d 674 at 677.  In this case, there is no plausible basis for CNAN to

contend that this Court should ignore the strong deference towards a finding of corporate

separation.

No precise test has been developed to determine whether one entity is the alter ego of

another.  To successfully plead an alter ego theory, the Plaintiff must show "actual domination,

rather than the opportunity to exercise control."  *See* De Jesus v. Sears, Roebuck & Co., 87 F.3d

65, 69 (2nd Cir. 1996).   In MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC,

268 F.3d 58 (2001), the Second Circuit identified a number of factors that may be considered

when determining whether the corporate veil may be pierced:

> (1) disregard of corporate formalities, (2) inadequate capitalization,
> (3) intermingling of funds, (4) overlap in ownership, officers,
> directors, and personnel, (5) common office space, address and
> telephone numbers of corporate entities, (6) the degree of
> discretion shown by the allegedly dominated corporation, (7)
> whether the dealings between the entities are at arm's length, (8)
> whether the corporations are treated as independent profit centers,
> (9) the payment or guarantee of debts of the dominated corporation
> by the dominating entity, and (10) intermingling of property
> between entities.

*See* MAG Portfolio, 268 F. 3d at 63.

As will be demonstrated below, a review of the MAG Portfolio factors shows that

CNAN has not established a basis upon which the corporate veil may be pierced in this

case.

### B.    Plaintiff's Inadequate Alter Ego Evidence

The Ex Parte Order obtained by CNAN against HAREC was based on Plaintiff's

erroneous and misleading allegations that HAREC and Igen Sea are related companies.

However, CNAN has not shown (nor can it show) that HAREC and Igen Sea have any common

10

employees, officers or directors.  Moreover, CNAN has not put forth sufficient evidence that HAREC and Igen Sea are related companies, partners, or joint venturers.  HAREC and Igen Sea do not share office space, bank accounts, or employees.  HAREC and Igen Sea did not participate in any joint partnership or joint venture relating to the CNAN – Igen Sea charter party.

CNAN alleges "upon information and belief" that Igen Sea "has no independent existence, corporate or otherwise, as an entity entitled to limited liability under Pakistani law." *See Plaintiff's Complaint at* ¶*16.*   CNAN further alleges, "[t]he Securities and Exchange Commission of Pakistan ("SECP"), which is the regulatory body that maintains a single register for all Registered Companies in Pakistan under the Companies Ordinance, 1984 - whether they be private, public or publically listed - does not have any record or listing under the name 'Igen Sea Shipping.'"  *Id.*

Apparently unappreciated, or unknown by CNAN, is the fact that HAREC and Igen Sea are separate sole proprietorships which doe not come within the purview of the SECP, which is a regulatory body for private, public and/or publically listed companies in Pakistan. *See Hashwani Decl.* ¶ *14.*  Presently, there is no central body in Pakistan similar to the SECP which registers sole proprietorships. *Id.*  Moreover, as both Igen Sea and HAREC are sole proprietorships, the words "Limited" or "Private" do not appear in HAREC's or Igen's company names.  CNAN's suggestion that this is a key absence of corporate form is completely unfounded.  Because sole proprietorships are owned by individuals, Igen Sea and HAREC are not "private limited companies" and not required to including the word "Private" in their company names.  Therefore, CNAN's allegations that Igen Sea has no independent identity because it is not listed with the SECP and because its company name does not include the word "Private" are simply

11

wrong.

CNAN also attempts to find support for its alter ego claim based on its allegation that "upon information and belief, there is no record in the database of National Tax Numbers maintained by the Government of Pakistan's Central Board of Revenue ("CBR") to indicate that an entity named 'Igen Sea Shipping' is registered as an income tax assessee in Pakistan." *See Plaintiff's Complaint at ¶18.*   However, because the government of Pakistan does not require national tax numbers this contention is similarly without merit. *See Hashwani Decl.¶ 16; see also article from Business Recorder, Karachi, Wednesday, April 16, 2008, attached hereto as Exhibit 13.*

CNAN attempts to convince this Court that Igen Sea and HAREC are related companies because a visit to Igen Sea's business address shows no evidence of a "going business concern" (such term of art not being explained by CNAN) being conducted at that location. *See Plaintiff's Complaint at ¶19.* However, even if this were so, which is not admitted, it is unknown why this would mean that HAREC is doing business as Igen Sea. Using CNAN's reasoning, if Igen Sea is not in business ("no evidence of a going business concern") then HAREC cannot be doing business as Igen Sea. Notwithstanding the foregoing, Igen Sea has a business address of Iftikhar Chambers, Hasrat Mohani Road, Karachi, Pakistan. *See Hashwani Decl. ¶ 6.* However, HAREC notes that Igen Sea is the only unit in Iftikhar Chambers which has it entrance from the Hasrat Mohani Road. All other offices in Iftikhar Chambers have their entrance through Altaf Husain Street. *See Hashwani Decl.¶ 17.* CNAN does not inform this Court the source(s) of information upon which it looked into Igen Sea and/or the familiarity, if any, of those souce(s) with Pakistani businesses and/or the Iftikhar Chambers. It is apparent that CNAN's surmise and conjecture widely misses the mark in this respect.

CNAN further alleges that "HAREC has made freight, partial demurrage and brokerage commission payments, and has paid port expenses with respect to the Vessel under the Charter at issue, even though, under the terms of the contract, those obligations rest with Igen." *See Plaintiff's Complaint at ¶18.* However, this does not support its alter ego argument, as any and all transactions between HAREC and Igen Sea were done at arm's length and for commercially legitimate and separate business purposes. CNAN cannot sustain its burden to show otherwise.

HAREC entered into a contract with Igen Sea on terms identical, except for freight commission, to that which Igen Sea had entered into with CNAN for chartering of the Vessel. *See Exhibit 5; see also letter from Igen Sea to HAREC dated November 19, 2005 attached hereto as Exhibit 14.* HAREC therefore could be obligated by Igen Sea to make payment due from Igen Sea to CNAN Sea albeit this could only be done at the direction of Igen Sea. HAREC could not itself lawfully ignore the existence of its contract with Igen Sea much as CNAN may not lawfully ignore the existence of its contract with Igen Sea.

After cargo was loaded onto the Vessel, Igen Sea advised HAREC that it was having difficulty in meeting its obligations under the charter party as it could not make timely freight payments to CNAN under the charter party. Igen Sea thus requested that HAREC make direct payments due and owing to it under the Fixture Recap directly to CNAN. *See Hashwani Decl. ¶ 18; see also Exhibit 6.* Igen Sea also requested that HAREC make direct payments of the commissions due to Helmgale and Oceanic and to pay the charge of the Karachi and discharge port agents. *See Hashwani Decl. ¶ 20; see also Exhibit 6.* In order to protect its interest in the cargo, and its rights under the Fixture Recap, HAREC remitted its freight payment due to Igen Sea directly to CNAN. *See Hashwani Decl. ¶ 20.* By operation of the back-to-back charter parties, Igen Sea, as disponent owner of the Vessel, owned this money to CNAN and thus Igen

13

Sea, and not HAREC, requested that HAREC simply tender payment directly to CNAN and to the brokers.

This transaction is nothing more than a simplified mechanism whereby Igen Sea sought to satisfy its obligation to CNAN via a crediting of an account receivable directly from HAREC. Igen Sea was not seeking to have HAREC pay its debts, or vice versa. *See Hashwani Decl.¶ 22.* CNAN obviously had no qualms otherwise with this arrangement since it accepted without reservation, or protest, HAREC's payment although HAREC was not in direct contractual privity with CNAN.

Yet, CNAN now hypocritically is heard to complaint that "HAREC directed payments allegedly due from Plaintiff to Igen Sea under the Charter to be paid to a bank account in Karachi whose beneficiary was stated to be HAREC." *See Plaintiff's Complaint at ¶ 26.* Pursuant to the terms of the charter party, HAREC was entitled to receive 1¼% of the freight commission. *See Exhibit 1.* Under the terms of the Fixture Note, Igen Sea owed this money to HAREC and thus Igen Sea, not HAREC, requested that CNAN simply tender payment to HAREC. *See email correspondence from Igen Sea to Oceanic, dated April 18, 2006, attached hereto as Exhibit 15.* Again, this was simply a simplified mechanism of payment and does not provide evidence of an alter ego relationship between Igen Sea and HAREC. This arrangement is entirely consistent with the manner in which Igen Sea also requested that HAREC make payments to CNAN.

CNAN has also alleged that "HAREC accepted, without reservation or any indication that it was acting solely in a representative capacity, communications with respect to the operation as though it was, in fact, the charterer of the Vessel instead of Igen Sea Shipping." *See Plaintiff's Complaint at ¶ 27.* HAREC disputes these allegations as all communications to CNAN were made through Igen Sea through Igen Sea's broker, Oceanic. *See Hashwani Decl. ¶*

14

*23.*

Using the <u>MAG Portfolio Consultants</u> factors as a guide, it is noteworthy to consider the evidence that CNAN has <u>not</u> furnished in support of its alter ego allegation against HAREC:

1.    Failure to follow corporate formalities;[3]

2.    Inadequate or under capitalization;

3.    Commingling of corporate and personal funds;

4.    Commonality (e.g. shared office space, address, telephone number, employees, officers or directors);

5.    Lack of Igen Sea autonomy;

6.    Failure to deal at arm's length;[4]

7.    HAREC's use of Igen Sea as a "profit center";

8.    Use of Igen Sea to pay debts of HAREC;

9.    Use by Igen Sea of HAREC's property as if it were Igen Sea's property;

10.    Any financial evidence linking Igen Sea and HAREC; or

11.    Any representations made by HAREC to CNAN, or any other third party, that it was the party responsible for Igen Sea's debts.

CNAN's alter ego allegations are insufficient to establish HAREC and Igen Sea are related companies. The Verified Complaint contains nothing beyond mere conjecture and speculation, rather than any <u>actual evidence</u> showing any linkage between HAREC and Igen Sea that would serve to support a finding by this Court that the corporate veil may be pierced.

CNAN also alleges that HAREC and Igen are related companies based on fraud. CNAN alleges:

---

[3] Pakistani, and not U.S., corporate requirements would be relevant to such an analysis.
[4] The freight commission paid to Igen Sea demonstrates that it received consideration under the Igen Sea-HAREC Fixture Recap.

15

> Upon information and belief and, in the alternative, the name Igen Sea Shipping has been used and interposed by HAREC as a trade or fictitious name as an artifice to divert and defraud lawful creditors of HAREC and is an attempt to improperly insulate HAREC from debts incurred for its ultimate benefit.

*See Plaintiff's Complaint at ¶23.* When a plaintiff pleads an alter ego theory on the basis of fraud, those allegations must meet the particularity requirements of Federal Rules of Civil Procedure, Rule 9(b). FRCP 9(b) provides, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

> Federal Rules of Civil Procedure 9(b) sets forth a heightened pleading standard for allegations of fraud: In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. In order to comply with Rule 9, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2006). CNAN has failed to meet its burden as it has only put forth conclusory allegations "based upon information and belief" of any alleged attempts to defraud. However, CNAN has not adequately stated with particularity any statements or actions which it contends were fraudulent. Further, even if this were so, which it is not, CNAN accepted the HAREC payments in satisfaction of Igen Sea's debt to CNAN and it is hard to understand why CNAN should be permitted to simultaneously enjoy, and then complain, about such fraudulent business practices.

Importantly, these same kind of allegations have previously been litigated before this Court . *See* Salam International Transport & Trading Co. v. Igen Sea Shipping and Hassan Ali Rice Export Co., 06 Civ. 2841 (RMB) (May 25, 2006). In that case, Judge Berman, in considering the exact same issue, found that the plaintiff had failed to offer sufficient evidence

16

that HAREC and Igen Sea were alter egos. Judge Berman, after considering all the evidence, found that "Plaintiff had not presented enough evidence of reasonable grounds for piercing the corporate veil." Id. at 4. This is because HAREC and Igen Sea are not alter egos. As is the case here, Judge Berman found that "there [was] no evidence (i.e. no reasonable grounds to believe) that [HAREC] is Igen Sea's alter ego. For example, there was no evidence that Igen Sea lacked the 'formalities and paraphernalia that are part and parcel of the corporate existence'; 'no evidence that there was any 'overlap in ownership, officers, directors, and personnel' between Igen Sea and Hassan Ali." Id.; quoting Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 993 F.2d 131, 139 (2nd Cir. 1991); DeJesus v. Sears, Roebuck & Co., Inc. 87 F.3d 65, 70 (2nd Cir. 1996). *See copy of decision and order in Salam International Transport & Trading Co. v. Igen Sea Shipping and Hassan Ali Rice Export Co. attached hereto as Exhibit 16.*

Accordingly, CNAN has alleged insufficient and inadequate evidence of an alter ego relationship between Igen Sea and HAREC. CNAN has not established a basis upon which the corporate veil may be pierced in this case and therefore has failed to meet its burden of proof to sustain the attachment against HAREC.

### C.   CNAN's Alter Ego Allegation Should be Dismissed

CNAN has offered virtually no evidence to support its alter ego allegation. Such deficient pleading and evidentiary showing is insufficient for a federal court sitting in admiralty to disregard the corporate veil. *See* Status International S.A. v. M&D Maritime Ltd., 994 F. Supp. 182, 186 (S.D.N.Y. 1998). CNAN cannot sustain its burden of sustaining its attachment under the law established in the Second Circuit for assessing alter ego liability. There is a complete absence of any showing by CNAN regarding commonality of ownership, management, personnel, premises, failure to deal at arm's length, or any of the other alter ego indicia against

17

HAREC.  This was the case at the time the attachment was obtained and it is the case now.

When presented with such a deficient alter ego case –  essentially an utter absence of any arguable claim or *prima facie* basis that HAREC and Igen Sea are indistinguishable – the Court should properly act to vacate the attachment.  *See* Isbrandtsen Co., Inc. v. Henry P. Lenaghan, 1955 AMC 80 (S.D.N.Y. 1955).  CNAN is incapable of providing any sufficient evidence in support of its allegation of an alter ego relationship between Igen Sea and HAREC.

CNAN has failed to establish any probable cause that HAREC is the alter ego of Igen Sea and thus its Rule B attachment should be vacated.

18

## CONCLUSION

For all of the foregoing reasons, CNAN's attachment should be vacated as against HAREC at CNAN's cost and expense. CNAN should also be ordered to pay HAREC interest on the attached funds at the prevailing rate for 28-day U.S. Treasury obligations from the date the funds were restrained until they are released if the funds have not otherwise been deposited into an interest-bearing account at the garnishee banks. HAREC also respectfully requests that this Court grant it such other and further relief as it deems just and equitable.


Dated: New York, NY
      June 20, 2008


                    LENNON MURPHY LENNON, LLC
                    Attorneys for Defendant
                    HASSAN ALI RICE EXPORT CO.

By:                _Anne C. LeVasseur_
                    Kevin J. Lennon (KL5072)
                    Anne C. LeVasseur (AL3333)
                    The Graybar Building
                    420 Lexington Avenue, Suite 300
                    New York, New York 10170
                    Phone: (212) 490-6050
                    Fax:   (212) 490-6070
                    kjl@lenmur.com
                    acl@lenmur.com

## AFFIRMATION OF SERVICE

I hereby certify that on June 20, 2008 a copy of the foregoing MEMORANDUM OF

LAW IN SUPPORT OF MOTION TO VACATE MARIRIME ATTACHMENT was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing.  Parties may access this filing through the

Court's CM/ECF system.

By: _____
            Anne C. LeVasseur

EXHIBIT 1

| 1 Shipbroker | RECOMMENDED |
|---|---|
| OCEANIC SHIPPING & TRADING CO.<br>MARINE PRIDE BUILDING, SUITE # 402,<br>P/NO. BC-2, BLOCK-7, K.D.A. SCHEME-5<br>KARACHI | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON"                                            Part I |

| 2 Place and date |
|---|
| KARACHI - 07-11-2005 |

| 3 Owners/Place of business (Cl.1) | 4 Charterers/Place of business (Cl.1) |
|---|---|
| CHAN GROUP SPA<br>QUAI NO 09 NOUVELLE GARE MARITIME<br>ALGER GARE | IGEN SEA SHIPPING<br>GROUND FLOOR, IFTIKHAR CHAMBERS, HASRAT MOHANI<br>ROAD, KARACHI 74000 |

| 5 Vessel's name (Cl.1) | 6 GT/NT (Cl.1) |
|---|---|
| MV "ANI CUSSERA" | 18784 / 18528 |

| 7 DWT all told on summer load line in metric tons (abt.) (Cl.1) | 8 Present position (Cl.1) |
|---|---|
| 30,197 M2 / 10.660 M | OFF PORT KARACHI |

| 9 Expected ready to load (abt.) (Cl.1) |
|---|
| 07TH NOVEMBER 2005 |

| 10 Loading port or place (Cl.1)<br>1-2SB(S) 1SP KARACHI, PAKISTAN | 11 Discharging port or place (Cl.1) :<br>2-3EBFA WEST AFRICA - DOULA - DAKAR RANGE<br>INTN DOULA A/O TEMA A/O ABIDJAN A/O LOME A/O CONAKRY<br>A/O COTONOU A/O FREETOWN A/O MONROVIA |

| 12 Cargo (also state quantity and margin in Owners' option, if agreed, if full and complete cargo not agreed state "part cargo" (Cl.1) |
|---|
| FULL LOAD BBD RICE SF MAX 52' AND BASIS 9.75 M SAILING DRAFT FROM KARACHI<br>(ABOUT 25,000 MT) |

| 13 Freight rate (also state whether freight prepaid or payable on delivery) (Cl.4) | 14 Freight payment (state currency and method of payment also beneficiary and bank account) (Cl.4) |
|---|---|
| USD 42.00 PMT SOS BASIS 1/3<br>FREE DIA ALL PORTS | SEE CLAUSE 28 |

| 15 State if vessel's cargo handling gear shall not be used (Cl.5) | 16 Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b) if total laytime for load. and disch., fill in c) only) (Cl.6) |
|---|---|
| N/A | NON-REVERSIBLE |

| 17 Shippers/Place of business (Cl.6)<br>HASSAN ALI RICE EXPORT CO<br>KARACHI - PAKISTAN | (a) Laytime for loading<br>2000 MTONS PWWD SHEX EIU |
|---|---|
| 18 Agents (loading) (Cl.6)<br>CHARTERERS AGENT BASIS FREE D/A TO OWNERS | (b) Laytime for discharging<br>1000 MTONS PWWD SHEX EIU |
| 19 Agents (discharging) (Cl.6)<br>CHARTERERS AGENT BASIS FREE D/A TO OWNERS | (c) Total laytime for loading and discharging. |

| 20 Demurrage rate and manner payable (loading and discharging) (Cl.7) | 21 Cancelling date (Cl.9) |
|---|---|
| USD 8,000/PDPR HDWTSBE<br>(SEE CLAUSE 46) | 10TH NOVEMBER 2005 |
|  | 22 General Average to be adjusted at (Cl.12)<br>LONDON |

| 23 Freight Tax (state if for the Owners' account. (Cl. 13(c)) | 24 Brokerage commission and to whom payable (Cl. 15) |
|---|---|
| SEE CLAUSE 49 | 5 PCT TOTAL COMMISSION TO BE DEDUCTED AT SOURCE ON<br>ON F/D/D |
| 25 Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>IN LONDON AND ENGLISH LAW TO APPLY |  |

| (e) State maximum amount for small claims/shortened arbitration (Cl.19) | 26 Additional clauses covering special provisions, if agreed |
|---|---|
| N/A | CLAUSE 27-53 |

It is mutually agreed that this Contract shall be performed subject to conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| CHAN GROUP SPA | IGEN SEA SHIPPING |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

Printed and sold by witherby Company Limited, 32/36 Aylesbury Street, London EC1R 0ET. Tel. No. 0171 251 5341. Fax No. 0171 254 4290<br>by authority of The Baltic and International Maritime Council, (BIMCO) Copenhagen.

C:23

PART II

"Gencon" Charter (As Revised 1922, 1876 and 1994)

It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that: 1–6

The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo is agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, as she may safely get and lie always afloat and there deliver the cargo. 7–15

**2. Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever. 16–25

**3. Deviation Clause**
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property. 26–33

**4. Payment of Freight**
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken/delivered quantity of cargo. 34–36

**5. Loading/Discharging**
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners.

**6. Laytime**
(a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and Holidays excepted, unless used, in which event time used shall count.

**7. Demurrage**
Demurrage at the loading and discharging ports is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.

**8. Lien Clause**
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

**9. Cancelling Clause**
(a) Should the Vessel not be ready to load (whether in berth or not) by the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.

**10. Bills of Lading**
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party.

**11. Both-to-Blame Collision Clause**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners.

**12. General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof.

**13. Taxes and Dues Clause**
(a) On Vessel – The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.

CHARTERES

14. **Agency**

15. **Brokerage**

16. **General Strike Clause**

17. **War Risks ("Voywar 1993")**

18. **General Ice Clause**

*Port of loading*

*Port of discharge*

19. **Law and Arbitration**  SEE CLAUSE No. 51

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

## CLAUSE 27

### ALL NEGOTIATIONS AND EVENTUAL FIXTURE TO REMAIN STRICTLY P&C

VESSEL DETAILS

Name :.MV  AIN OUSSERA.
Type : SLTRM SDBC
Built:..June 1983 / JAPAN.
Official Reg No :...IMO 8220321
Call Sign/Inmarsat No :...7TQV/ 460500481
Class Reg/Number/Notation :.B.V./900G73 /I 3- 3 BC Esp Deep Sea
Flag / Port of Reg :... Algerian/Algiers
Hull Underwriters : .Societe Algerienne D'assurances  (S.A.A.)
H&M Value :.. USD 3,125,000.00.
P&I Club :.. American Steamship Owners Mutual Association
Crew Nationality :Algerian
grt / nrt : 18784 / 10528
Loa / Lbp / Breadth / Depth:174.00 / 165.00 / 26.00 / 14.80 m.
Distance from water line to upper deck : 4.190 m.
Dead Weight /Draft :
Summer:.. 30,197 mt / 10.660 m / Tpc: 40.2.
Winter:.29,307 mt / 10.438 m
Tropical:..31,091 mt / 10.882 m
Holds / Hatches: 5 Ho/5 Ha Mac Gregor / folding type hatch
covers.

| Hold dim.(LxBxH). | | Hatch size |
|---|---|---|
| No l: | 11,56 x 12,18 m. | 20.40 x 17.50  x 13.20 m. |
| No 2/3/4/5: | 18,63 x 13,92 m. | 26.70 x 17.50  x 13.20 m. |

Strength (T/m2) : Upper Deck: 4.0 / Hatch Cover: 2.5.
AS PER CLASS REQUIREMENT CARGO DENSITY TO BE BELOW 1.78 FOR
HOLDS

Hold Capacity (m3):

| | No 1 | No 2 | No 3 | No 4 | No 5 |
|---|---|---|---|---|---|
| Grain: | 4,959.9 | 8,384.9 | 8,451.7 | 8,452.3 | 8,216.0 |
| Bale: | 4,811.1 | 8,206.8 | 8,238.8 | 8,263.6 | 8,065.4 |

Total  Grain / Bale: 38,464.80 / 37,630.50 m3

Gears / swl: 04 cranes x 25 T.

Main Engine : Sulzer type 6RLB66. Hp 9860

1

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

Speed / Consumption : ALL ABT
-at sea:  abt 12 knts on   ABT 25 mtpd Ifo 180 + 3 mtpd Mgo.
-at port:  IDLE abt 2 mt Mgo. / WW ABT 3 TPD MGO

Tank Capacity : Fo:1860 mt / Do: 243 mt / Fw: 287mt.

Last Dry Dock : April 2004.
next S.S. Due :  Oct. 2005.

ALL DTLS ABT N WOG

Holds/Hatches/Weather deck space without any obstacles: Yes
Vessel suitable for grab discharge: Yes
Vessel Grain fitted: Yes
Vessel ITF approved: Yes
Co2 fitted in holds: No
Vessel free from any encumbrances and/or any maritime lien: Yes

keel to highest point :45.80 m
waterline to highest point in fully ballast condition :39.00 m
waterline to highest point in light ballast condition :41.37 m
waterline to highest point in laden condition :35.14 m

waterline to top of hatchcoaming in fully ballast condition :
9.59 m
waterline to top of hatchcoaming in light ballast condition
:11.77 m
waterline to top of hatchcoaming in laden condition : 5.55 m

height of hatch above weather deck : 1.40 m
tanktop to underside of closed hatch covers :14.55 m
tanktop to underside weatherdeck :13.05 m

top of hopper to underside weatherdeck : 8.90 m
top of hopper to bottom of wing tanks  : 5.90 m

qty of constant on board  : 350 mt
qty of unpumpable bunkers : 30 m3
qty of unpumpable ballast : 200 mt

Cargo Exclusions :
Vessel to be employed in carrying lawful harmless cargo in bulk
of a density below 1.78 T/m3, excluding cement or sulphur
(allowed only in big bags).

2                                          *Oceanic Shipping & Trading Co*
                                                       *As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

Excluding dangerous and inflammable goods, hot briquetted iron
or direct reduced iron, live stock and scraps.

Excluding petroleum or its product, tar, asphalt, railway
wagons, nuclear materials, radioactive products, calcium
carbide, acids, creosoted goods, motor blocks and turnings
shavings, calcium hydrochloride, ammonium nitrate, nitrates
except fertilizer grade, arms, ferrosilicon, fish meal, copra,
quebracke extracts, hides, sunflower seeds, expellers, sponge
iron, raw asbestos , black powder, pitch in bulk and drums,
blasting caps, bombs (loaded or not), charcoal, feed weed ,meat,
bone meal, cotton, dangerous goods, IMO 3/4/5 goods. General
cargo, steel products and any heavy cargo to be loaded as per
permissible strength of vessel structure and according to Class
Reg. requirements.

Concentrates to be loaded in accordance with IMO regulation.

Transport of agricultural and forest products allowed providing
exportation of such products permitted by local Authorities.

Trading Limits.
Lawful trades via safe ports , safe berths, safe anchorages
always afloat always accessible (naabsa excluded) always within
International Warranty Limits within med - far east range only,

Excluding Cis ports, Australia, New Zealand, War or Warlike
zones.

## QUESTIONAIRE

1. General
Last updated: by:
1.1 Vessel - Ain Oussera
1.2 Previous Names - Cosmos Victory
1.3 Flag - Algerian
1.4 Construction date - 28.06.83
1.4 Construction place - Tsuneishi Shipbuilding Co. ltd Japan
1.5 Yard name and no. - tsuneishi shipbuilding nr 516
1.6 Official class register no. - BV N R 900G73
1.6 Lloyds number
1.7 Class of vessel - Bulk Carrier
1.8 Port of Registry - Algiers - Algeria
1.9 Owners - CNAN GROUP spa

3                                      *Oceanic Shipping & Trading Co*
                                                *As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

1.10 Managers - CNAN GROUP spa

2. Particulars - A
2.1 Vessel Type - Bulk Carrier
2.2 DWAT/Draft/Immersion
DWAT metric
Type Tons Draft TPI/TPC TYPE
Summer / 10.660 M / 30.197 MT / 40.2
Winter / 10.438 M / 29.307 MT / 40.0
Tropical / 10.882 M / 31.091 MT / 40.3
Fresh Water /10.893 M / 30.196 MT / 40.3
Tropical FW / 11.115 M / 31.072 MT / 40.5

2.3 Is vessel fitted for transit:
   Panama Canal - YES
   Suez Canal - YES
   St Lawrence Seaways
2.4 Panama: State deadweight / cert is taken by panama canal to
   renew
2.5 Affect by bilge turn radius
2.6 St Lawrence: State deadweight / no
2.7 GT/NT
International / 18784 T / 10528 T
Suez / 19460.58 T / 16863.80 T
Panama / 15695 T
British
2.8 Length overall (meters) - 174.00 M
2.9 Length between perpendiculars - 165.00 M
2.10 Extreme breadth - 26.00 M
2.10 Depth moulded - 14.80 M
2.11 Distance form waterline to top of hatch:
   Fully loaded
   Full ballast (holds not flooded) - 9M 59
   Full ballast (holds flooded)
2. Particulars - B
2.12 Deballasting time / approx 300cm/h- 30hrs
2.13 Accepted loading rate
2.14 Distance from keel to:
   Hatch top - 20.00m
   Highest fixed point of vessel - 45.80 m
2.15 Capacity - Ballast tanks - 9172 cm
2.15 Capacity - Hold ballast - nil
Hold numbers - 05
2.16 Constants excl fresh water - 350 t
2.16 Daily fresh water consumption - frm 7 to 10 mt
2.16 Fresh water capacity - 460 cm

4

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

2.16 Capacity/production - evaporator - out of order

2.16 Normal fresh water reserve - 20mt

2.17 Fitted with shaft generator - no

2.18 Onboard electric supply - v/hz / 440 volts / 60 hz

2.18 Details of alternative supply / 24v batteries


3.1 Holds

A Number of holds / 05

B Holds free of obstruction / yes

C Capacity CUBM CBFT Grain/Bale

  38464.8 cm / 1358.384 cft - 37630.5 cbm / 1328.921 cbft

E Strengthened for heavy cargo Empty holds - nr 3

F Tanktop Steel - 17 mt / sm

G Corrugations

I Holds Co2 fitted / no

J Smoke detection / no

K Australian holdladders / yes

L Stowage calculator / yes

P Ventilation Air changes per hour / natural

3.2 Hatches

A Number of hatches / 10

B Make and type of hatchcovers / mac gregor

F Distance from bow to fore of 1st hold / 15m

G Distance from stern to aft of last hold / 59.0 m

H Vessel fitted with cement holes - yes


4. Speed and Consumption / 12 kts / 25 mt ifo / 3mt mgo

4.1 Beaufort Scale Douglas sea state - 3

  IFO MDO MGO

4.2 Bunker Grades / ifo: 180 cst/rme 25   mgo: 4,3 cst
      density 15dg c: 0.8547

4.3 Bunker capacities 100% / ifo: 1813 cm  mgo: 243 cbm

4.3 Bunker capacities 96% / ifo: 1813 cm   mgo: 210 cbm

4.4 Consumption port idle / ifo: nil    mgo: 2mt

4.4 Consumption port 8 hrs ww / 1mt

4.4 Consumption port 24 hrs /ifo: nil   gear wrking mgo:3mt

4.5 Engine make and type / ihi - sulzer type : 6rlb66

4.6 Max. output BHP/max. mco. 9860ps x 119rpm//cso: 9800ps x 106rpm


5. Bankers


6. Classification

6.1 Classification society / bureau veritas

6.2 Date of last special survey / may 04

6.3 Date of last annual survey / may 04

6.4 Vessel in enhanced survey program / yes bv

*Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

6.4 Date of last inspection / may 04

6.4 Date of next inspection / may 05 annual

6.5 Date of last drydock / may 04

6.5 Place of last drydock / chenxi shipyard, china

6.6 Pollution incidents, last 12 mos / none

6.6 Details of pollution incident / n/a

6.7 Groundings/collisions, last 12 mos / none

6.7 Details of grounding/collision / n/a

6.8 ISM certified / yes

6.8 Issued by / bureau veritas

6.8 Date of issue / 02 july 2004

6.8 Expiry date / 08 may 2009

6.8 Date of last audit / 28 may 2004

6.8 Date of next audit

6.8 Recommendations / none

6.8 DOC certified

6.8 Issued by / bureau veritas

6.8 Date of issue / 19 march 2004

6.8 Expiry date / 01 dec 2008

6.9 Date of last port state control / NOV 2004

6.9 Place of last port state control / RAVENNA, italy

6.10 Passed without detentions

6.11 Crew ITF covered

6.12 ITF number / none

6.12 ITF issue date / none

6.12 ITF expiry date / none

6.13 Certificates

   Issue date Last annual endorsement Expiry date

   Special survey

   Loadline / 27.09.04 / sept 04/ bv / 28 may 2009

   Safety equipment / 08 oct 04 / 08 oct 04 / bv / 07 dec 04

   Gear survey / 27 may 04 / 27 may 04/ bv

   Safety radio / 08 oct 04 / 08 oct 04 / bv / 07 march 05

   Int. oil pollution / 27 sept 04 / 27 sept 04 / bv / 28 may 09

   Deratisation / 21 may 04 - 20 nov 04

6.14 Recommendations to certificates / safety equipment

6.14 Recommendation details / batteries for life jacket to be changed

6.15 IMO registration number / 8220321

6.16 Expiry date of FMC certificate

6.17 ISPS CODE/CERTIFICATE / bv issue date 30.06.04

7. Communication

7.1 Call sign / 7tqv

7.2 Name of radio station / skanti

7.3 Inmarsat A phone number/mini-m phone nr : 00873 763011066/67

6

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

7.4 Inmarsat A fax number/mini-m fax nr: 00873 763011068

7.5 Inmarsat A telex number - none

7.6 Inmarsat C telex number/imn: 460500481/ rtlx: 58162

7.7 e-mail address / nil


8. Insurance

8.1 Hull and machinery insured value / usd 3,125,000.00

8.2 Name of Owners P and I insurers / american club

9. Crew

9.1 Number of crew / 28

9.2 Name of master /

9.2 Nationality of master / algerian

9.3 Nationality of officers / algerian + 01 burmese

9.4 Nationality of crew / algerian


10. Miscellaneous

10.1 Called at Far East Ports
   Called at When / may 04
   Called at Where / chengxi shipyard


10.2 Last 5 Cargoes

Cgo No Commodity

1    grain

2    cement

3    hbi

4    logs

5    steels


10.3 Fitted for carriage of grain in accordance
   with chapter IV Solas 1974 and amendments
   without requiring bagging With ends untrimmed

10.4 Number of holds which may be left slack
   without requiring bagging, strapping and
   securing / 1


11 Cargo Gear

11.1 Gear, make / ihi

11.1 Gear, type / crane

11.2 Number of cranes/derricks / 04 cranes


ada/wog


=OTHER VSLS OWNED/UNDER CONTROL OF OWNS/MANAGERS : www.cnan-dz.com
=PRESENT POSITION/LAST DISCH PORT/AGENTS FULL STYLE=ETA KARACHI=
AT KARACHI / KARACHI
=LAST THREE CARGOES WITH C/P DATES :

*Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

OWNS CONFIRM:

=VSL IS HIGHEST CLASSED LLOYDS 100A1 OR EQUIV, P+I COVERED
=VSL HAS NOT SUFFERED ANY GA DURING LAST TWO YEARS
=VSL WAS NOT DETAINED BY PORT STATE CONTROL IN LAST 2 YEARS DUE TO
NEGLIGENCE OR BAD MAINTENANCE.
=VSL IS NOT SOLD/WILL NOT BE SOLD FOR SCRAP DURING THIS VOYAGE
=VSL IS NOT CONTROLLED/OWNED/MANAGED BY ISRAELI INTERESTS

OWNERS HAVE PROVIDED FOLLOWING CERTIFICATES:

-CLASS
-PNI
-HNM
-CARGO GEAR

## CLAUSE 28

100 PCT FREIGHT LESS ADCOM / BROKERAGE / UNDISPUTED
DESPATCH AT LOAD TO BE PAID TO OWNERS WITHIN 5 BANKING DAYS
UPON COMPLETION OF LOADING AND AFTER S/R BS/L MARKED
"FREIGHT PAYABLE AS PER C/P".

FULL FREIGHT DEEMED EARNED UPON COMPLETION OF LOADING
DISCOUNTLESS AND NON-RETURNABLE VESSEL AND/OR CARGO LOST OR
NOT LOST. IF CHARTERERS NEED BILLS OF LADING MARKED
"FREIGHT PREPAID" THEN OWNERS TO ISSUE THE SAME AFTER
OWNERS BANK CONFIRMS THAT FREIGHT HAS BEEN RECEIVED.

FREIGHT RATE TO BE BASED UPON THE GROSS WEIGHTING UANTITY
AS PER B/L. BILLS OF LADING TO SHOW NET AND GROSS WEIGHT OF
CARGO LOADED.

FREIGHT TO BE REMITTED TO OWNERS NOMINATED BANK ACCOUNT AS
PER FREIGHT INVOICE.

## CLAUSE 29

CARGO TO BE LOADED AND STOWED FREE OF ANY LIABILITY AND
EXPENSE TO THE VESSEL / OWNERS AT THE AVERAGE RATE OF 2,000
METRIC TONS BASIS MIN 4 WORKING HOOKS PER WEATHER WORKING
DAY OF 24 CONSECUTIVE HOURS SUNDAY HOLIDAY EXCLUDED EVEN IF
USED. TIME FROM 12:00 HOURS SATURDAY OR ON A DAY PRECEEDING
HOLIDAY TO 08:00 HOURS MONDAY OR A DAY FOLLOWING HOLIDAY
NOT TO COUNT EVEN IF USED. PRO RATA IF VESSEL HAS LESS THAN
4 WORKING HOOKS.

*Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

NOTICE OF READINESS AT LOAD PORT TO BE TENDERED BY TLX OR CABLE OR IN WRITING WWWW PROVIDED VESSEL HAS ARRIVED AT CUSTOMARY WAITING PLACE DURING OFFICE HOURS I.E. BETWEEN 0900-1700 HOURS MONDAY-FRIDAY AND 0900-1200 HOURS ON SATURDAY.

TIME STARTS TO COUNT 24 RUNNING HOURS AFTER TENDERING N.O.R.

IN THE EVENT VESSEL ARRIVES AT THE LOAD PORT PRIOR TO COMMENCEMENT OF HER LAYDAYS IT IS UNDERSTOOD THAT SHE CAN ONLY TENDER HER N.O.R. ON THE FIRST LAYDAY UNLESS OTHERWISE AGREED BY CHARTERERS.

## CLAUSE 30:

OWNERS / MASTER TO SERVE NOTICE OF FIXING THEN FOLLOWED TO 24 HOURS DEFINITE NOTICE OF READINESS TO LOAD TO BE GIVEN TO CHARTERERS. IF 24 HOURS DEFINITE NOTICE OF READINESS NOT GIVEN THEN LAYTIME WILL BE DELAYED BY 24 HOURS.

## CLAUSE 31:

AT LOADING PORT VESSEL TO BE TENDERED WITH CLEAN, DRY AND SWEPT HOLDS FREE FROM RESIDUES OF PREVIOUS CARGOES AND FROM OBJECTIONABLE SMELLS. IF THIS IS NOT DONE, TIME STARTS TO COUNT 24 RUNNING HOURS AFTER SURVEYORS PASS HOLDS.

## CLAUSE 32:

KRAFT PAPER TO BE FOR CHARTERERS ACCOUNT AND TO BE LAID DOWN BY CHARTERERS SERVANTS AT CHARTERERS TIME AND EXPENSES. OWNERS TO CONTRIBUTE USD 2,500 LUMPSUM.

## CLAUSE 33:

CLEAN MATE'S RECEIPTS TO BE SIGNED FOR EACH PARCEL OF RICE WHEN ON BOARD, MASTER HAVING THE RIGHT TO REFUSE CARGO WHICH IS NOT CLEAN AND MASTER OR CHARTERERS AGENT ON HIS WRITTEN AUTHORITY TO SIGN "CONGEN BILL OF LADING" BILLS OF LADING IN ACCORDANCE THEREWITH ACCORDING TO MATE'S RECEIPTS. F.I.O.S. BILLS OF LADING TO BE ISSUED CLAUSED "FREIGHT PAYABLE AS PER CHARTER PARTY" BUT ONCE FREIGHT HAS BEEN RECEIVED IN OWNERS ACCOUNT, OWNERS AGREE FOR BILLS OF LADING TO BE MARKED "FREIGHT PAID" OR "FREIGHT PRE-PAID". BAGS REFUSED BY MASTER TO BE SUBSTITUTED WITH SOUND ONES BY CHARTERERS / SHIPPERS.

9            *Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
## CP DATED "07-11-2005"

### CLAUSE 34:

CHARTERERS HAVE THE RIGHT TO LOAD UPTO 3% EMPTY BAGS
CALCULATED ON THE NUMBER OF BAGS LOADED FREE OF CHARGE.
SEPARATE BILL OF LADING TO BE ISSUED FOR EMPTY BAGS.

### CLAUSE 35:

LATEST 5 DAYS FROM SAILING LOADING PORT, MASTER TO SEND FAX
OR CABLE OR EMAIL TO CHARTERERS STATING GROSS AND NET
QUANTITITES AND NUMBER OF BAGS STATED ON BILLS OFLADING AND
SAILING DATE.

UPON DECLARATION OF DISCHARGE PORT OWNERS / MASTER TO GIVE
FIRST APPROX NOTICE TO CHARTERERS A/O TO ANY OTHER PARTY
ADVISED BY CHARTERERS OF VESSEL'S ETA DISCHARGE PORT AND
EXPECTED DRAFT UPON ARRIVAL THERE FOLLOWED BY 5/3 DAYS
APPROXIMATE AND 24 HOURS DEFINITE NOTICE, WHICHEVER IS
POSSIBLE IN RESPECT OF THE DISTANCE FROM VESSEL'S
GEOGRAPHICAL POSITION AND DECLARED PORT OF DISCHARGE. IF 24
HOURS DEFINITE NOTICE IS NOT GIVEN THEN LAYTIME WILL BE
DELAYED BY 24 HOURS.

CHARTERERS TO BE KEPT WELL ADVISED ABOUT ANY ALTERATIONS OF
VESSEL'S POSITION AND OWNERS / MASTER TO COMMUNICATE TO
CHARTERERS THE DATE WHEN VESSEL LEAVES THE PREVIOUS PORT OF
CALL.

### CLAUSE 36:

IF UPON ARRIVAL OFF PORT OF LOADING THE VESSEL CANNOT ENTER
PORT DUE TO CONGESTION THE MASTER MAY TENDER NOTICE OF
READINESS BY RADIO, AND LAYTIME SHALL COMMENCE TO COUNT,
WHETHER IN PORT OR NOT, WHETHER IN BERTH OR NOT, WHETHER IN
FREE PRATIQUE OR NOT, WHETHER CUSTOMS CLEARED OR NOT, IN
ACCORDANCE WITH THE TERMS OF THIS CHARTER PARTY. IF, UPON
ENTERING PORT, VESSEL FAILS TO OBTAIN FREE PRATIQUE OR
CUSTOMS CLEARANCE OR IS FOR ANY OTHER REASON FOUND UNFIT TO
LOAD THE CARGO, THEN TIME NOT TO COUNT AS LAYTIME UNTIL
VESSEL COMMENCES LOADING OR EXPIRY OF 24 HOURS AFTER
TENDERING N.O.R. WHICHEVER LATER.

### CLAUSE 37:

10

# RIDER CLAUSES MV "AIN OUSSERA"
## CP DATED "07-11-2005"

NOTICE OF READINESS AT DISCHARGE PORT TO BE TENDERED BY TLX OR CABLE OR IN WRITING WWWW PROVIDED VESSEL HAS ARRIVED AT CUSTOMARY WAITING PLACE, DURING OFFICE HOURS (MONDAY-FRIDAY 09:00 - 17:00 AND SATURDAY 09:00 - 12:00 HOURS).

TIME TO COUNT 24 RUNNING HOURS AFTER TENDERING OF N.O.R.

CHARTERERS OPTION TO USE PORT(S) IN WEST AFRICA NON-GEOGRAPHICAL.

TIME TAKEN FROM ANCHORAGE TO DISCHARGE BERTH SHALL BE CONSIDERED PART OF THE VOYAGE AND SHALL NOT COUNT AS LAYTIME EVEN IF THE VESSEL IS ALREADY ON DEMURRGE.

### CLAUSE 38:

CARGO TO BE DISCHARGED FREE OF EXPENSE TO THE VESSEL AT THE AVERAGE RATE OF 1,000 METRIC TONS BASIS MIN 4 WORKING HOOKS PER WEATHER WORKING DAY OF 24 CONSECUTIVE HOURS, SUNDAYS HOLIDAY EXCLUDED EVEN IF USED. TIME FROM 12:00 HOURS SATURDAY OR ON A DAY PRECEDING HOLIDAY TO 08:00 HOURS MONDAY OR A DAY FOLLOWING HOLIDAY NOT TO COUNT EVEN IF USED.

AT ALL PORTS BOTH ENDS ANY BERTH USED TO BE "GOOD, SAFE AND ALWAYS AFLOAT".

### CLAUSE 39:

IF CARGO IS STOWED IN ALLEYWAYS, BUNKERS TANKS, DEEP TANKS OR OTHER AWKWARD PLACES OWNERS SHALL PAY THE EXTRA LABOUR COST OF LOADING AND DISCHARGING FROM SUCH PLACES AND SHALL ALLOW CHARTERERS ADDITIONAL DOUBLE LAYTIME FOR LOADING AND DISCHARGING, NO BAGS TO BE CUT FOR STOWAGE PURPOSES.

### CLAUSE 40:
SHIP TO GIVE FREE USE AT ALL TIMES BY DAY AND BY NIGHT OF POWER WINCHES, GEAR AND TACKLE IN GOOD WORKING CONDITION. ALSO FULL LIGHTS FOR NIGHT WORK ON DECK AND IN THE HOLDS, IF REQUIRED. ALL CARGO GEARS ABLE TO WORK AT ALL HATCHES SIMULTANEOUSLY AT ALL TIMES.

### CLAUSE 41:

SHIPPERS / RECEIVERS WILL BE PERMITTED TO LOAD AND DISCHARGE OUTSIDE ORDINARY WORKING PERIODS AND DURING EXCEPTED PERIODS, THE OWNERS PROVIDING FREE OF CHARGE ALL

11                                    *Oceanic Shipping & Trading Co*
                                                    *As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

VESSEL'S FACILITIES INCLUDING SERVICES OF OFFICERS AND
CREW. IN THE EVENT OF A BREAKDOWN OF GEAR / DERRICKS /
WINCHES BY REASON OF DISABLEMENT OR INSUFFICIENT POWER TIME
NOT TO COUNT. IF OWNERS INSTEAD ELECT TO WORK WITH SHORE
GEAR FOR THEIR ACCOUNT TIME TO COUNT IN FULL.

## CLAUSE 42:

IF PERMITTED BY LOCAL REGULATIONS / AUTHORITIES, FIRST
OPENING AND LAST CLOSING OF HATCHES, INCLUDING THE HANDLING
AND SHIFTING OF BEAMS AT BOTH ENDS TO BE CARRIED OUT BY
VESSEL FOR VESSEL'S ACCOUNT AND TIME NOT TO COUNT.

## CLAUSE 43:

LAYTIME NON-REVERSIBLE

## CLAUSE 44:

SHORE SIDE TALLY TO BE FOR CHARTERERS ACCOUNT BENDS. SHIP
SIDE TALLY DONE BY CREW TO BE FOR OWNERS ACCOUNT BENDS.

## CLAUSE 45:

DEMURRAGE/DESPATCH 8,000/- PDPR HALF DESPATCH, WORKING TIME
SAVED AT BOTH ENDS.

DEMURRAGE/DESPATCH, IF ANY, TO BE SETTLED WITHIN 20 DAYS
AFTER COMPLETION OF DISCHARGE AND SUBMISSION OF OWNERS
LAYTIME CALCULATION FOR DEMURRAGE WITH SUPPORTING DOCUMETNS
DULY SIGNED BY MASTER AND AGENTS AT BOTH ENDS AND AGREEMENT
THEREOF.

## CLAUSE 46:

CHARTERERS AGENT BENDS BASIS FREE D/A BENDS.

AT LOAD PORT:
OCEANWORLD (PRIVATE) LIMITED
EMAIL: owpl@fascom.com / oceanworld@cyber.net.pk

## CLAUSE 47:

*Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

AT 2ND DISCH PORT, VESSEL TO TENDER N.O.R. AS PER RIDER CLAUSE 37.

### CLAUSE 48:

CHARTERERS HAVE THE OPTION TO FUMIGATE THE CARGO ON BOARD THE VESSEL AS PER CUSTOM OF THE PORT AT CHARTERERS TIME AND EXPENSE, INCLUDING HOTEL ACCOMMODATION FOR CREW SHOULD REMOVAL OF CREW BE REQUIRED BY FUMIGATION OR LOCAL AUTHORITIES. IN ANY CASE, CHARTERERS WILL BE ALLOWED TO SPRAY THOSE EMPTY HOLDS TO BE USED FOR CARRIAGE OF THE RICE PIOR TO LOADING SAME, ALWAYS UNDER MASTER'S SUPERVISION IN ACCORDANCE WITH RECOMMENDATIONS / REGULATIONS AND/OR LOCAL AUTHORITIES AND TIME NOT TO COUNT AS LAYTIME. AFTER FUMIGATION OF HATCHES ON COMPLETION OF LOADING CARGO, HATCHES TO REMAIN CLOSED FOR 48 – 72 HRS AS NECESSARY DURING THE VOYAGE AFTER WHICH MASTER WILL OPEN THEM FOR VENTILATION SUBJECT TO WEATHER CONDITIONS.

### CLAUSE 49:

ALL TAXES AND / OR DUES AT LOAD AND DISCHARGE PORT ON VESSEL AND/OR FLAG AND / OR OWNERSHIP AND/OR FREIGHT TO BE FOR OWNERS ACCOUNT.

ALL TAXES AND/OR DUES AT LOAD AND DISCHARGE PORT ON CARGO TO BE FOR CHARTERERS ACCOUNT.

OVERAGE PREMIUM TO BE FOR CHARTERERS ACCOUNT, OWNERS TO CONTRIBUTE USD 2,500/ LUMPSOM.

### CLAUSE 50:

OVERTIME FOR THE ACCOUNT OF PARTY ORDERING THE SAME. IF ORDERED BY PORT AUTHORITIES SAME TO BE FOR CHARTERERS / SHIPPERS / RECEIVERS ACCOUNT.

OFFICERS AND CREW OVERTIME ALWAYS FOR OWNER'S ACCOUNT.

### CLASUE 51:

THE FREIGHT RATE UNDER THIS CHARTER PARTY IS TO BE KEPT ENTIRELY CONFIDENTIAL FROM ALL THIRD PARTIES.

### CLASUE 52:

13                                    *Oceanic Shipping & Trading Co*
                                          *As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
## CP DATED "07-11-2005"

VESSEL TO BE LEFT IN SEAWORTHY TRIM BETWEEN BERTHS / PORT
TO MASTER'S SATISFACTION.

FIRST SHIFTING BETWEEN BERTH(S) IF ANY TO BE FOR OWNERS
EXPENSES AND TIME NOT TO COUNT. BEYOND FIRST SHIFTING (IF
ANY) PORT SHIFTING CHARGES TO BE FOR CHARTERERS ACCOUNT AND
TIME TO COUNT. ANY SHIFTING DUE TO PORT CONVENIENCE TO BE
FOR CHARTERERS ACCOUNT TIME NOT TO COUNT.

### CLAUSE 53:

DISCHARGE PORT(S) TO BE DECLARED LATEST WITHIN 15 DAYS
AFTER COMPLETION OF LOADING.

CHARTERERS TO ENSURE THAT CARGO LOADED IS AS PER PORT
ROTATION.

### CLUASE 54:

OWNERS WARRANT THAT THE VESSEL IS OR WILL BE PRIOR TO
TENDERING ANY NOTICE OF READINESS, ELIGIBLE FOR TRADING TO
THE PORTS AND PLACES SPECIFIED FOR THE VOYAGE AND IN FULL
COMPLIANCE WITH ALL LAWS AND REGULATIONS OF ALL PORT
AUTHORITIES AND OF ALL OTHER GOVERNMENTAL AUTHORITIES
HAVING JURISDICTION AS INTERPRETED AND APPLIED BY SUCH
AUTHORITIES, WHICH APPLY TO THE VESSEL OR WHICH REGULATES
LOADING OR DISCHARGING AS CONTEMPLATED IN THIS CHARTER, ANY
TIME LOST BY FAILURE OF THE VESSEL TO MAINTAIN SUCH
ELIGIBILITY OR TO BE IN SUCH COMPLIANCE SHALL NOT COUNT AS
USED LAYTIME OR TIME ON DEMURRAGE.

ANY EXPENSES IN OBTAINING ELIGIBILITY OR TO COME INTO
COMPLIANCE OR INCURRED DUE TO NON-ELIGIBILITY OR NON-
COMPLIANCE SHALL BE FOR OWNER'S ACCOUNT.

OWNER'S WARRANT THAT THE VESSEL HAS NOT ENTERED AND WILL
NOT ENTER ANY PORT IN VIOLATION OF ANY APLICABLE
RESTRICTIONS OF GOVERNMENT HAVING JURISDICTION.

OWNERS AND/OR THEIR PNI TO PUT UNDERTAKING / GUARANTEE AT
LOME FOR EVENTUAL SHORTAGE CLAIM, HOWEVER CHARTERERS WILL
TAKE CARE AND FACILITATE OWNERS BY PUTTING GUARANTEE OR
CASH SETTLEMENT WITH REGARDS TO ANY EVENTUAL CUSTOMS FINES
DUE TO EVENTUAL SHORTAGES, WHICH WILL BE SETTLED LATER
DIRECTLY WITH OWNERSW AMICABLY.

14

*Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

### CLAUSE 55:

VESSEL TO BE IN POSESSION OF A VALID CERTIFICATE OF EFFICIENCY FOR WINCHES AND DERRICKS FOR THE DURATION OF THE ENTIRE CHARTER.

### CLAUSE 56:

OWNERS WARRANT THAT THE VESSEL IS COVERED BY A VALID INSURANCE POLICY IN RESPECT OF OIL POLLUTION RISKS AND THAT SHE CARRIES ON BOARD INSURANCE CERTIFICATE AS DOCUMENTARY EVIDENCE THEREOF.

### CLAUSE 57:

NEW BOTH TO BLAME COLLISION CLAUSE, NEW JASON CLAUSE, PANDI CLUB BUNKER CLAUSE, GENERAL PARAMOUNT CLAUSE & BIMCO ISM CLAUSE, ARE DEEMED TO BE INCORPORATED IN THIS CHARTER PARTY.

CHARTERERS WILL IN ALL RESPECT ASSIST OWNERS TO SOLVE THE PROBLEMS WITH STEVEDORES IN CASE OF STEVEDORING DAMAGE TO SHIP'S HULL AND OR CARGO GEAR / SUPERSTRUCTURES.

### CLAUSE 58:

THIS CHARTER PARTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING OUT OF THIS CHARTER PARTY SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION ACTS 1950 AND 1979 OR ANY STATUTORY MODIFICATION OR RE-ENECTMENT THEREOF FOR THE TIME BEING IN FORCE. UNLESS BOTH PARTIES AGREE UPON A SOLE ARBITRATOR, ONE ARBITRATOR SHALL BE APPOINTED BY

EACH PARTY AND THE ARBITRATORS SO APPOINTED SHALL APPOINT A THIRD ARBITRATOR. THE DECISION OF THE THREE-MAN TRIBUNAL THUS CONSTITUTED OR ANY TWO OF THEM SHALL BE FINAL.

ON THE RECEIPT BY ONE PARTY OF THE NOMINATION IN WRITING OF THE OTHER PARTY'S ARBITRATOR, THE PARTY SHALL APPOINT THEIR ARBITRATOR WITHIN 14 DAYS, FAILING WHICH THE DECISION OF THE SINGLE ARBITRATOR APPOINTED SHALL BE FINAL.

ANY CLAIM MUST BE MADE IN WRITING AND CLAIMANT'S ARBITRATOR APPOINTED WITHIN 12 MONTHS OF FINAL DISCHARGE AND WHERE THIS PROVISION IS NOT COMPLIED WITH, THE CLAIM / DISPUTE,

*Oceanic Shipping & Trading Co*
*As Brokers only*

# RIDER CLAUSES MV "AIN OUSSERA"
# CP DATED "07-11-2005"

WHETHER PERTAINING TO LIABILITY OR QUANTUM OR BOTH SHALL BE DEEMED TO BE EXTINGUISHED AND CEASE TO EXIST.

### CLAUSE 59:

IN THE EVENT OF ORIGINAL BILL(S) OF LADING ARE DELAYED AND CAN NOT BE PRODUCED AT DISCHARGE PORT BY The RECEIVERS IN TIME PRIOR DISCHARGING THEN CHARTERERS WOULD REQUEST OWNERS TO RELEASE THE ENTIRE CARGO TO RECEIVERS AGAINST LETTER OF INDEMNITY AS PER OWENRS PANDI CLUB WORDING ON CHARTERERS LETTER HEAD SIGNED BY CHARTERERS. RECIVERS TO ALSO PROVIDE SEPARATE LOI.

### CLAUSE 60:

IF VESSEL IS DETAINED FOR OWNERS FAULT AT LOAD/DISCHARGE PORT THEN ALL TIME SO LOST NOT TO COUNT AS LAYTIME OR TIME ON DEMURRAGE.

### CLAUSE 61:

IF CARGO FOUND DAMAGED IN THE HOLDS THEN ALL EXPENSES TO SEPARATE THE CARGO TO BE FOR OWNERS ACCOUNT PROVIDED SAID DAMAGES ARE DUE TO VESESL FAULT DULY PROVEN BY SURVEY REPORT. ALL TIME LOST / USED NOT TO COUNT AS LAY TIME OR TIME ON DEMURRAGE.

### CLUASE 62:

VESSEL TO PROCEED DIRECTLY TO THE PORT OF DISCHARGE AS ORDERED WITHOUT CALLING ANY OTHER PORT / EN ROUTE EXCEPT FOR BUNKERING. NO OPTION FOR LOADING OTHER CARGO WHATSOEVER FROM LOAD PORT OR ANY OTHER PORT.

### CLAUSE 63:

MASTER / OWNERS TO DECLARE EXACT QUANTITY TO BE LOADED WITHIN 48 HOURS OF COMMENCEMENT OF LOADING.

**OWNERS**

**CHARTERERS**

16

EXHIBIT 2

# CNAN Group Spa

## ALGERIAN SHIP MANAGEMENT COMPANY Spa
### DIRECTION FRETEMENT

Fax (213 21 ) 42.31.15

ALGER LE :    11-Dec-05

Doit   IGEAN SEA SHIPPING

**CREDIT NOTE**    142/05

**CANCEL & REPLACE OUR CREDIT NOTE N° 140/05 ON 08/12/05**

| | | US Dollars DEBIT | US Dollars CREDIT |
|---|---|---|---|
| VSL NAME | AIN OUSSERA | | |
| CODE | 693.11.05 | | |
| C/P DATE | 7 November 2005 | | |
| TRADING | KARACHI / OUEST AFRICA | | |
| VGE | 1/2006 | | |
| **CASH TO MASTER AT KARACHI ON 08/12/2005** | US$ | | 30,000.00 |
| COMMISSION | 2.50   % | | 750.00 |
| **TOTAL AMOUNT** | | | |
| THIRTY THOUSAND AND SEVEN HUNDRED FIFTY US Dollars | | 0.00 | 30,750.00 |
| | **TOTAL** | 30,750.00 | |

LE CHEF DE DEPARTEMENT GESTION
FINANCIERE EXTERNE
R.HADDOU-HADJ

S/DIRECTEUR FRETEMENT
A.SAHNOUNI

EXHIBIT 3

# CNAN Group Spa

## ALGERIAN SHIP MANAGEMENT COMPANY Spa
### DIRECTION FRETEMENT

Fax (213 21 ) 42.31.15

ALGER LE :     11-Dec-05.

Doit   IGEAN SEA SHIPPING

**CREDIT NOTE**     142/05

**CANCEL & REPLACE OUR CREDIT NOTE N° 140/05 ON 08/12/05**

| | | US Dollars DEBIT | US Dollars CREDIT |
|---|---|---|---|
| **VSL NAME** | AIN OUSSERA | | |
| **CODE** | 953.11.06 | | |
| **C/P DATE** | 7 November 2005 | | |
| **TRADING** | KARACHI /OUEST AFRICA | | |
| **VGE** | 1/2005 | | |
| **CASH TO MASTER AT KARACHI ON 06/12/2005** | | US$ | 30,000.00 |
| **COMMISSION** | 2.50 | % | 750.00 |
| **TOTAL AMOUNT** | | | |
| **THIRTY THOUSAND AND SEVEN HUNDRED FIFTY US Dollars** | | 0.00 | 30,750.00 |
| | **TOTAL** | 30,750.00 | |

LE CHEF DE DEPARTEMENT GESTION
FINANCIERE EXTERNE
B.HADDOU-HADJ

S/DIRECTEUR FRETEMENT
A.SAHNOUNI

EXHIBIT 4

ANN. 3

# CNAN Group Spa

## ALGERIAN SHIP MANAGEMENT COMPANY Spa
### DIRECTION FRETEMENT

Fax (213 21 ) 42.31.15

ALGER LE :    11-Dec-05

Doit  IGEAN SEA SHIPPING

**INVOICE N°**              141/05

**CANCEL & REPLACE OUR INVOICE N° 138/05 ON 08/12/05**

|  |  | US Dollars | US Dollars |
|---|---|---|---|
|  |  | DEBIT | CREDIT |
| **VSL NAME** | AIN-OUSSERA | | |
| **CODE** | 083.11.05 | | |
| **C/P DATE** | 7 November 2005 | | |
| **TRADING** | KARACHI / OUEST AFRICA | | |
| **CARGO : BAGGED RICE** | | | |
| **GROSS WEIGHT  25 062 MT** | | | |
| **FREIGHT ; 42,00 USD/ MT** | | | |
| 25 062 TM at US$ 42,00 = | US$ | 1,052,604.00 | |
| **COMM. TTL.** | 5% | US$ | | 52,630.20 |
| **OWNERS CONTRIB.OVERAGE PREMIUM** | US$ | | 2,500.00 |
| **OWNERS CONTRIB.KRAFT PAPER** | US$ | | 2,500.00 |
| **TOTAL AMOUNT** | | | |
| NINE HUNDRED NINETY FOUR THOUSAND AND NINE HUNDRED SEVENTY | | 1,052,604.00 | 57,630.20 |
| THREE US Dollars  80 Cts | **TOTAL** | 994,973.80 | |

PAYABLE TO OWNER.' S BANK :
BANQUE ALGERIENNE DU COMMERCE EXTERIEUR TALACKER 41-CH 8001 , ZURICH SUISSE
ACCOUNT N° 000.200.000.6 USD IN FAVOUR OF CNAN Group / ASMC

LE CHEF DE DEPARTEMENT GESTION
FINANCIERE EXTERNE

B.HADDOU-HADJ

S/DIRECTEUR FRETEMENT

A.SAHNOUNI

EXHIBIT 5



# Igen Sea Shipping

Ground Floor Iftikhar Chambers
Hasrat Mohani Road, Karachi - 74000
Phone : 92-21-8345918 Email-igensea@igenseashipping.com

19TH NOVEMBER 2005

TO,
**HASSAN ALI RICE EXPORT COMPANY**
1ST FLOOR, COTTON EXCHANGE BUILDING,
I. I. CHUNDRIGAR ROAD,
**KARACHI.**

### Re: FIXTURE RECAP FOR M.V. "AIN OUSSERA"

- MV. AIN OUSSERA

- LOAD PORT 1- 2 SB(S) 1SP KARACHI PAKISTAN.

- DISCHARGE PORT 1 – 3 SBPA WEST AFRICA.

- CARGO: FULL LOAD (25000 MT) BAGGED RICE.

- FREIGHT US$ 42.00 PMT FIOS BASIS 1/3 – FREE D/A ALL PORTS.

- LAYTIME NON REVERSIBLE – LOADING 2000 MT PWWD SHEX EIU
  SAT-DAY BEFORE HOLIDAY NOON/MONDAY DAY AFTER HOLIDAY
  8 AM DISCHARGING – 1000 MT PWWD SHEX EIU.

- OUR COMMISSION 1¼% ON FREIGHT.

- OTHER RELEVANT TERMS AS PER DRAFT WORKING CHARTER
  PARTY.

FOR **IGEN SEA SHIPPING**

EXHIBIT 6



# Igen Sea Shipping

Ground Floor Iftikhar Chambers
Hasrat Mohani Road, Karachi - 74000
Phone : 92-21-8345918  Email-igensea@igenseashipping.com

Karachi, December 14, 2005

To,
**M/s. Hassan Ali Rice Export Co.,**
1st Floor, Cotton Exchange Building,
I. I. Chundrigar Road,
Karachi.

Dear Sir,

We invite your kind attention to Ocean Shipping & Trading Co's E-Mail dated 14/12/05
enclosing the revised invoices of CNAN Group SPA. Since we have difficulty in
arranging prompt payment, we shall be obliged if you will make direct payments to them
and also pay the 1¼% each to Helmgale Sarl and Ocean Trading & Shipping Co.,
Karachi. We shall also be obliged if you will pay the charges of the Karachi and
discharge port ship agents.

Thanks & Best Regards.

Yours faithfully,
For **Igen Sea Shipping**

EXHIBIT 7

# CNAN Group Spa

الشركة الجزائرية لتسيير البواخر ش.ذ.أ

## ALGERIAN SHIP MANAGEMENT COMPANY spa.

### DIRECTION FRETEMENT

ALGER LE  11/12/2005

## TELEFAX MESSAGE

**FROM** : CNAN I Group I ASMC I D.F.  FAX NBR: (021) 42.31.15

**TO** : HELMGALE SRL I ATT PAUL H.
00.33.4.67.58.95.45

**SUBJECT :** M/V Ain Oussera I IGEAN SEA SHIPPING C/P 07/11/05

**PAGES** : 04

PLS FORWARD THE ATTACHED DOCUMENTS TO CHARTS:
Mssrs IGEAN SEA SHIPPING.

Cancel & replace our invoice n° 138/05 , credit note n° 139/05,
Credit note n° 140/5 on 08/12/2005.

**INVOICE N° 141/05**

( 25 062 MT X US$ 42.00) less 5% Com. ............................US$  -  999,973.80
Owners contrib. overage premium: ...................................US$  -  2,500.00
Owners contrib. Kraft paper: ............................................US$  -  2,500.00

Total.......................US$  -  994,973.80

**CREDIT NOTE N° 142/05**
Cash to Master at Karachi on 06/12/2005 .....................US$  -  30,750.00
**CREDIT NOTE N° 143/05**
Cash to Master at Karachi on 08/12/2005.......................US$  -  43,152.50

Total Amount..........US$  -  921,071.30

We kindly request you to arrange remittance of USD 921,071.30 ( Nine
hundred twenty one thousand and seventy one US Dollars US 30 Cts)

To owners account:

- Account N° 000.200.000.0 USD
- IBAN: CH 23083460002000000US
- Bank Name Address : BANQUE ALGERIENNE DU COMMERCE
  EXTERIEUR TALACKER 41 – CH 8001, ZURICH SUISSE
- In favour of CNAN GROUP spa.

BEST REGARDS.

Directeur Frétement

B. BELABED

Spa au capital social de 100.000.000 DA
Siège Social : 74, Bd Mohamed V ALGER
Agence : 2 Quai N° 9 Nouvelle gare Maritime Alger Gare
BP 200 Alger Gare

Tél : 021.42.32.17
Fax : 021.42.31.23

EXHIBIT 8

1ST FLOOR, COTTON EXCHANGE BUILDING
I.I. CHUNDRIGAR ROAD·
KARACHI - PAK'STAN

Consignee

TO ORDER OF
HABIB BANK LIMITED
KARACH PAKISTAN

# NON-NEGOTIABLE

Notify address

SOC:ETE BARRY DE COMMERCE,S.A.
BP 3071 CONAKRY
BOUSSOURA DIMAFAM
REP. DE GUINEE

| Vessel | Port of Loading |
|---|---|
| M.V. AIN OUSSERA | KARACHI - PAKISTAN |

Port of discharge
CONAKRY - REP. OF GUINEA

FORM E NO: HBL 1723346

Shipper's description of goods

Gross weight

20.000 BAGS
1,000 MT PAKISTAN LONG GRAIN
WHITE RICE 2005-2006 CROP
25 PERCENT BROKENS

PACKING IN NEW SINGLE WOVEN
POLYPROPYLENE BAGS OF 50 KGS
NET EACH

SHIPPING MARKS
☆ ☆ ☆ ☆ ☆
PAKISTAN
LONG GRAIN
WHITE RICE
50 KGS NET
HASSAN PAK RICE
REAP NO. 2-1-91-1622

1,002,400 MT

NET WEIGHT
1,000.000 MT

CLEAN "ON BOARD"
BILL OF LADING

FREIGHT PREPAID

(of which 0 (NONE)    'on deck at Shipper's risk; the Carrier not
being responsible for loss of damage how-soever arising)



SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.

Weight, measure, quality, quantity, condition, contents and value unknown.

IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| | Place and date of issue KARACH 0 2 DEC 2005 |
|---|---|
| Number of original B3/L | Signature |
| | For OCEAN WORLD (PVT) LTD. |
| 03/THREE | As Agent |

Printed and sold by
Fr.G. Knuditrons-Bogtrykkori A/S, 55 Toldbodgade, DK-1259 Copenhagen K.
Telefax +45 33 93 11 84
by authority of the Baltic and International Maritime Council
(BIMCO), Copenhagen.

FOR ON BEHALF OF THE MASTER OF
THE VESSEL M.V. AIN OUSSERA

EXHIBIT 9

**DadaCom Intl**

14 MAR 20..

From:    "Amr Kana" <amrk@riceco.com>
To:      <supmark@africaonline.com.gh>; "Supermaritime Ghana Ltd" <supmargh@africaonline.com.gh>
Cc:      "John Lestingi" <Johni@riceco.com>; "Sebastien RAVINET" <sebastianr@riceco.com>;
         <samirs@riceco.com>; "Miguel Lima" <miguell@riceco.com>; <diegog@riceco.com>;
         <dadacom@dadacomintl.com>; <harec@hashgroup.com>; "amr kana" <amrk@riceco.com>
Sent:    Monday, March 13, 2006 9:15 PM
Subject: MV Ain Oussara at Takoradi .

TO: Supermaritime Ghana
Attn: Mr. Pobee

Dear Sir,

Reference is made to our various correspondences and to our MV Ain Oussara presently at anchorage in
Takoradi.

Please note that our bank (SG New York) has sent to your attention, original BLs covering 6800 MT of cargo
loaded on board the above mentioned vessel. Same was sent on Friday, March 10th 2006 with DHL n° 826.
5873 496 and should be delivered to your offices latest tomorrow Tuesday, March 14th 2006.

lease note that original BLs covering 2000 MT of rice cargo in favour of ESTF are already available at
discharge port and will be presented to master upon request.

Please advise vessel master accordingly and confirm to him that berthing shall take place now.
Kindly let us kow if master still refuses to bring vessel at quay enabling immediate discharge of cargo.

Looking forward to hearing from you.

Best Regards

Amr Kana
INTERCO (Suisse) S.A. /
The Rice Company (Suisse) S.A.
Direct: +4122 775 0003
Mobile: +4179 204 4773
Fax:    +4122 775 0001

EXHIBIT 10

## IGENSEA

From:     "Igen Sea Shipping" <igensea@igenseashipping.com>
To:       <helmgale@helmgale.fr>
Cc:       <farooq@ostc-group.com>; "Oceanic Shipping & Trading Co." <chartering@ostc-group.com>
Sent:     Wednesday, March 15, 2008 3:53 PM
Subject:  MV. AIN OUSSERA - BILLS OF LADING OF 6800 MT FOR TAKORADI.

TO: HELMGALE SARL/PAUL

CC: OCEANIC SHIPPING & TRADING CO.,

PLEASE REFER TO THE PRINTING ON THE FACE OF BILLS
OF LADING BOX WHICH STATES

"SHIPPED AT THE PORT OF LOADING IN APPARENT GOOD ORDER
AND CONDITION ON BOARD THE VESSEL FOR CARRIAGE TO THE
PORT OF DISCHRGE OR SO NEAR THERETO AS SHE MAY SAFELY
GET THE GOODS SPECIFIED ABOVE.

WEIGHT, MEASURE, QUALITY, QUANTITY, CONDITION, CONTENTS
AND VALUE UNKNOWN.

IN WITNESS WHEREOF THE MASTER OR AGENT OF THE SAID VESSEL
HAS SIGNED THE NUMBER OF BILLS OF LADING INDICATED BELOW
ALL OF THIS TENOR AND DATE, ANY ONE OF WHICH BEING
ACCOMPLISHED THE OTHERS SHALL BE VOID."

IT IS A CLEAR AND NORMAL PRACTICE THAT IF ONE ORIGINAL
B/L IS SURRENDERED TO MASTER OTHER 2 ORIGINAL B/L OF THE SET
BECOME VOID.

THEREFORE ONE ORIGINAL B/L IS SUFFICIENT FOR DISCHARGE.
MAY WE REMIND YOU THAT AS PER C/P CLAUSE 59 OWNERS
ARE BOUND TO DISCHARGE AGAINST LOI ONLY THEREFORE AS
OWNERS BROKER YOU SHOULD PREVAIL ON THEM TO DISCHARGE
CARGO WITHOUT FURTHER DELAYS.

BEST REGARDS.

IGEN SEA SHIPPING

EXHIBIT 11

Page 1 of 1

ANN. 10

## IGENSEA

| From: | "Igen Sea Shipping" <igensea@igenseashipping.com> |
|---|---|
| To: | <helmgale@helmgale.fr> |
| Cc: | <farooq@ostc-group.com>; "Oceanic Shipping & Trading Co." <chartering@ostc-group.com>; <supmartk@africaonline.com.gh> |
| Sent: | Tuesday, March 21, 2006 1:14 PM |
| Subject: | MV. AIN OUSSERA. |

TO: HELMGALE SARL/PAUL

CC: SUPERMARITIME GHANA LTD

CC: OCEANIC SHIPPING & TRADING CO. (FOR OWNERS)- Y/E-MAIL 21 MARCH 2006

SUB: MV. AIN OUSSERA - BILLS OF LADING OF 6800 MT FOR TAKORADI

REF NUM: PAUL 4607966/20-03/2006

WE INVITE YOUR ATTENTION TO OUR E-MAIL DATED 15/03/06. WE AGAIN REMIND YOU THAT ONE ORIGINAL B/L IS SUFFICIENT TO DISCHARGE OF CARGO AND WE HOLD OWNERS RESPONSIBLE FOR ALL TIME LOST, COSTS AND LOSSES.

BEST REGARDS.

IGEN SEA SHIPPING

EXHIBIT 12

 

# Igen Sea Shipping

Ground Floor   Iftikhar   Chambers,
Hasrat Mohani Road, Karachi - 74000

MARCH 29, 2006

## R E V I S E D - I N V O I C E

TO:  **M/S. OCEANIC SHIPPING & TRADING CO.,**
     FAX # 5834785

ATTN:  **MR. FAROOQ / MR. IMTIAZ**

REF:  **MV. AIN OUSSERA.**

|  | U.S. DOLLARS DEBIT | U.S. DOLLARS CREDIT |
|---|---|---|
| FREIGHT | 1,052,604 | - |
| COMM 5 PCT |  | 52,630.00 |
| OAP OWNERS CONTRIBUTION |  | 2,500.00 |
| KRAFT PAPER OWNER CONTRIBUTION |  | 2,500.00 |
| CASH TO MASTER AT KARACHI ON 06/12/2005 |  | 30,750.00 |
| CASH TO MASTER AT KARACHI ON 08/12/2005 |  | 43,152.50 |
| REMITTANCE (1) |  | 200,000.00 |
| REMITTANCE (2) |  | 300,000.00 |
| REMITTANCE (3) |  | 221,071.00 |
| REMITTANCE (4) |  | 200,000.00 |
| REMITTANCE (5) |  | 50,000.00 |
| LOAD PORT DESPATCH |  | 19,707.20 |
| **TOTAL** | 1,052,604.00 | 1,122,310.70 |
| AMOUNT DUE TO CHARTERERS |  | 69,706.70 |
| DISCHARGE PORTS DESPATCH |  | 29,675.60 |
| DUE TO CHARTERERS |  | 99,382.30 |

E & O. E.
IGEN SEA SHIPPING

EXHIBIT 13

BUSINESS RECORDER KARACHI WED

16 APRIL 2008

## NATIONAL NEWS

# 'Individuals can use CNIC number as NTN soon'

**RECORDER REPORT**

KARACHI: The Federal Board of Revenue (FBR), Chairman, Abdullah Yusuf has said that the FBR is formulating a plan under which the Computerised National Identity Card (CNIC) number will be the National Tax Number (NTN) for an individual and for corporate sector the NTN will be the tax number.

Addressing the members of Karachi Chamber of Commerce and Industry (KCCI) on Monday evening, he said that the FBR is examining merits and demerits of the said plan and it may be implemented soon.

The Chairman said that FBR is making improvements in its system of filing tax returns electronically and it has been decided that from July 1, 2008 tax returns would only be filed electronically.

He said that filing of tax returns manu-

ally creates many problems, whereas the electronic filing system verifies tax return documents automatically, reduces work, load, manipulation and chances of mistakes. The new system, he added will detect refund claims and the taxpayers can also pay tax electronically.

Referring to tax collection targets, the FBR Chairman said that revenue collection target was fixed at Rs1,025 billion which may not be achieved due to prevailing law and order condition. He added revenue collection shortfall is expected to be to the tune of Rs35 billion.

Yusuf said that increasing prices of petroleum products have affected the prices of food and other products worldwide and Pakistan is no exception to this problem.

He said that Pakistan's biggest problem is its fiscal deficit. It can easily be imag-

ined that what is going to be happened if income is less than the expenditure. It is the position of Pakistan, he added.

The FBR Chairman said that Pakistan needs to mobilise its resources adding that Tax GDP ratio which is at 11 percent should be increased to at lest 16 percent, which is achievable.

Yusuf said that tax collection system needs to be changed and efforts should be made for tax mobilisation to increase the collection. He said that sales tax regime needs to be further reformed and the FBR has already introduced around 60 to 70 percent reforms and rest will be introduced soon.

Replying to a question, he dispelled the impression that sales tax was never reduced. He recalled that sales tax was to the tune of 23 percent when it was introduced and later was reduced to 15 percent.

Referring to income tax on salaried persons, he said in Pakistan income tax rates are lowest in the region. He added: "I principally favour reducing tax but tax base should be increased first."

Referring to cost of doing business, the Chairman said that in Pakistan it is very high and FBR is working to reduce the cost of doing business.

Referring to a World Bank's recent report on cost of doing business, he said that according to the report, out of 178 countries, Pakistan is at 77 while China at 83 and India at 120. He added that this indicates that Pakistan has much better position than many other countries.

He admitted that under invoicing, smuggling and mis-declaration are problems for the FBR and no improvement has been made in the same so far.

Yousuf said that FBR is examining a

custom clearance system of Singapore where 90 percent goods are cleared by just 10 minutes. Government of Singapore has also offered its assistance to introduce the same system in Pakistan.

Welcoming the guests, President KCCI Shamim Ahmed Shamsi said that for the last couple of months, the country has been facing internal and external threats such as economic recession, slow pace of foreign and local investments, increase in inflation and sky-rocketing prices of essential items, deteriorating law and order situation etc, which may destabilise the economy of the country.

He said that the manifold increase in international prices of POL and metals have consequently increased our cost of doing business and eroding competitive edge of Pakistani products in global as well as local markets.

EXHIBIT 14



# Igen Sea Shipping

Ground Floor Iftikhar Chambers
Hasrat Mohani Road, Karachi - 74000
Phone : 92-21-8345918 Email-igensea@igenseashipping.com

19th November 2005

To,
**Hassan Ali Rice Export Company**
1st Floor, Cotton Exchange Building,
I. I. Chundrigar Road,
**KARACHI.**

Re: **C/P OF M.V. "AIN OUSSERA"**

Dear Sir,

On 7th November 2005, we had advised you that we had chartered on
back-to-back basis M.V. Ain Oussera to you with the exception that you
will pay us 25% of the total commission of 5%.

We attach herewith a copy of the Broker's E-Mail dated 19/11/2005
together with the draft working charter party.

Thanking you,

Yours truly,
For **IGEN SEA SHIPPING**

EXHIBIT 15

ANN-11

## IGENSEA

| | |
|---|---|
| From: | "Igen Sea Shipping" <igensea@igenseashipping.com> |
| To: | "Oceanic Shipping & Trading Co." <ostc-group@fescom.com>; "Farooq Chaudhry" <farooq@ostc-group.com> |
| Sent: | Tuesday, April 18, 2006 5:09 PM |
| Subject: | MV AIN OUSSERA. |

TO: OCEANIC SHIPPING & TRADING CO.,

REF: PAUL 4651542.

OWNERS BROKERS CALCULATIONS ARE ENTIRELY
INCORRECT. AGAIN REPEAT THAT VESSEL ONLY
ARRIVED AT KARACHI ON 7TH NOVEMBER 2005 AT
18.15 HRS AND VESSEL DID NOT SUBMIT ANY NOR
AFTER REPEAT AFTER THIS DATE AND TIME.

THEREFORE SINCE VESSEL FAILED TO SUBMIT NOR
AFTER ARRIVAL AT KARACHI, IN ACCORDANCE
WITH C/P CLAUSE 31 "TIME STARTS TO COUNT 24
RUNNING HOURS AFTER SURVEYORS PASS HOLDS"
AND USS 19707.20 IS THE AMOUNT DUE TO US
TOWARDS DESPATCH AT KARACHI.

FOR DISCHRGE PORTS, WE EARNED DESPATCH OF
USS 29,675.60.

THUS THE TOTAL AMOUNT DUE TO US IS US$ 99,382.30

EXCESS REMITTED TO OWNERS :                  US$ 49,999.50
DESPATCH AT LOAD PORT KARACHI:               USS 19,707.20
DESPATCH AT DISC. PORT CONAKRY & TAKORADI USS 29,675.60

_____

                              TOTAL :

USS 99,382.30

WHICH PLEASE REQUEST OWNERS TO REMIT TO US

THRU FEDERAL RESERVE BANK OF NEW YORK

FOR CREDIT TO HABIB BANK LTD., NEW YORK
ACCOUNT ABA NO: 026007809

SWIFT CODE HABBUS33XXX

FOR FURTHER CREDIT TO HABIB BANK LIMITED,

CORPORATE CENTRE, A/C NO: 050005

EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SALAM INTERNATIONAL TRANSPORT &
TRADING CO., PLC
c/o JORDAN NATIONAL LINES FOR SHIP
OPERATIONS,

              Plaintiff,

      - against -

IGEN SEA SHIPPING AND HASSAN ALI,
RICE EXPORT CO.,

              Defendants.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: May 25, 06

06 Civ. 2841 (RMB)

**ORDER**

## I.    Background

On or about April 12, 2006, Salam International Transport & Trading Co. ("Salam" or

"Plaintiff") filed a verified complaint against Igen Sea Shipping ("Igen Sea") and Hassan Ali Rice

Export Co. ("Hassan Ali," together, "Defendants") alleging that Igen Sea failed to pay $249,517.42

due to Plaintiff under a voyage charter party agreement, dated November 12, 2005 (the "Charter").

(See Verified Complaint, dated April 11, 2006 ("Verified Complaint"), at ¶ 5.)  Plaintiff alleges that

Defendant Hassan Ali "was the alter ego of Igen Sea Shipping." (See Verified Complaint at ¶ 4.)

On or about April 13, 2006, the Court issued an Ex Parte Order for Process of Maritime Attachment

and Garnishment against Igen Sea and Hassan Ali (the "Attachment").  On or about May 10, 2006,

Plaintiff attached Defendant Hassan Ali's property valued at $249,517.42 by serving non-party

garnishee Habib Bank with a copy of the Attachment.

On May 15, 2006, Defendant Hassan Ali moved to vacate the Attachment ("Motion to

Vacate") contending that Plaintiff's alter ego allegations are "woefully insufficient."  (See

Memorandum of Law in Support of Motion to Vacate Maritime Attachment, dated May 15, 2006

("Def. Mem." or "Hassan Ali's Memorandum of Law"), at 2, 5.) Plaintiff filed an opposition on

May 17, 2006, arguing that Plaintiff "had reasonable grounds for its belief that Igen and Hassan Ali

were alter egos of each other," because, among other things, Igen Sea "was a 'paper' charterer used

to improperly insulate sub-charter Hassan Ali from damages." (See Memorandum of Law in

Opposition to Motion to Vacate Attachment, dated May 17, 2006 ("Pl. Mem." or "Plaintiff's

Memorandum of Law"), at 2.) Defendant Hassan Ali filed a reply on May 18, 2006, stating that

Plaintiff's opposition "relies on Declarations that comment not on evidence showing any linkage

between Hassan Ali and Igen Sea but rather on continued conjecture and unwarranted speculation."

(See Reply Memorandum in Further Support of Motion to Vacate Maritime Attachment, dated May

18, 2006 ("Def. Reply" or "Hassan Ali's Reply Memorandum of Law"), at 2.)

The Court heard oral argument on May 22, 2006 at which the parties agreed there was no

need for a further hearing. (See Transcript of Oral Argument, dated May 22, 2006.)

**For the reasons set forth below, Defendant Hassan Ali's Motion to Vacate is granted.**

## II.    Legal Standard

"Under Supplemental Rule B an order of maritime attachment must issue upon a minimal

prima facie showing provided the defendant cannot be 'found within' the federal district in which

the assets are sought to be attached." Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F.

Supp. 2d 318, 322 (S.D.N.Y. 2006). Under Supplemental Rule E(4)(f), "any person claiming an

interest in [the attached property] shall be entitled to a prompt hearing at which the plaintiff shall be

required to show why the . . . attachment should not be vacated or other relief granted consistent

with these rules." Fed. R. Civ. P. Supp. R. E(1) (2006); see Seaplus Line Co. Ltd. v. Bulkhandling

Handymax AS, 409 F.Supp.2d 316, 319 (S.D.N.Y. 2005) ("It is clear from the text of [Rule E(4)(f)]

that the party . . . having obtained the maritime attachment bears the burden of showing that the

attachment should not be vacated."). "The post-arrest hearing is not intended to resolve definitively

2

the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant." Ullises Shipping, 415 F.Supp.2d at 322 (internal citations omitted); see Thypin Steel Co. v. Certain Bills of Lading, No. 96 Civ. 2166, 1996 WL 223896, at *4 (S.D.N.Y. May 2, 1996) ("The language of the Rule and the case law decided thereunder therefore support [the] contention that [plaintiff's] burden at the post-arrest hearing stage is to produce evidence sufficient to show that the arrest was supported by reasonable grounds.").

Federal courts, sitting in admiralty, allow "piercing of the corporate veil where (1) a corporation uses its alter ego to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." Status Intern. S.A. v. M & D Mar. Ltd., 994 F. Supp. 182, 186 (S.D.N.Y. 1998). "At a post-attachment hearing, a plaintiff asserting corporate alter egos need not definitively establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil." Ullises Shipping, 415 F. Supp. 2d at 323.

III.    Analysis

Having reviewed the record in this case, including, among other things, Defendant Hassan Ali's Memorandum of Law and the accompanying affidavit of Kevin J. Lennon, dated May 15, 2006; Plaintiff's Memorandum of Law, the accompanying affidavit of Julia M. Moore, dated May 17, 2006, and the declarations of Sheikh Dildar Hussain, dated May 16, 2006 ("Hussain Decl."), Captain Mazen Baddar, dated May 17, 2006, and Klaus C.J. Mordhorst, dated May 17, 2006 ("Mordhorst Decl."); Defendant Hassan Ali's Reply Memorandum of Law and the accompanying declarations of Abdullah Haswani, dated May 19, 2006, and Aziz Ashiq Ali, dated May 19, 2006; Plaintiff's supplemental declarations from Muhammad Shaiq Usmani, dated May 22, 2006, and Captain Mazen Baddar, dated May 21, 2006; and the applicable law, the Court finds that Plaintiff

has not presented enough evidence of reasonable grounds for piercing the corporate veil.[1] Ullises Shipping, 415 F.Supp.2d at 323. Among other things, there is no evidence that Hassan Ali used Igen Sea for a fraudulent purpose and insufficient evidence (i.e. no reasonable grounds to believe) that Hassan Ali is Igen Sea's alter ego. For example, there is no evidence that Igen Sea lacks the "formalities and paraphernalia that are part and parcel of the corporate existence;" no evidence of "inadequate capitalization;" and no evidence that there was any "overlap in ownership, officers, directors, and personnel" between Igen Sea and Hassan Ali. Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991); see De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996) ("To overcome the 'presumption of separateness' afforded to related corporations, Plaintiffs must come forward with the showing of actual domination required to pierce the corporate veil.") (internal citations omitted); American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988) ("A corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owners. Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners which is entitled to substantial weight.") (internal citations omitted).

Plaintiff offers only conclusory allegations that Hassan Ali is Igen Sea's alter ego. (See, e.g., Verified Complaint ¶ 4 ("Upon information and belief, at all material times, Defendant, [Hassan Ali] was the alter ego of Igen Sea Shipping"); Moore Aff. ¶ ("At the time that [Plaintiff] sought the Order of Attachment, it was in possession of information which indicated that the relationship between Hassan Ali and Igen Sea was not arms length, that Igen Sea was not operating as a true independent entity, and may have been functioning as a chartering department of Hassan Ali . . . ."); Hussain Decl. ¶ 1 ("The building structure in the vicinity of [Hassan Ali's] shop was

---

[1]   The Court expresses no view upon the ultimate merits of Plaintiff's claims.

exceedingly dilapidated and it would appear that this shop has not been used for a long time.");

Mordhorst Decl. ¶ 6 ("To my mind, there is no valid business purpose for Igen Sea to accept such

risks without real compensation.").)

## IV.   Conclusion and Order

For the reasons stated herein, Defendant Hassan Ali's Motion to Vacate [#7] is granted.

Dated: New York, New York
May 25, 2006

Richard M. Berman, U.S.D.J.

5