Keith W. Heard (KH-8578)
Michael J. Walsh (MW-6578)
Burke & Parsons
100 Park Avenue
New York NY  10017-5533
(212) 354-3800


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CNAN GROUP S.P.A.,** <br><br>      **Plaintiff,** <br><br>   **-against-** <br><br><br> **HASSAN ALI RICE EXPORT CO. d/b/a IGEN SEA SHIPPING,** <br><br>      **Defendant.** | **DECLARATION OF** <br><br> **THOMAS ALAN MOISLEY IN OPPOSITION TO MOTION TO VACATE ATTACHMENT** <br><br> **Electronically Filed** <br><br> **08 CV 1201 (PAC)** |

UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

CITY OF LONDON


THOMAS ALAN MOISLEY, pursuant to the provisions of 28 U.S.C. § 1746, declares and

states as follows:

  1.  I am a solicitor admitted to practice in England and Wales and am employed

     as a Managing Solicitor by the law firm Thomas Cooper of Ibex House, 42-27

     Minories, London, EC3N 1HA.  I was admitted on 01 November 1993 and

     have practiced shipping law continuously ever since in the City of London.

     Prior to training as a solicitor, I was awarded a MSC in Shipping, Trade and

Finance by the City University Business School.  My studies for that post graduate degree included modules on ship broking practice.  Prior to completing my MSC, I worked for 11 years in the marine insurance market in the City of London and qualified as a Fellow of the Chartered Insurance Institute.  I have therefore been involved with shipping, marine insurance and the law relating to these areas of business for 31 years.

2.    I was first instructed in this matter by CNAN Group Spa ("CNAN"), the Owners of the MV "AIN OUSSERA", in May 2006.  CNAN is a state-owned shipping company in Algeria.  At that time I was employed by another shipping law firm in the City of London, Shaw and Croft.  I resigned from that firm in March 2007 and left their employment on 22 June 2007 in order to start my employment with Thomas Cooper on 25 June 2007.  CNAN Group Spa decided to transfer their instructions to me at my new firm and from September 2007 Thomas Cooper entered into a retainer with CNAN Group Spa under the terms of which Thomas Cooper took over the conduct of this matter on behalf of CNAN Group Spa.  I continue to be the case handler.

3.    I am informed by Keith W Heard Esq. of the New York law firm, Burke & Parsons, that Hassan Ali Rice Export Co ("HAREC") have, in their memorandum of law in support of a motion to vacate CNAN's Rule B Attachment over US Dollar funds belonging to HAREC in case number 08CV1201 in the United States District Court for the Southern District of New York, advanced two arguments on the merits of CNAN's claims against HAREC d/b/a Igen Sea Shipping ("Igen Sea").  In order to assist the court in evaluating the merits of those arguments, should it wish to do so, I have been asked by Burke & Parsons to make this declaration in response to those two

arguments. Any argument on the merits of the substantive dispute between the parties requires consideration of the position under English law, as the charterparty dated 7 November 2007 ("the Charterparty") between CNAN and Igen Sea is expressly agreed to be subject to English law by the choice of the parties. (For ease of understanding, the charterer under that contract will simply be referred to as "Igen Sea", although it is CNAN's stated position that HAREC and Igen Sea are in fact one and the same.) The two arguments concern (1) an alleged time bar and (2) an assertion that CNAN caused the delay at the second discharge post, Takoradi, by making what is said to be an unreasonable request for surrender of the original bills of lading. I will deal with each in turn.

<u>Time bar</u>

4.     I have been provided with a copy of HAREC's memorandum of law and I note that towards the bottom of page 4 of that memorandum, the following is stated:

> "*Pursuant to Clause 58 of the charterparty* [the choice of law and jurisdiction clause] *CNAN appointed an arbitrator against defendant Igen Sea but CNAN has neither commenced arbitration proceedings nor made a claim in writing against Igen. Although CNAN appointed an arbitrator, to date it has failed to submit a written claim in accordance with the mandatory terms of its charterparty with Igen Sea. Cargo discharge was completed on March 26 2006... Therefore, any claim arising under the charterparty was deemed to be extinguished and ceased to exist as of March 26, 2007. Accordingly, CNAN is time barred from pursuing its underlying claim against Igen Sea in the arbitration action...*"

Two allegations are made in the passage quoted against CNAN:

(1)     that it has not commenced arbitration proceedings; and

(2)     that it has not made a claim in writing against Igen Sea.

I will deal with each of these points in turn.  Before doing so, I can agree that the date of completion of discharge in the final port of discharge, Takoradi, was 26 March 2006 and that, therefore, pursuant to clause 58 of the charterparty, if the steps required by that clause had not been taken by CNAN, their claim would have been deemed to be extinguished after 26 March 2007.

5.    Regarding *"CNAN has neither commenced arbitration proceedings…"* this is factually incorrect and is, in any case, contradicted by the next sentence: *"Although CNAN appointed an arbitrator…"*  In case, despite the contradiction, HAREC still take this point against CNAN, I deal with it as follows.

6.    On 21 April 2006 CNAN sent a message via their charter party brokers, Helmgale S.a.r.l., to Igen Sea inviting them to agree to submit the disputes that had arisen under the Charterparty to arbitration before a sole arbitrator, Mr David Farrington.  In response, Igen Sea sent a message back through the broking chain with a copy to Mr William Packard (a well-known London arbitrator who has since sadly died) rejecting CNAN's suggestion that Mr Farrington be a sole arbitrator and nominating Mr William Packard as Igen Sea's arbitrator.  This email message was passed on by CNAN's broker to CNAN early in the morning of 24 April 2006 and, in response, CNAN sent a fax to Mr David Farrington on the same day offering him the appointment as owners' arbitrator.  Mr Farrington accepted that appointment by fax dated 24 April 2006.    Notice of that appointment was given to Igen Sea via the broking chain on 3 May 2006.

7.    Thus both parties had appointed arbitrators on 24 April 2006, well within the one year time limit stipulated in the Charterparty.  The relevant exchanges are in Exhibit 1.  It is not necessary as a matter of English law for the purposes of

4

determining whether an arbitration has been commenced that the two arbitrators appointed by the parties should have appointed a third arbitrator, supposing the arbitration clause requires a third, as in this case.

<u>Clause 58: Commencement of arbitration</u>

8.  Clause 58 of the Charterparty is an amended Centrocon Arbitration Clause.  It requires referral to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force.   The current statute is the Arbitration Act 1996 ("the Act") and the question of when arbitral proceedings are to be regarded as commenced is dealt with in section 14 which says, so far as is relevant:

"14 (1).   *The parties are free to agree when arbitral proceedings are to be regarded as commenced for the purposes of this Part and for the purposes of the Limitation Acts.*

*….*

*(2)  If there is no such agreement the following provisions apply.*

*….*

*(4)  Where the arbitrator or arbitrators are to be appointed by the parties, arbitral proceedings are commenced in respect of a matter when one party serves on the other party or parties notice in writing requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator in respect of that matter…"*

The Act gives the parties the freedom to agree when arbitral proceedings are to be regarded as commenced.  The provisions of the Act only apply to the extent that there is no such agreement.  In this case, Clause 58 expressly provides a

5

mechanism for the appointment of arbitrators and that mechanism, when read against the background of Section 14(4) of the Act, provides that the arbitration was commenced at the time one party, in this case CNAN, served on the other a notice in writing asking Igen Sea to agree to the appointment of Mr Farrington as sole arbitrator.  That happened on 21 April 2006.  The last part of Clause 58 (... *and the Claimants' arbitrator appointed within 12 months of final discharge...*") is satisfied in that the claimants' arbitrator was appointed within 12 months of the date of final discharge.  The Claimants' arbitrator was appointed on 24 April 2006, well within 12 months of 27 March 2006.  Thus I conclude that the first limb of the last part of Clause 58 was clearly satisfied as a matter of English law.

9.    Regarding HAREC's contention that CNAN "...*has failed to submit a written claim in accordance with the mandatory terms of its charterparty with Igen Sea*", this statement is also factually incorrect.  A letter before action (i.e., a demand letter) dated 13 October 2006 was sent by Shaw and Croft, CNAN's then solicitors, to Igen Sea.  It was sent by DHL courier to Igen Sea at the address on their letterhead paper, by "signed for" international post to Oceanworld (Pvt) Limited ("Oceanworld"), Igen Sea's broker, and by fax to Helmgale, CNAN's broker, for onward transmission to Igen Sea through the broking chain.  The letter contained a detailed statement of all CNAN's claims and enclosed a full set of supporting documents.  A second copy of the letter, re-addressed to both HAREC and Igen Sea, together with the supporting documents, was sent by DHL courier to HAREC's address on 02 November 2006.  There is authority to support the proposition that these letters before action fulfilled the "claim must be made in writing" component of Clause 58 and, as a result, in my opinion, the substantive

6

claim is clearly not time barred according to English law.    These letters are in Exhibit 2.

10.    The authority for this conclusion is *Tradax Export SA v Italcarbo Societa Di Navigazione Spa (the Sandalion)* [1983] 1 Lloyd's Rep 514 [Exhibit 3 ], which was a case also concerned with an amended Centrocon arbitration clause.    At page 516 Lloyd J suggested, in obiter, that the act of the charterer in submitting invoices amounted to their making a claim in writing.    Further on, at page 517, when again discussing the requirement for the claim to be made in writing, Lloyd J said:

> "*it seems to me clear both on the language of the clause and also by reason of the commercial purpose which it was intended to serve that the claim must be identified in terms precise enough to enable the other party to know what claim it is he has to meet*".

Further down on the same page, Lloyd J draws an analogy with the House of Lords judgment in "*Rendal v Arcos*" (1948) 58 Lloyd's Law Rep 287 and quotes Lord Wright who said (at page 292):

> "*Notice of claim… does not mean a precisely formulated claim with full details, but it must be such a notice as will enable the party to whom it is given to take steps to meet the claim by preparing and obtaining appropriate evidence for that purpose*".

It is my opinion that an English court would find that CNAN's letter before action dated 13 October 2006 identifies the claim in sufficiently precise terms to enable Igen Sea to know the claim it had to meet and consequently fulfills the Clause 58 requirement of "a claim must be made in writing…"

11.    By reference to Lloyd J's obiter remarks at page 516 of the judgment in *the Sandalion* (supra), I respectfully draw to the court's attention the fact that, in this

matter, there had been considerable correspondence apart from the two letters before action between the parties about the claims, including the following:

(1)     An invoice dated 18 December 2005 in respect of a load port demurrage claim of US$120,650 was sent by CNAN and acknowledged by Igen Sea on 09 January 2006. [Exhibit 4.4 ]

(2)     A demurrage invoice for discharge port demurrage at Conakry dated 22 February 2006 for US$99,437.64 was sent by CNAN and acknowledged by Igen Sea on 29 March 2006 (who responded by alleging that CNAN owed them US$99,382 despatch, an allegation CNAN vigorously denies as being completely unsupported by the facts). [Exhibit 4.1]

These facts show that a claim in writing was made not merely once prior to 26 March 2007 but on at least four occasions prior to that date.  Thus, HAREC's argument that the claim is time barred is clearly wrong, both as a matter of English law and on the facts.

## HAREC's bill of lading argument

12.   Regarding Igen Sea's contention that "*CNAN's claim that it required all three original bills of lading before discharging the cargoes is without merit*", this argument appears to be based on correspondence exchanged between CNAN and Igen Sea in relation to the discharge of the balance of the cargo at the second discharge port, Takoradi.   Pausing there, I note that HAREC have chosen not to explain how it is that they have seen this correspondence even though, according to their position, they are not privy to the Charterparty between

CNAN and Igen.  Nor have they chosen to identify the particular correspondence upon which this argument is based.

13.    HAREC'S memorandum of law continues (at the top of page 4):

*"Due solely to CNAN's unnecessary requirement that all three original bills of lading* (sic)*, the cargo was delayed at Takoradi"*.

It appears from this statement that HAREC believe that CNAN's claim (a) arises only as a result of the alleged delay due to the problem with bills of lading at Takoradi and (b) that CNAN's requirement that "all three original bills of lading" be surrendered was unreasonable.    I will take each of these points in turn.

14.    CNAN's claim does not solely arise from the delays which occurred in discharged at Takoradi.  As was made clear by the enclosures to the letter before action, CNAN's claim has the following elements:

1.    Claim for demurrage at Karachi of US$90,916.00;

2.    A claim for demurrage at Conakry of US$89,128.80;

3.    A claim for demurrage at Takoradi of US$106,049.60;

4.    A claim for damages for detention at Karachi of US$26,800;

5.    A claim for interest on elements 1 to 4 above;

6.    A claim for legal costs of the arbitration.

It can be seen from the above that the delay at Takoradi is only one part of CNAN's claim.  Thus, even if HAREC were right about CNAN's requirement being unreasonable, which is denied, it only relates to claim No. 3 above

9

15.    In order to assess whether the requirement that "all three original bills of lading" be surrendered was reasonable or not, it is necessary to set it against the factual background.  It had come to CNAN's notice that, contrary to the terms of the Charterparty and to the terms of the letter of authority given by the "AIN OUSSERA"'s Master on the instructions of CNAN ("the Letter of Authority") and contrary to the normal custom and practice of the shipping industry, Igen Sea had caused to be issued a second set of bills of lading marked "freight prepaid" without surrendering to CNAN the first set.  As a result, there were two complete sets of bills of lading in circulation for the same cargo.  As a matter of English law, the original bill of lading is the document which entitles the holder of it to delivery of the cargo by the carrying ship.  If, therefore, there are two sets of original bills of lading in circulation for the same cargo, there is clearly a risk that the ship would be faced with competing claims for delivery.  If it then gave delivery to the wrong party, it would be exposed to the risk of a claim for breach of contract and/or breach of duties owed in the tort of bailment by the rightful owner of the goods.  Thus, no properly-run shipping company would ever tolerate a situation where there are two sets of bills of lading in circulation for the same cargo.

16.    On 20 January 2006, Igen Sea's agents at Karachi, Oceanworld, sent CNAN's brokers an email message in which they said that Igen Sea had requested that all bills of lading be amended to read "freight prepaid".

First set of bills of lading

17.    The bills of lading which had been issued showing "freight payable as per c/p" were as follows. The total cargo loaded at Karachi was 25,062 MT gross or 25,000 MT net.

| Number | Place issued | Date issued |
|---|---|---|
| KHI/WA/01A to I | Karachi | 30 November 2005 |
| KHI/WA/02 | Karachi | 02 December 2005 |
| KHI/WA/03 | Karachi | 03 December 2005 |
| KHI/WA/04 | Karachi | 02 December 2005 |
| KHI/WA/05 | Karachi | 02 December 2005 |
| KHI/WA/06 | Karachi | 02 December 2005 |
| KHI/WA/07 | Karachi | 02 December 2005 |
| **Total cargo covered by the above bills of lading** | | **19,800 MT net** |

Duplicate bills of lading issued marked freight payable as per c/p

18.    However, for reasons that have never been explained by Igen Sea or HAREC, two sets of duplicate "freight payable as per c/p" bills of lading were issued, identical in terms to the ones listed above numbered KHI/WA/04 and 05, save

11

that the quantity of cargo said to be covered by the bills was substantially greater.

| Number | Place issued | Date issued |
|---|---|---|
| KHI/WA/04 | Karachi | 03 December 2005 |
| KHI/WA/05 | Karachi | 03 December 2005 |
| **Total weight of cargo covered by these two bills of lading** | | **9,200 MT net** |

<u>Second complete set of bills of lading marked freight prepaid</u>

19.    Further duplicate bills of lading then came into existence stating "freight prepaid" as follows.

| Number | Place issued | Date issued |
|---|---|---|
| KHI/WA/01A to I | Karachi | 30 November 2005 |
| KHI/WA/02 | Karachi | 02 December 2005 |
| KHI/WA/03 | Karachi | 03 December 2005 |
| KHI/WA/04 to 11 inclusive | Karachi | 02 December 2005 |
| **Total weight of cargo covered** | | **25,000 MT net** |

20.     CNAN made it clear in a message to Igen Sea dated 02 February 2006 that they had not approved the issuance of the second set of the bills of lading.  They pointed out that in breach of the charterparty clause number 28, freight had been paid almost a month late and only after intense pressure from CNAN on Igen Sea through the broking chain.  On 05 February 2006, CNAN received copies of certain of the first set of original bills of lading and they became aware for the first time that there were two sets of bills of lading numbered KHI/WA/04 and 05 for different quantities of cargo.  CNAN also became aware on this date that 5,000 MT of cargo had been released to receivers at Conakry against an original bill of lading number KHI/WA/02, which was a "freight prepaid" and, therefore, unauthorized bill of lading.  At that time, the bill of lading marked "freight payable as per c/p", the only authorized bill of lading for that parcel of cargo, was still in circulation.  Igen Sea were in clear breach of the charterparty by (a) causing their agent, Oceanworld, to sign and issue unauthorised bills of lading and (b) putting one or more of those unauthorized bills of lading into circulation so that at least one of them was used to obtain delivery of 5,000 MT of cargo at Conakry.

21.     By Clause 28 of the Charterparty, it had been agreed that if Igen Sea needed bills of lading marked "freight prepaid", then CNAN would issue the same after CNAN's bank had confirmed the freight had been received.  By the agreed variation to the Charterparty terms (contained in the Letter of Authority), CNAN authorized Oceanworld to issue the bills in these terms:

> "I, Master of MV "AIN OUSSERA", hereby authorize agent MS Ocean World Pvt Ltd to sign/release the bills of lading on my behalf <u>after approval of Owners and as per charterparty terms and conditions</u>". (Emphasis mine)

Thus, to comply with the Charterparty terms, Igen Sea, if they wanted to replace the original set of bills of lading with a new set marked "freight prepaid", would

have to obtain CNAN's approval first.  This was not done.  On 01 February 2006, CNAN sent a message to Igen Sea protesting against Igen Sea's breach of contract by issuing a new set of bills of lading marked "freight prepaid" without owner's approval and requesting Igen Sea to forward immediately to CNAN by DHL courier all sets of the original bills of lading marked "freight payable as per c/p" duly cancelled.  The message went on:

*"Besides, Charts are hereby advised that no further LOI will be accepted and cargo will be released only against original new set of B/L and after receipt by Head Owners of all first sets OBL cancelled".*

22.     Thereafter, the vessel was ordered to go to Takoradi to discharge the balance of the cargo.  Not surprisingly, against the background described above, CNAN put Igen Sea on notice on 20 February 2006 regarding discharge at Takoradi in the following terms:

*"Discharge of cargo at Takoradi and subject to production of original b/l(s).  Due to charts unlawful and fraudulent issuance of a second set B/L(s) and non compliance to c/p provisions as regard to rate of discharge, owners have suffered a considerable prejudice with abt 30 days demurrage up to day plus another expected 10 or 15 days additional demurrage at Takoradi…"*

23.     Igen Sea wanted CNAN to agree to discharge the Takoradi cargo against an LOI (i.e. a letter of indemnity) without the surrender of any original bills of lading Clause 59 of the charterparty says as follows:

*"<u>Clause 59</u>*

*In the event of original bill(s) of lading are delayed  and can not be produced at discharge port by the receivers in time prior discharging then charterers would <u>request</u> owners to release to entire cargo to receivers against letter of indemnity as per owners' pandi club wording on charterers' letter head signed by charterers.  <u>Recivers</u> (sic) to also provide separate LOI."* ( my emphasis )

This clause gives Igen Sea as charterer the option of asking owner to agree to discharge against two LOI's, one to be signed by Igen Sea on their letterhead and the other to be provided by the cargo receivers. There is no obligation on CNAN as owner to agree to do this. The protection given to a shipowner by an LOI is entirely a function of the financial strength and credit worthiness of the charterer concerned. If the charterer has a cash flow problem or other financial difficulties, the LOI may turn out to be worthless. Furthermore, as a matter of English law, letters of indemnity may be unenforceable if there is any suggestion that the background facts against which they were issued involved fraud against, for example, an innocent third party purchaser of the cargo. Thus, if a shipowner agrees to discharge cargo without production of original bills of lading in exchange for an LOI, he is taking a commercial risk.

24.   On the facts of this case, where CNAN had not received timely payment of the freight due under the charterparty nor timely payment of the demurrage due in respect of the delays experienced at Karachi and in circumstances where Igen Sea had caused a second set of bills of lading to be issued without obtaining CNAN's approval first, it is respectfully suggested that CNAN had every reason to refuse Igen Sea's request and demand production of all of the original bills of lading before discharging the cargo.

25.   Furthermore, the delay at Takoradi was not caused by CNAN's insistence on the surrender of all three original bills of lading but by the absence of the original bills of lading for the majority of the Takoradi cargo. The contemporaneous correspondence between the parties [ Exhibit 5 ] shows that the bills of lading for 6,600 mt of the cargo were in a New York bank and were only sent by the bank to the receivers on Friday, 10 March 2006 with an estimated arrival date of

Tuesday, 14 March 2006.   So, irrespective of the rights and wrongs of CNAN's stated  position regarding production of original bills of lading, the fact is that *no* original bills of lading were available for 6,600mt of the cargo  In the event the delay at Takoradi was primarily caused by the non-availability of  these original bills of lading and not by the insistence of CNAN on production of all three originals of any particular bills of lading.

26.    Thus, to conclude, CNAN's insistence on the surrender of all three original bills of lading was a reasonable requirement, given that they had become aware that a second set of original bills of lading had been issued for the same cargo without their approval.   Thus, the difficulties and delays prior to discharge in Takoradi arose from the breach by Igen Sea of the variation to the terms of the Charterparty by which Igen Sea's agents were given authority to sign and release bills of lading but only after after approval by CNAN.   Thus, it is respectfully suggested, HAREC's argument on this substantive issue in the underlying dispute in their memorandum of law cannot be sustained on the facts.

Delivery of the letter before action to HAREC

27.    Despite HAREC's contention that Igen Sea has an office and a separate existence of its own, it has been exceedingly difficult to contact Igen Sea since this claim arose.  A prime example of this may be found in my efforts, as CNAN's solicitor, to transmit appropriate claim correspondence to Igen.

28.    I prepared on behalf of CNAN a letter before action, or demand letter, which was sent to Igen Sea on 13 October 2006 by DHL courier under Airway bill 3778326591.  This is the letter referred to in paragraph 9 above, which enclosed CNAN's revised demurrage calculations and a full set of supporting documents.

16

On 18 October 2006 I instructed my then trainee solicitor, Gordon Robertson, to check DHL's online tracking website, where he learned that DHL had not been able to deliver the letter.  On the same day, Mr Robertson telephoned DHL's customer services enquiry number and was told that they would need a telephone number for Igen Sea to enable them to contact the latter, prior to making another delivery attempt.

29.    Also on 19 October 2006, I sent a chasing fax to CNAN's broker, Helmgale, to which they replied on the same day, confirming that they had forwarded the letter before action to Igen Sea's brokers, Oceanic Shipping & Trading Co ( "Oceanic"), whose name appears in Box 1 of Part 1 of the Charterparty.  On 20 October 2006, Helmgale sent me a follow-up message re-confirming that they had sent the letter before action to Oceanic both by fax and by email.  In that message, Helmgale mentioned that they were having difficulty recovering their commission on the freight, which they said had been retained by Igen Sea.  They also commented that the freight and disbursement account at the discharge ports "seems to have been paid by shippers who are Hassan Ali Rice Company of Karachi" and Helmgale went on "we also noted that in a despatch calculation ISS (that is, Igen Sea) asked for despatch to be paid to Hassan Ali account"[Exhibit 6].

30.    On 19 October 2006, CNAN's then Commercial Director, Mr Belabed, sent me an email giving me the telephone number of the person reportedly in charge at Igen Sea, said to be a Mr Noor.  I asked Gordon Robertson to try telephoning Mr Noor on the number given +92 21 834 5918 but it proved impossible to get through. On 25 October 2006, Gordon Robertson telephoned DHL, gave them Mr Noor's telephone number and asked them to attempt once again to deliver the letter to

17

Igen Sea.  On 30 October 2006 I was telephoned by a lady called Jane Brien from the DHL customer services office, who told me their Karachi office had not been able to get hold of Igen Sea Shipping on 834 5918, the number Mr Robertson provided, and so they could not deliver the letter.  I said that I would get back to her as soon as I had more details of Igen Sea's address.

31.    On 30 October 2006 I sent Ms Brien an email in which I provided HAREC's name and address and asked DHL to deliver the letter addressed to Igen Sea to that address.  On 31 October 2006 Ms Brien telephoned me to say that a person who had signed as " Aziz" took delivery of the letter earlier that day.  I then printed out from the DHL website a track result summary showing that the shipment was delivered at 3:41 pm on 31 October 2006 in Karachi.  In order to make absolutely certain of the delivery, I asked DHL to send me a copy of their delivery sheet and they did this by fax on 02 November 2006.  The delivery sheet, attached as Exhibit 7, shows that the letter couriered under airway bill 3778326591 addressed to Igen Sea was delivered to Hassan Ali Rice Export and signed for by someone who wrote the name "Aziz".

<u>The back to back fixture point</u>

32.    It is asserted both in HAREC's memorandum of law (see for example the second paragraph on page 13) and in Mr Hashwani's declaration dated 8 May 2008 that Igen Sea and HAREC entered into a contract on terms identical to that between CNAN and Igen Sea except for the commission payable.  I wish to draw to the Court's attention that this is the first time since this dispute arose in early 2006 that there has been any mention of such a back to back fixture so far as I am aware.  Furthermore, I can confirm that, having reviewed my law firm's copy of

CNAN's file, there is no reference to such a back to back fixture in any of the contemporaneous correspondence between the parties. In my experience of charterparty arrangements between a shipowner and a charterer, the contract said to have been entered into between Igen Sea as disponent owner and HAREC as charterer and the circumstances in which it is said to have come into being, display a number of unusual features:

(a)     there are no contemporaneous exchanges between the parties recording the negotiations leading up to the fixture or at least none have been disclosed;

(b)     there is no fixture recap or none has been disclosed, in contrast to what happened in the case of the Charterparty, where there was a fixture recap in the conventional manner [Exhibit 8].

(c)     the fixture note itself is on letter head paper rather than on the Gencon form and refers imprecisely to the charterparty with which it is said to be back to back;

(d)     there is no written record of the full terms of this alleged charter or at least none has been disclosed;

(e)     It is highly unusual for a sub-charter to be at the same freight rate as the head charter for the very good reason that the main purpose of entering into a sub-charter is normally to enable the disponent owner to make a profit on the difference between the freight he is paying up the chain and the freight he is earning from the sub-charterer.

Without full disclosure of all relevant materials including originals of all documents relied upon by HAREC (so that they can be forensically examined), it is impossible to form any concluded view as to whether or not there was a back to back charterparty of the type alleged. It is noteworthy in my opinion that the only evidence of the existence of this fixture comes from HAREC; there is no evidence or documents from any third party, for example, a ship broker. I therefore respectively submit that the Court should view with apprehension the suggestion that there was such a fixture. This is particularly so in circumstances where HAREC rely as evidence of consideration having been given (footnote 4

19

on page 15 of their memorandum of law) on the fact that freight commission was allegedly paid to Igen Sea by HAREC yet I note that no evidence of any such payment has been produced.

<u>Telephone calls to Igen Sea and HAREC</u>

33.    I was present on each occasion that Vivek Jain made the telephone calls described by him in his declaration dated 9 July 2008.

<u>Payments under the Charterparty and correspondence</u>
<u>regarding payments and progress of discharge at Conakry</u>

34.    I have been asked to summarise the evidence in CNAN's files regarding payments received by CNAN and Helmgale, requests for payment of despatch allegedly due (liability for which CNAN denies) and correspondence regarding payment of the port disbursements account (sometimes referred to as the D/A, an account of port dues, agents fees, stevedoring costs, etc) for the call at Conakry.  I will deal with each of these topics in turn as follows:

<u>Payments to CNAN and Helmgale</u>

34.1    The following payments were made pursuant to the terms of the Charterparty, in each case by HAREC.

| Date | Beneficiary | Payer | Amount USD |
|---|---|---|---|
| 04 January 2006 | CNAN Group Spa | HAREC | 199,954.00 |
| 06 January 2006 | CNAN Group Spa | HAREC | 299,969.00 |

| 11 January 2006 | CNAN Group Spa | HAREC | 199,969.00 |
| 11 January 2006 | CNAN Group Spa | HAREC | 221,040.00 |
| 12 January 2006 | Helmgale SARL | HAREC | 13,096.56 |
| 03 February 2006 | CNAN Group Spa | HAREC | 50,000.00 |

<u>Request made by Igen Sea for payment by CNAN to HAREC</u>

34.2    On 5 April 2006 Igen Sea requested that CNAN pay despatch direct to HAREC
[Exhibit 9 ].  This payment was, of course, not made as CNAN deny liability for
despatch.

<u>Correspondence regarding the port disbursement account at Conakry</u>

34.3    It was a term of the Charterparty that Igen Sea had the right to appoint the
agents at the load and discharge ports – see Exhibit 1 to HAREC's Memorandum
of Law, page 1 boxes 18 and 19. Igen Sea appointed Transafrica in Conakry.
Transafrica are part of an agency network controlled by Getma International of
Paris. When CNAN sent a message to Transfrica on 13 January 2006 seeking
confirmation that, as per Clause 46 of the Charterparty, Igen Sea would be
responsible for paying the D/A at Conakry, the confirmation sought came in a
message to CNAN dated 17 January 2006 from Mr Monnier of Getma
International's Paris office, who stated as follows:

> "*Following to our various telecon regarding <u>our principal</u> Hassan Ali Rice Export,
> we do confirm that our proforma D/A for port call at Conakry has been fully
> remitted.*
> *According to our previous messages, we do confirm that your good company will
> not responsible of any charges from us for a/m vessel's call at Conakry…*"
> (emphasis mine) [Exhibit 10].

21

Clearly M. Monnier of Getma regarded HAREC, and not Igen Sea, as Transafrica's (and Getma's) principal.

### Notice of Readiness

35.  It is standard practice in the shipping industry for a vessel to give notice to the charterer when she is ready to load the charterer's cargo. This notice is known as a Notice of Readiness or NOR and is given by the Master of the vessel on behalf of the owner to the charterer, usually by the vessel sending a telex, fax or email message to the charterer's nominated port agents. Those port agents then relay the NOR to the charterer. In the case of the Charterparty, Clauses 29 and 30 deal with the giving of notice at the load port and the Court's attention is specifically drawn to the wording of Clause 30 which states:-

"... *definite notice of readiness to load to be given to* <u>*Charterers*</u>". (My emphasis)

In accordance with this Clause the NOR should have been given to Igen Sea, the named charterer. The ship sent notice by email on 5 November 2005. The email was sent to the nominated port agents, Oceanworld (identified in Clause 46 of the Charterparty as the load port agents) and Oceanworld sent a notice of readiness, not to Igen Sea, but to HAREC. It was HAREC who acknowledged receipt of that notice, stamping and signing the letter [Exhibit 2.4]. Had Igen Sea in truth been the charterer the notice should have been sent to them. Had there in truth been a genuine back to back fixture, Igen Sea should have in turn sent a notice of readiness to HAREC.   It is clear that Oceanworld's letter dated 7 November 2005 is a formal notice of readiness as required by the Charterparty

as it has a record of when the notice was tendered and when accepted and has been claused in handwriting requiring the vessel's holds to be clean dry, fit and ready in all respects to load the cargo of bagged rice. Those are all pieces of information which are relevant to the calculation of the start of laytime. To conclude, Oceanworld's letter dated 7 November 2005 is, in my opinion, clear evidence that they regarded HAREC as the charterer under the Charterparty.

_____
THOMAS ALAN MOISLEY

## DECLARATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and has been executed on this, the 10th day of July, 2008.

_____
THOMAS ALAN MOISLEY

23

-----------------------

# EXHIBIT 1

-----------------------

```
**********************************************************
  Delivered Message Printed at 21/04/2006 16:15:46 by PAUL    RefNum: 46610
    From/To: Oceanic Karachi
**********************************************************
```

Date:    21/04/2006 16:15:46
RefNum:  PAUL4661057
Att:

Good Day from Helmgale Sarl, Montpellier. France.
Ph: 33 (0)4 6758 4600 Fax 33 (0)4 6758 9503 e-mail: helmgale@helmgale.fr

farooq/paul

ain oussera/iss cp 2.11.05

owners see that chtrs not willing to pay demurrage due as per cp and have
no choice but to hand over file to arbitration because it is rather a large
sum at stake.

as brokers, feel that a commercial solution could be found if any
willingness to do so was seen on chtrs side.

but meantime owners advised us of their intention to activate london
arbitration process and asking if one sole london arbitrator is acceptable
to chtrs which case pls cfm agreement to nominate sole arbitrator mr david
farrington

rgds

-------------------------------- End Of Message --------------------------------

```
*********************************************************************
 Incoming Message Printed at 24/04/2006 15:15:16 by PAUL    RefNum: 4663262
   From/To: Oceanic Karachi
*********************************************************************
```

ReplyTo: "Oceanic Shipping & Trading Co." <chartering@ostc-group.com>
From: "Oceanic Shipping & Trading Co." <chartering@ostc-group.com>
To: <HELMGALE@helmgale.fr>
Subject: Fw: MV AIN OUSSERA.
Date: Mon, 24 Apr 2006 17:58:30 +0500

TO HELMGALE FRANCE

RE MV AIN OUSSERA
-----

RECEIVED BELOW FROM CHARTS

----- Original Message -----
From: "Igen Sea Shipping"
To: "Oceanic Shipping & Trading Co." <ostc-group@fascom.com>; "Farooq
Chaudhry" <farooq@ostc-group.com>
Cc: <william@packard.co.uk>
Sent: Monday, April 24, 2006 5:46 PM
Subject: MV AIN OUSSERA.


TO: OCEANIC SHIPPING & TRADING CO.,

CC: MR. WILLIAM PACKARD

WITH REFERENCE TO YOUR E-MAIL DATED APRIL 21, 2006
QUOTING THE MESSAGE YOU RECEIVED FROM OWNER'S
BROKERS; WE REGRET THAT WE CANNOT ACCEPT THEIR
NOMINATION OF A SOLE ARBITRATOR. IN ACCORDANCE
WITH CLAUSE 58 OF THE C/P, WE HEREBY NOMINATE
MR. WILLIAM PACKARD AS OUR ARBITRATOR.
MR. PACKARD'S ADDRESS, E-MAIL AND FAX NUMBER IS
AS FOLLOWS:-

M/S. WILLIAM PACKARD LTD,
20 VICTORY ROAD,
WEST MERSEA, COLCHESTER
ESSEX, CD5 8LX,
ENGLAND
TEL: 44 1206 383593

FAX 44 1206 383839

E-MAIL: <william@packard.co.uk>

WE SHALL BE OBLIGED IF YOU WILL REQUEST OWNERS
BROKERS TO GIVE US THE ADDRESS, E-MAIL AND FAX
NUMBER OF MR. DAVID FARRINGTON.


THANKS & REGARDS.

IGEN SEA SHIPPING

END

THANKS & BEST REGARDS
OCEANIC SHIPPING & TRADING CO.
AS AGENTS / BROKERS ONLY
TEL: +92-21-587-3157 / 58 / 59
FAX: +92-21-583-4785
EML: chartering@ostc-group.com / ostc-group@fascom.com
MSN: ostcgroup@hotmail.com / ostc_group@hotmail.com
SKYPE: ostc-group

**1.2**

```
*********************************************************************
   Delivered Message Printed at 24/04/2006 16:07:59 by PAUL     RefNum: 4663349
   From/To: Oceanic Karachi
*********************************************************************

Date:      24/04/2006 16:07:59
RefNum:    PAUL4663349
Att:

Good Day from Helmgale Sarl, Montpellier, France.
Ph: 33 (0)4 6758 4600 Fax 33 (0)4 6758 9503 e-mail: helmgale@helmgale.fr

ain oussera/ISS


Owners advise that ISS will be contacted by their own lawyers/legal dept


rgds

                           ------------ End Of Message ------------
```

1.3

# DAVID FARRINGTON

Gun House, 1 Artillery Passage, London E1 7LJ

Tel: 020 7247 8090
Fax: 020 7247 7060
df@chorleyfarm.co.uk



LMAA

Fax Transmission 1 page (s)

24 April, 2006

**To:** CNAN Group SpA

42

**No.** 00 213 21 33 75

Ref: A Draa, Esq.
Director Legal Department

This communication is intended only for use by the Addressee. It may contain confidential or privileged information. If you receive this communication unintentionally, please inform me immediately and destroy the copy in your possession. Thank you.

## "Ain Oussera"; cp dd 07.11.05

Thank you for your fax today. I confirm that I accept on LMAA Terms (2006) appointment as Arbitrator from CNAN Group SpA, as Owners, in their dispute with Igen Sea of Karachi, the Charterers. I note that Igen Sea has appointed as their Arbitrator Mr William Packard.

Would you please send to me by mail or e-mail, not fax, a copy of the relevant charterparty? Many thanks for the appointment. As always, I look forward to working with you.

Meilleurs salutations.

*David Farrington*

**1.4**

Delivered Message Printed at 03/05/2006 15:46:37 by PAUL
From/To: Oceanic Karachi
**********************************************************************

Date:    03/05/2006 15:46:37
RefNum:   PAUL4677915
Att:

Good Day from Helmgale Sarl, Montpellier. France.
Ph: 33 (0)4 6758 4600 Fax 33 (0)4 6758 9503 e-mail: helmgale@helmgale.fr

Re:MV Ain Oussera / Igean Sea Shpg. c:p 07-11-2005

 Charterers are hereby advised that Owners has appointed Mr David
FARRINGTON as their arbitrator.
Tel: 020 7247 8090
Fax: 020 7247 7060
E-mail: df@chorleyfarm.co.uk.

Best Regards

                 --------------------- End Of Message ---------------------

1.5

# EXHIBIT 2

DHL EXPRESS - 05-03 - P4 - UNITED KINGDOM

Shipper's copy

**DHL EXPRESS**

Track this shipment via the DHL Web Site: http://www.dhl.com

**Shipment Air Waybill**

**1 Payer account number and insurance details**

Charge to: ☑ Shipper ☐ Receiver ☐ 3rd party

Payer Account No. — 20097 591

**Shipment Insurance** see reverse

☐ Yes Insured value (in local currency) /

**2 From (Shipper)**

Shipper's account number  13097309/6

Contact name  MR ANNE CULFEED

Company name  SHAW & CROFT

Address  115 HOUNDSDITCH
LONDON

Postcode/Zip Code (required)  EC3A 7BR

Phone, Fax or E-mail (required)  020 7643 9000

**3 To (Receiver)**

Company name

Delivery address  DHL cannot deliver to a PO Box

Postcode/Zip Code (required)

Country

Phone, Fax / mail (required)

**377 8326 591**

ORIGIN  LHR

**4 Shipment details**

Total number of packages

Total Weight  kg

Pieces

Dimensions in cm  Length × Width × Height

**5 Full description of contents**

Give content and quantity

**6 Dutiable shipments only (WPX) (Customs Requirement)**

Attach the original and four copies of a Proforma or Commercial Invoice

Shipper's VAT/GST number

Receiver's VAT/GST or Shipper's EIN/SSN

Harmonised Commodity Code if applicable

Declared Value for Customs (as on commercial/proforma invoice)

TYPE OF EXPORT  ☐ Permanent  ☐ Repair / Return  ☐ Temporary

Destination duties/taxes if left blank receiver pays duties/taxes

☐ Receiver  ☐ Shipper  ☐ Other

**7 Shipper's agreement (Signature required)**

Signature                    Date

**8 Products & Services**

**DHL Express**

**Service Options**

DIMENSIONAL/CHARGEABLE WEIGHT  kg

**CHARGES**
Services
Other
Insurance
VAT

CURRENCY   TOTAL

TRANSPORT COLLECT STICKER No.

PAYMENT DETAILS (Cheque, Card No.)

No. :

Type                 Expires

Picked up by

Route No.

Time                 Date

DESTINATION CODE

☐ Cash
☐ Cheque
☐ Credit Card

2.1

Igen Sea Shipping,                                    Please advise
Ground Floor,
Iftikhar Chambers,                                    TAM/JRK/C1-94
Hasrat Mohani Road,
Karachi 74000,
Pakistan.
                                                      13th October 2006

DHL Courier

Dear Sirs,

"AIN OUSSERA" c/p dd 7.11.05 with Igen Sea Shipping
Owners claim for outstanding demurrage in an amount of US$271,790.44
net of commission and claim for damages for detention in an amount of US$26,800

We have been instructed by owners in relation to the above matter.  As you are aware, owners appointed Mr. David Farrington as their arbitrator and you have appointed Mr. William Packard as yours.  A third arbitrator will have to be appointed by the two arbitrators nominated by the parties in order to complete the tribunal in accordance with rider clause 58.

Having reviewed this matter, we find that you, as charterers, owe owners demurrage in the sum of US$271,790.44 net of commission.  After taking into account all payments between owners and charterers, the balance owed to owners is US$221,930.24 as is shown on owners' final statement of account, a copy of which is attached.  We also find that owners have a good claim against you for damages for detention arising out of your failure to give voyage instructions to the master after completion of loading at Karachi, thus obliging the vessel to wait at Karachi outer anchorage from 0130 hours on 8th December 2005 until 10:00 hours on 11th December 2005.

We attach owners' revised demurrage calculations together with a full set of the supporting documents, that is to say the Notice of Readiness, Statements of Facts and supporting time sheets for each of the three ports.  We now call upon you to pay the outstanding demurrage within fourteen days of receipt of this letter by transfer to the owners' bank account, details of which were given below:

Account No:          000.200.000.0 USD
IBAN:                CH 23083460002000000US
Banque Algerienne du Commerce Exterieur,
Talacker 41 – CH 8001
Zurich,
Switzerland.
In favour of CNAN Group SpA.

**2·2**

We also call upon you to pay the owners the sum of US$26,800 as damages for detaining their vessel after completion of loading at Karachi. You, as charterers, are under an obligation in English law to give voyage orders promptly following completion of loading and in breach of that implied term of the charterparty you failed to do so. We have calculated the loss suffered by owners in consequence of your breach by reference to the agreed demurrage rate of US$8,000 per day or pro rata and using that as the measure of owners' loss the damages are calculated to be 3.35 days X US$8,000 per day or US$26,800. We now call upon you to pay this sum into the same bank account as the outstanding demurrage.

In the absence of payment of US$298,590.44 (i.e. US$271,790.44 plus US$26,800) within fourteen days of the date of this letter, claim submissions will be served on you without further notice and owners' claim in the arbitration will be increased by a claim for interest and for the costs of the reference. In order to avoid increasing your liability unnecessarily, we urge you to pay the outstanding amounts due to owners immediately.

Yours faithfully,

S & C

Enc ✓

**2.3**

# Oceanworld (Pvt.) Ltd.

Shipping Agents, Charterers, Operators



Marine Pride Building, Suite # 403,
4th Floor, P/No. BC-2, BI-7,
K.D.A. Scheme-5, Clifton,
Karachi - Pakistan.
Tel    :(92-21) 5 8 7 3 1 4 8 - 9
Fax    :(92-21) 5 8 3 4 7 8 5
E-mail : oceanworld@cyber.net.pk
E-mail : o w p l @ f a s c o m . c o m

Dated 07th November 2005

To,

**M/s. Hassan Ali Rice Export Co.,**
Suite # 102, Cotton Exchange Building,
I.I.Chundrigar Road,
**Karachi - Pakistan**

Subject:

## NOTICE OF READINESS
## M.V. AIN OUSSERA – VOY 001

Dear Sir,

This is to notify you that the subject vessel has arrived Karachi outer anchorage at 1730 hours on 05th November 2005, in order to Load about 25,000 M/tons Rice in Bags at Karachi Port.

This is to further notify that the vessel is ready in all respects to load your cargo as per terms, conditions and exceptions to the relevant Charter Party.

Kindly acknowledge receipt of this Notice of Readiness.

Thanking You,

Your faithfully,
*for* OceanWorld (Private) Limited

As Agents Only

NOTICE OF READINESS TENDERED AT ___0900___ HOURS ON _07TH_, NOVEMBER, 2005

NOTICE OF READINESS ACCEPTED AT ___0900___ HOURS ON _08TH_, NOVEMBER, 2005

Subject to vessel's Holds/Hatches are clean, dry, fit and ready in all respect to load Cargo of Bagged Rice.

2.4

an 23 06 09:40a          CNAN-ASMC-AIN OUSSERA          +(873) 764465247          P.1

OUT.001          Page  1     UTC Time: 05-11-05  13:07:07

to: helmgale@helmgale.fr
cc: belabed@cnan-dz.com
subj: NOR


fm mv ain oussera
to oceanworld (pvt) ltd
cc helmgale
    nan-asmc/df

subj...: notice of readiness

dear sirs,

kindly be informed that mv ain oussera, which is anchored at karachi
road, is in all respects ready to load her cargo (25000mt bagged
rice), according to terms and conditions of charter party.

please consider this as official notice of readiness and advise all
parties accordingly.

karachi road the 5th november, 2005 at 1730lt.

                              the master

2.5

# STATEMENT OF FACTS.
## M.V. AIN OUSSERA
### KARACHI PORT AT BERTH #.11 EAST WHARF

| | |
|---|---|
| - VESSEL ARRIVED OUTER ANCHORAGE AT KARACHI PORT | AT 1730 HRS ON 05-11-2005 |
| - N.O.R TENDER BY MASTER | AT 1730 HRS ON 05-11-2005 |
| - N.O.R ACCEPTED BY M/S.HASSAN ALI RICE EXPORT CO., | |
| CHARTERERS/SHIPPERS REMARKS: SUBJECT TO VESSEL HOLDS/HATCHES | |
| ARE CLEAN, DRY, FIT AND READY IN ALL RESPECT TO LOAD CARGO OF | |
| BAGGED RICE. | AT 0900 HRS ON 08-11-2005 |
| - PILOT ON BOARD FOR BERTHING | AT 0627 HRS ON 26-11-2005 |
| - VESSEL BERTHED AT BERTH #.12 EAST WHARF | AT 0820 HRS ON 26-11-2005 |
| - COMPLETE IMMIGRATION/CUSTOM/OTHER CLEARANCE | AT 0920 HRS ON 26-11-2005 |
| - HOLDS/HATCHES INSPECTION START | AT 1030 HRS ON 26-11-2005 |
| - HOLDS/HATCHES INSPECTION FINISH (ALL HOLD/HATCH CLEARED) | AT 1230 HRS ON 26-11-2005 |
| - LOADING COMMENCED | AT 2015 HRS ON 26-11-2005 |
| - LOADING COMPLETED | AT 1725 HRS ON 07-12-2005 |
| - FUMIGATION START | AT 1730 HRS ON 07-12-2005 |
| - FUMIGATION COMPLETED | AT 1830 HRS ON 07-12-2005 |
| - VESSEL SAILED IN FIRST AVAILABLE TIDE | AT 0130 HRS ON 08-12-2005 |
| - ETA NEXT PORT     (NOT KNOWN) | AT -- HRS ON --12-2005 |

| BUNKERS ON BOARD | | ARRIVAL | SUPPLIED | DEPARTURE |
|---|---|---|---|---|
| | I.F.O | 635.000 M.T. | NIL M.T. | 635.000 M.T. |
| | D.O. | 13.000 M.T. | 78.000 M.T. | 88.000 M.T. |
| | F.W. | 8.000 M.T. | 150.000 M.T. | 55.000 M.T. |

| DRAFT | | FORWARD | MID | AFTER |
|---|---|---|---|---|
| | ARRIVAL | 4.50 M | 5.30 M | 6.10 M |
| | SAILING | 9.70 M | 9.72 M | 9.75 M |

| HOLIDAYS | LIST OF SATURDAY | LIST OF SUNDAY | LIST OF OTHER HOLIDAY |
|---|---|---|---|
| | 05-11-2005 | 06-11-2005 | 05-11-2005 (EID HOLIDAY) |
| | 12-11-2005 | 13-11-2005 | 09-11-2005 (IQBAL DAY) |
| | 19-11-2005 | 20-11-2005 | |
| | 26-11-2005 | 27-11-2005 | |
| | 03-12-2005 | 04-12-2005 | |

CARGO
CARGO BAGGED RICE LOADED AS PER TALLY      25062.600 M.TONS GROSS
                                           500000 BAGS

DELAYS AND DETANTION
AS PER TIME SHEET & DEALAYS AND DETANTION SHEET ATTACHED.

REMARKS
- SEE CHARTERERS/SHIPPERS REMARKS ON NOR.

---

MASTER OF M.V.AIN OUSSERA
AT BERTH #.11 EAST WHARF
KARACHI PORT

OCEANWORLD (PRIVATE) LIMITED
AS AGENTS ONLY

2.6

# MV. AIN OUSSERA – AT B.NO.11 E/W KARACHI PORT
# TIME SHEET / DELAYS AND DETENTION REPORT

| hift Timing | | Normal | Overtime | Meal/Other Breaks |
|---|---|---|---|---|
| Day | | 0730 to 1630 | 1630 to 1830 | 1130 to 1230 (Except Friday) |
| | | | | 1230 to 1400 (Friday) |
| Night | | 1900 to 0330 | 0330 to 0630 | 2300 to 2330 |

| Date | Shift | Gangs | From | To | Reason |
|---|---|---|---|---|---|
| 5-11-2005 | --- | --- | 1730 | --- | Vessel Arrived at Karachi Outer Anchorage / Awaiting |
| | --- | --- | 1730 | 2400 | - DO - *EID HOLIDAY* |
| 6-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 5 | --- | --- | 0001 | 2400 | - DO - |
| 8-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 9-11-2005 | --- | --- | 0001 | 2400 | - DO - *IQBAL HOLIDAY* |
| 0-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 1-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 12-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 13-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 14-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 1 -2005 | --- | --- | 0001 | 2400 | - DO - |
| 16-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 17-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 18-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 19-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 20-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 21-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 22-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 23-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 24-11-2005 | --- | --- | 0001 | 2400 | - DO - |
| 25-11-2005 | --- | --- | 0001 | 2400 | - DO - |

2·7

Contd......Pg/02

# MV. AIN OUSSERA — AT B.NO.11 E/W KARACHI PORT
# TIME SHEET / DELAYS AND DETENTION REPORT

- : ( 02 ) : -

| Date | Shift | Gangs | From | To | Reason |
|------|-------|-------|------|----|--------|
| 26-11-2005 | --- | --- | 0001 | 0627 | - DO - |
|  | Day | --- | 0627 | --- | Pilot Boarded for berthing |
|  |  |  | --- | 0820 | Vessel berthed at B.No.12 East Wharf |
|  |  |  | 0820 | 0920 | Clearance/Formalities of Custom/Immigration & Other Port Authorities. |
|  |  |  | 1030 | 1230 | Holds/Hatches inspection carried out & surveyors cleared all Holds/Hatches. |
|  | Night | 03 | 2015 | --- | Commenced Loading Operation. |
|  |  |  | 0200 | 0330 | 03 Gangs detained due to want of cargo. |
| 27-11-2005 | Day | 02 | 0730 | 1000 | 02 Gangs detained in H No.1/3 due to want of cargo |
| 28-11-2005 | Day | 02 | 0730 | 1000 | 02 Gangs detained due to want of cargo. |
|  | Night | 02 | 1955 | 2040 | 02 Gangs detained due to vessel shifting to B.No.11. |
| 01-12-2005 | Day | 02 | 0730 | 0930 | 02 Gangs detained in H.No.1/3 due to want of cargo. |
| 04-12-2005 | Day | 02 | 0730 | 0900 | 02 Gangs detained due to want of cargo |
| 06-12-2005 | Night | 03 | 0130 | 0330 | 02 Gangs detained due to want of cargo. |
| 07-12-2005 | DAY | 03 | 1725 | – | COMPLETE LOADING. |
|  |  |  | 1730 | 1830 | FUMIGATION START COMPLETE. |
| 08-12-2005 |  |  | 0130 |  | VESSEL SAILED. |

Master M.V. AIN OUSSERA
At B.No.11 E/W at Karachi Port

OceanWorld (Private) Limited
As Agents Only

# 2.8

eb 20 06 07:38a        CNAN-ASMC-AIN OUSSERA        +(873) 764465247        P.1

# Cnan Group Asmc

M/V    :    AIN OUSSERA
Master :    M.HAMIMI

## *NOTICE OF READINESS*

Dear sirs,

Kindly be informed that the above-mentioned vessel arrived at **Conakry**

road on **January 14**th **2006 at 1107lt** and is in all respects ready to

discharge her cargo according to terms and conditions of the charter-party.

Yours faithfully,

The Master:

Receivers/Shippers:  *RECEIVED ON 18/10/2006 AT 11.10 HRS*

*TRANSAFRICA SA AS AGENT ONLY*

**2.9**

## STATEMENT OF FACTS  MV AIN OUSSERA

16 200 MT RICE

| | |
|---|---|
| ARRIVED  ON  ROADS | 14/01/06 AT 11.07 |
| N.O.R TENDERED | 14/01/06 AT 11.07 |
| N.O.R  ACCEPTED | 18/11/06 AT 11.10    *typo* |
| ALONGSIDE BERTH N° 1 | 18/01/06 AT 11.00 |
| FREE PRATIQUE GRANTED | 18/01/06 AT 11.30 |
| DISCH. COMMENCED | 18/01/06 AT 13.15 |
| DISCH. COMPLETED | 18/02/06 AT 16.00 |

VESSEL SAILED  FOR

BUNKERS ON ARRIVAL                  BUNKERS ON DEPARTURE

| | |
|---|---|
| FO | 258.00 MT |
| MDO | 68 .00 MT |
| LUBOIL | 12 500 LTRS |
| F.W | 100.00 MT |

ARRIVAL DRAFT                          DEPARTURE DRAFT

FWD    9.85   AFT   9.85         FWD                    AFT


REMARKS : FROM FRIDAY 13.00 HRS TO MONDAY  08.00  HRS HOLIDAY


TRANSAFRICA   AS AGENT ONLY            THE MASTER OF AIN OUSSERA

**2.10**

## SAT.14/01/06
FM 11.07 TO 24.00 VESSEL ON ROADS .PORT CONGESTION

## SUN.15/01/06
FM 00.00 HRS TO 24.00 VESSEL ON ROADS.PORT CONGESTION

## MON.16/01/06
FM 00.00 HRS TO 24.00 HRS AWAITING OWNERS INSTRUCTION FOR BERTHING

## TUE.17/01/06
FM 00.00 HRS TO 24.00 HRS AWAITING OWNERS INSTRUCTIONS FOR BERTHING

## WED.18/01/06
FM 00.00 HRS TO 10.00 HRS AWAITING OWNERS INSTRUCTION FOR BERTHING
FM 10.00 HRS TO 11.07 HRS VESSEL BERTHING TIME ⟶ *shifting for I to roads*
FM 11.10 HRS TO 11.25 HRS INWARD FORMALITIES
FM 11.25 HRS TO 13.15 HRS HOLDS INSPECTION
FM 13.15 HRS TO 18.00 HRS DISCH CARGO WITH 5 HOLDS
FM 15.00 HRS TO 16.00 HRS MEASLS BREAK

## THU.19/01/06
FM 08.15 HRS TO 19.00 HRS DISCH CARGO WITH 5 HOLDS
FM 09.30 HRS TO 10.20 HRS VESSEL SHIFTED FORWARD  = *1st shift*
FM 14.30 HRS TO 15.30 HRS MEALS BREAK

## FRI.20/01/06
FM 08.05 HRS TO 18.00 HRS DISCH CARGO WITH 5 HOLDS
FM 14.30 HRS TO 15.30 HRS MEALS  BREAK

## SAT.21/01/06
FM 08.00 HRS TO 20.00 HRS DISCH CARGO WITH 5 HOLDS
FM 10.30 HRS TO 12.10 HRS HOLD 3 DERRICK BREAKDOWN   = 10·30 h 12·00 = 1½ on
FM 14.00 HRS TO 15.00 HRS MEALS BREAK
$$0·41666$$
$$·020833$$
$$= ·437493 \, km$$

## SUN.22/01/06
FM 08.00 HRS TO 15.00 HRS DISCH CARGO WITH 5 HOLDS          $\div 4 = 0·10937325$
FM 13.30 HRS TO 15.30 HRS MEALS BREAK
DISCH OPS STOPPED AT 15.00 HRS DUE TO LACK OF SAFETY.          4/9'6 in
DUE TO AFRICAN NATIONS CUP,TOWN STREET WERE OVER FLOWED          22·5 mn

## MON.23/01/06
FM 08.00 HRS TO 17.00 HRS DISCH.CARGO WITH 5 HOLDS
FM 14.00 HRS TO 15.00 HRS MEALS  BREAK



**2.11**

## TUE.24/01/06
FM 12.00 HRS TO 19.00 HRS DISCH CARGO WITH 5 HOLDS
FM 08.00 HRS TO 12.00 HRS AWAITING AUTHORIZATION FM OWNER TO DISCH.
FM 13.15 TO 13.50 HOLD 4-5 DERRICK BREAKDOWN    = 35 m  or  · 0 2 4 3 0 5 /dg
FM 14.00 TO 15.00 HRS MEALS BREAK                      or · 0 1 2 1 5 2 5

## WED.25/01/06
FM 08.00 HRS TO 19.00 HRS DISCH CARGO WITH 5 HOLDS
FM 14.00 HRS TO 15.00 HRS MEALS BREAK

## THU.26/01/06
FM 08.00 HRS TO 10.30 HRS DISCH CARGO WITH 5 HOLDS
FM 10.30 HRS TO 24.00 HRS AWAITING AUTHORIZATION FM OWNER TO DISCH  — B/L
                                                          putter

## FRI.27/01/06
FM 08.30 HRS TO 19.00 HRS DISCH CARGO WITH 5 HOLDS
FM 08.00 HRS TO 08.30 AWAITING AUTHORIZATION FM OWNER
FM 13.00 HRS TO 14.00 HRS MEALS BREAK
HOLD 1 COMPLETED AT 18.00 HRS

## SAT.28/01/06
FM 08.00 HRS TO 17.00 HRS DISCH CARGO WITH 4 HOLDS
FM 13.00 HRS TO 14.00 HRS MEALS BREAK
DISCH OPS STOPPED AT 17.00 HRS DUE TO OWNER INSTRUCTION

## SUN.29/01/06
FM 00.00 HRS TO 24.00 AWAITING OWNER INSTRUCTION TO DISCH

## MON.30/01/06
FM 00.00 HRS TO 24.00 AWAITING OWNER INSTRUCTION TO DISCH

## TUE.31/01/06
FM 10.00 HRS TO 19.00 DISCH CARGO WITH 4 HOLDS
FM 08.00 HRS TO 10.00 HRS AWAITING OWNER INSTRUCTION TO DISCH
FM 13.00 HRS TO 14.00 HRS MEALS BREAK

## WED.01/02/06
FM 08.00 HRS TO 11.30 HRS DISCH CARGO WITH 4 HOLDS
FM 11.30 HRS TO 24.00 HRS AWAITING OWNER INSTRUCTIONS TO DISCH

## THU.02/02/06
FM 00.00 HRS TO 24.00 AWAITING OWNER INSTRUCTION TO DISCH

## FRI.03/02/06
FM 08.00 HRS TO 11.00 HRS AWAITING OWNER INSTRUCTION TO DISCH

**2.12**

## SAT.04/02/06
FM 08.00 HRS TO 16.00 HRS DISCH CARGO
FM 13.00 HRS TO 14.00 HRS MEALS BREAK

## SUN.05/02/06
FM 00.00 HRS TO 24.00 HRS NO DISCHARGING

## MON.06/02/06
FM 08.00 HRS TO 14.00 HRS DISCH CARGO
FM 14.00 HRS TO 24.00 HRS AWAITING OWNER INSTRUCTION TO DISCH.

## TUE.07/02/06
FM 00.00 HRS TO 24.00 HRS AWAITING OWNER INSTRUCTION TO DISCH          B/L pub

## WED.08/02/06
FM 08.00 HRS TO 19.00 HRS DISCH CARGO
FM 13.00 HRS TO 14.00 HRS MEALS BREK
FM 14.55 HRS TO 17.00 HRS CRANE N° 2 OUT OF ORDER          2 hr 05 or

## THU.09/02/06
FM 08.10 HRS TO 18.30 HRS DISCH CARGO
FM 14.30 HRS TO 15.30 HRS MEALS BREAK
FM 08.10 HRS TO 18.30 HRS CRANES 3 AND 5 OUT OF ORDER = 10hr 20m

## FRI.10/02/06          09
FM 08.10 HRS TO 18.00 HRS DISCH CARGO
FM 08.20 HRS TO 08.15 HRS RAIN          WWD   Time ?55m
FM 14.30 HRS TO 15.30 HRS MEALS BREAK
HOLD 5 COMPLETED AT 17.30 HRS
FM 08.10 HRS TO 18.00 HRS HOLDS 3 OUT OF ORDER   ? 9 h 50m
          Crane

## SAT.11/02/06
FM 08.10 HRS TO 19.00 HRS DISCH CARGO
FM 14.00 HRS TO 15.00 HRS MEALS BREAK
FM 08.10 HRS TO 19.00 HRS HOLDS 3 OUT OF ORDER   ?   3 h 50m
          12-00   Crane

## SUN.12/02/06
FM 08.10 HRS TO 18.30 HRS DISCH CARGO
FM 13.30 HRS TO 14.30 HRS MEALS BREAK

## MON.13/02/06
FM 09.00 HRS TO 18.00 HRS DISCH CARGO
FM 14.00 HRS TO 15.00 HRS MEALS BREAK



**2.13**

Feb 20 06 07:42a    CNAN-ASMC-AIN OUSSERA    +(873) 764465247    P.

### TUE.14/02/03
FM 08.30 HRS TO 19.30 HRS DISCH CARGO
FM 13.30 HRS TO 14.30 HRS MEALS BREK

### WED.15/02/06
FM 09.05 TO 18.00 HRS DISCH CARGO
HOLD 3 COMPLETED AT 13.57 HRS
FM 14.00 HRS TO 15.00 HRS MEALS BREAK

### THU.16/02/06
FM 08.30 HRS TO 19.30 HRS DISCH CARGO
HOLD 2 COMPLETED AT 11.30 HRS
FM 14.30 HRS TO 15.00 HRS GANGS SHIFT
FM 15.00 HRS TO 16.00 HRS MEALS BREAK

### FRI.17/02/06
FM 08.30 HRS TO 19.00 HRS DISCH CARGO
FM 14.00 HRS TO 15.00 HRS MEALS BREAK
VESSEL ARRESTED BY PROTECTING AGENT FOR NON PAYMENT OF
PROTECTING AGENT CHARGES.

### SAT 18/02/06
DISCH OPS COMPLETED AT 16.00
DISCH DOCS ON BOARD AT 18.00
VESSEL AWAITING TO BE RELEASED BY PROTECTING AGENT AFRITRAMP

* SHIP'S REMARKS
  - WAITING OWNER INSTRUCTION TO DISCHA.
  - LACKS OF ORIGINAL B/LADDINGS/ TWO SETS IN
    CIRCULATION.



2.14

28 06 09:26a    CNAN-ASMC-AIN OUSSERA    +(873) 764465247    p.1

# NOTICE OF READINESS



DATE : 27 / 02 / 2006

Roads / : TAKORADI........

M/V " AIN OUSSERA"

Dear Sirs,

This is to notify that the above vessel has arrived at : TAKORADI ROADS

At: 14 H 20 MN  On:   FEB   27TH, 2006  and she is ready in all respects; to

commence loading / discharging her cargo in accordance with the terms and

conditions of the Charter party.

NOTICE OF READINESS TENDERED at: 14 H 15 mn        on: Feb 27th, 2006

SUPERMARITIME GHANA LTD.

AS AGENT ONLY

Yours faithfully,

Master M/V "AIN OUSSERA"

N.O.R accepted at ............H......... mn        on ................................ .........

2.15



# SUPERMARITIME (GHANA) LIMITED
## P.O. BOX 1154 TAKORADI

VESSELS NAME:        MV 'AIN OUSSERA'              DATE:        26TH MARCH 2006

## STATEMENT OF FACTS

| DATE: | DAY: | TIME: | HATCH No. | FACTS: |
|---|---|---|---|---|
| 27-Feb-06 | MON. | 1430 | | VESSEL ARRIVED ON ROADS |
| " | " | 1430 | | NOTICE OF READINESS TENDED |
| " | " | 1440 | | VESSEL ANCHORED TO AWAIT BERTH DUE TO CONGESTION IN PORT |
| ( | " | " | 1440 - 2400 | | VESSEL AT ANCHORAGE AWAITING BERTH DUE TO CONGESTION IN PORT |
| 28-Feb-06 | TUE. | 0000 - 2400 | | VESSEL AT ANCHORAGE AWAITING BERTH DUE TO CONGESTION IN PORT |
| 01-Mar-06 | WED. | 0000 - 2400 | | NOTE THAT ON THIS DAY A BERTH WAS ALLOCATED TO THE VESSEL BUT THE MASTER FAILED TO UTILIZE IT WITH THE REASON THAT HE WAS AWAITING ORDERS FROM HIS OWNERS. BERTH WAS ALLOCATED TO OTHER VESSEL. THIS KEPT THE VESSEL AT THE ANCHORAGE FROM 2ND TO 13TH MARCH 2006 |
| 13-Mar-06 | | | | ON THIS DAY BILL OF LADING WAS RECEIVED AND COMMUNICATED TO THE MASTER (VESSEL AWAITING BERTH FROM 0930 HRS - 2400 HRS) |
| 14-Mar-06 | TUE. | 0000 - 2400 | | VESSEL AT ANCHORAGE AWAITING BERTH NOTE THAT VESSEL AWAITING FOR BERTH FROM 14TH TO 17TH |
| 17-Mar-06 | FRI. | | | BERTH ALLOCATED, PILOT BOARDED VESSEL FOR BERTHING AT 0055 HRS BUT HAD TO DISEMBARK DUE TO ENGINE BREAKDOWN AT 0217 HRS. HOWEVER, MASTER CONFIRMED THAT ENGINE WAS READY AT 1045 HRS BY THEN THE PORT HAD ALREADY RE-ALLOCATED THE BERTH TO ANOTHER VESSEL AWAITING BERTH. |
| " | " | 1045 - 2400 | | VESSEL AT ANCHORAGE AWAITING BERTH |
| 18-Mar-06 | SAT | 0000 - 2350 | | VESSEL AT ANCHORAGE AWAITING BERTH |
| " | " | 2350 | | PILOT BOARDED VESSEL |
| 19-Mar-06 | SUN. | 0055 | | VESSEL BERTH |
| " | " | 0055 - 0800 | | AWAITING CUSTOMS CLEARANCE / PORT FORMALITIES |
| " | " | 0800 - 0815 | | OPENING OF HATCHES 1,2,3 AND 5 |
| " | " | 0815 - 0900 | | AWAITING SURVEYOR'S FORMALITIES |
| " | " | 0900 - 0905 | | FIXING STEVEDORE GEARS |
| " | " | 0905 | 1,2,3 &5 | DISCHARGING COMMENCED |
| " | " | 0905 - 1930 | 1,2,3 & 5 | WORKING |
| " | " | 1930 - 2400 | 1 & 5 | WORKING |

2.16

.pr 03 06 10:53a     CNAN-ASMC-AIN OUSSERA     +(873) 764465247

| DATE: | DAY: | TIME: | HATCH No. | FACTS: |
|---|---|---|---|---|
| 20-Mar-06 | MON. | 0000 - 0630 | 1 & 5 | WORKING |
| " | " | 0630 - 0800 | | SHIFTING VESSEL FROM No.3 WHARF TO No.4 WHARF BY THE ORDER OF THE PORT AUTHORITY |
| " | " | 0800 - 0830 | 1 & 5 | FIXING STEVEDORE GEARS IN HOLD 1 & 5 |
| " | " | 0830 - 1600 | 1 & 5 | WORKING |
| " | " | 1600 - 1630 | 3 | FIXING STEVEDORE GEARS |
| " | " | 1630 - 1900 | 1, 3, & 5 | WORKING |
| " | " | 1900 - 2000 | | SHIFTING VESSEL FORWARD |
| " | " | 2000 - 2400 | 1 & 3 | WORKING |
| 21-Mar-06 | TUE | 0000 - 0040 | 1 & 3 | WORKING |
| " | " | 0040 - 0200 | | AWAITING CLEAR WEATHER |
| " | " | 0200 - 0445 | 1 & 3 | WORKING |
| " | " | 0445 - 0810 | | AWAITING CHARGING OVER OF STEVEDORE |
| " | " | 0810 - 0845 | | RAINING |
| " | " | 0845 - 0930 | 1 & 2 | WORKING |
| " | " | 0845 - 0930 | | AWAITING STEVEDORE GANG IN HOLD 5 |
| " | " | 0930 - 2400 | 1,2,3 & 5 | WORKING |
| 22-Mar-06 | WED. | 0000 - 0730 | 1,2,3 & 5 | WORKING |
| " | " | 0730 - 0800 | | AWAITING STEVEDORE GANG IN HOLD 1, 2 & 5 |
| " | " | 0800 - 1200 | 1, 3 & 5 | |
| " | " | 1200 | | DISCHARGING COMPLETED IN HOLD 1 AND GANG SHIFTED TO HOLD 2 |
| " | " | 1200 - 1600 | 2,3 & 5 | WORKING |
| " | " | 1600 - 1930 | | RAINING -- |
| " | " | 1930 - 2400 | 2,3,4 & 5 | WORKING |
| 23-Mar-06 | THR. | 0000 - 0530 | 2,3,4 & 5 | WORKING |
| " | " | 0530 - 0722 | | SHIFTING VESSEL FORWARD |
| " | " | 0722 - 0730 | | FIXING STEVEDORE GEARS |
| " | " | 0730 - 1930 | 2, 4 & 5 | WORKING |
| " | " | 1930 - 2400 | 2,3,4 & 5 | WORKING |
| 24-Mar-06 | FRI. | 0000 - 0030 | 2,3,4 & 5 | WORKING |
| " | " | '0030 | | COMPLETED DISCHARGING IN HOLD 4 |
| " | " | 0030 - 0730 | 2,3 & 5 | WORKING |
| " | " | 0730 - 1330 | 2 & 5 | WORKING |
| " | " | 1330 | | COMPLETED DISCH. IN HOLD 5 SHIFTED TO HOLD 2 |
| " | " | 1330 - 2400 | 2 & 3 | WORKING |
| 25-Mar-06 | SAT. | 0000 - 1730 | 2 & 3 | WORKING |
| " | " | 1815 | | DISCHARGING COMPLETED IN HOLD 2 |
| " | " | 1815 - 2400 | 3 | WORKING |
| 26-Mar-06 | SUN. | 0000 - 1200 | 3 | WORKING |
| " | " | 1200 | | DISCHARGING COMPLETED |

SUPERMARITIME GHANA LTD.

AS AGENT ONLY

AGENT
SUPERMARITIME

CAPTAIN'S REMARKS
WAITING ORDERS = WAITING
PROPER CARGO DOCS. from
CHARTERERS

2.17

| CNAN GROUP SPA | | | | | | |
|---|---|---|---|---|---|---|
| MV AIN OUSSERA A/C IGEAN SEA SHPG KARACHI | | | | | C/P DATED | 7-Nov-2005 |
| Owners Statement of Accounts | | | revised | as on | 12-Oct-2006 | |
| | | | | | | |
| Cargo | | 25,062 mt gross weight of bagged rice. | | | | |
| Loading port | | Karachi (Pakistan) | | | | |
| Discharge port | | Conakry (Guinea) & Takoradi (Ghana) | | | | |
| Freight | | USD 42.0 / mt | | | | |
| Add+Brk comm | | 5% | | | | |
| Loading rate | | 2,000 mt / day | | | | |
| Discharge rate | | 1,000 mt /day | | | | |
| Demurrage rate | | USD 8,000,00 / day | | | | |
| Laytime Karachi | | 23.8959 | Days | | | |
| Laytime Conakry | | 27.3411 | Days | | | |
| Laytime Takoradi | | 22.1182 | Days | | | |
| | | | | | | |
| | | | | | CREDIT  USD (OWNS FAV) | DEBIT USD (CHRTS FAV) |
| | | | | | | |
| FREIGHT | USD | 42.00 | x GW (mt) | 25062.00 | 1,052,604.00 | |
| | | | | | | |
| ADDRESS COMMISSION | | | 2.50% | | | 26,315.10 |
| BROKERAGE COMMISSION | | | 2.50% | | | 26,315.10 |
| | | | | | | |
| Owners contribution OAP | | | | | | 2,500.00 |
| Owners contribution kraft paper | | | | | | 2,500.00 |
| | | | | | | |
| Cash to Master at Karachi on 06-12-2005 | | | | | | 30,750.00 |
| | | | | | | |
| Cash to Master at Karachi on 08-12-2005 | | | | | | 43,152.00 |
| | | | | | | |
| Demurrage at Loading port Karachi | | | 11,3646 dys | | 86,370.96 | |
| | | | | | | |
| Demurrage at Discharge port Conakry | | | 11,1411 dys | | 84,672.36 | |
| | | | | | | |
| Demurrage at Discharge port Takoradi | | | 13,2562 dys | | 100,747.12 | |
| | | | | | | |
| | PAID TO OWNERS | | | | | |
| Value date | Hire | | | | | |
| 03-Jan-06 | 1st freight remittance | | | | | 199,954.00 |
| 05-Jan-06 | 2nd freight remittance | | | | | 299,969.00 |
| 09-Jan-06 | 3rd freight remittance | | | | | 199,969.00 |
| 09-Jan-06 | 4th freight remittance (balance) | | | | | 221,040.00 |
| 15-Feb-06 | Advance on demurrage Karachi | | | | | 50,000.00 |
| | | TOTAL | | USD | 1,324,394.44 | 1,102,464.20 |
| | Balance in Owners favour | | | USD | 221,930.24 | |
| | | | | | | |
| ( Two hundred twenty one thousand nine hundred thirty USD and 24 cents ). | | | | | | |

2.18

| MV AIN OUSSERA  A/C IGEAN SEA SHIPPING.  C/P 07-11-2005 | | | | | |
|---|---|---|---|---|---|
| **Revised** | **DEMURRAGE AT LOADING PORT KARACHI.** | | | | **11/10/06** |
| | | | | | |
| Cargo | Bgd Rice | | saturdays | sundays | holidays |
| Load port | Karachi | | 12/11/05 | 13/11/05 | 9/11/05 |
| Gr weight | 25,062 mt | | 19/11/05 | 20/11/05 | |
| Load. Rate | 2,000,00 mt | pwwd shex eiu | 26/11/05 | 27/11/05 | |
| Load. Time | 12,53 days | | 3/12/05 | 4/12/05 | |
| NOR given | 07/11/05 | 09:00 LT | | | |
| Time to count | 08/11/05 | 09:00 LT | | | |
| Demur. Rate | 8,000,00 usd | pdpr hdwtsbe | | | |

| **Time used** | | Hours | Days | |
|---|---|---|---|---|
| | | | | |
| 08/11/05 from 09:00 to 12:00 | | 3.00 | 0.1250 | |
| 10/11/05 from 08:00 to 24:00 | | 16.00 | 0.6666 | |
| 11/11/05 from 00:00 to 24:00 | | 24.00 | 1.0000 | |
| 12/11/05 from 00:00 to 12:00 | | 12.00 | 0.5000 | |
| 14/11/05 from 08:00 to 24:00 | | 16.00 | 0.6666 | |
| 15th + 16th + 17th + 18th Nov. 05 | | | 4.0000 | |
| 19/11/05 from 00:00 to 12:00 | | 12.00 | 0.5000 | |
| 21/11/05 from 08:00 to 24:00 | | 16.00 | 0.6666 | |
| 22nd + 23rd + 24th + 25th Nov. 05 | | | 4.0000 | |
| 26/11/05 from 00:00 to 09:45 | | 9.00 | 0.4065 | |
| | | | | |
| | **Total** | | **12.5313** | days |

vessel on demurrage from 26/11/05 at 09:45
Loading operations completed

| **Demurrage time** | | Hours | Days | |
|---|---|---|---|---|
| | | | | |
| 26/11/05 from 09:45 to 24:00 | | 14.25 | 0.5938 | |
| 27th + 28th + 29th + 30th Nov. 05 | | | 4.0000 | |
| 1st + 2nd + 3rd + 4th + 5th + 6th Dec. 05 | | | 6.0000 | |
| 07/12/05 from 00:00 to 18:30 | | | 0.7708 | |
| | **Total** | | **11.3646** | days |

| **Demurrage amount** | | | | |
|---|---|---|---|---|
| | | | | |
| 11.3646 | days x usd | 8000.00 | 90,916.80 | usd |
| | | | | |
| | Less 5% total commission | | 4,545.84 | usd |
| | | | | |
| | **Total** | | **86,370.96** | usd |

( Eighty six thousand three hundred seventy USD and 96 cents ).

2.19

| MV AIN OUSSERA  A/C IGEAN SEA SHIPPING.  C/P 07-11-2005 | | | | | |
|---|---|---|---|---|---|
| **Revised** | **DEMURRAGE AT 1ST DISCHARGE PORT CONAKRY** | | | | **11/01/06** |
| | | | | | |
| Cargo | Bgd Rice | | saturdays | sundays | holidays |
| Disch. Port | Conakry | | 14/1/06 | 15/1/06 | |
| Gr weight | 16,200 mt | | 21/1/06 | 22/1/06 | |
| Disch. Rate | 1,000.00 mt | pwwd shex eiu | 28/1/06 | 29/1/06 | |
| Dich. Time | 16,20 days | | 4/2/06 | 5/2/06 | |
| NOR given | 14/01/06 | 11:07 LT | 11/2/06 | 12/2/06 | |
| Time to count | 16/01/06 | 08:00 LT | 18/2/06 | 19/2/06 | |
| Demur. Rate | 8,000,00 usd | pdpr hdwtsbe | | | |
| | | | | | |
| **Time used** | | | Hours | Days | |
| 16/1/06  from 08:00 to 24:00 | | | 16.00 | 0.6666 | |
| 17th + 18th + 19th + 20th Jan. 06 | | | | 4.0000 | |
| 21/1/06 from 00:00 to 12:00 | | | 12.00 | 0.5000 | |
| 23/1/06 from 08:00 to 24:00 | | | 16.00 | 0.6666 | |
| 24th + 25th + 26th + 27th Jan. 06 | | | | 4.0000 | |
| 28/1/06  from 00:00 to 12:00 | | | | 0.5000 | |
| 30/1/06  from 08:00 to 24:00 | | | 16.00 | 0.6666 | |
| 31/1/06 from 00:00 to 24:00 | | | | 1.0000 | |
| 1st + 2nd + 3rd Feb. 06 | | | | 3.0000 | |
| 04/2/06 from 00:00 to 12:00 | | | 12.00 | 0.5000 | |
| 06/2/06 from 08:00 to 24:00 | | | 16.00 | 0.6666 | |
| 07/2/06 from 00:00 to 00:48 | | | 0.80 | 0.0336 | |
| | | | Total | 16.2000 | days |
| **Vessel on demurrage from 07/2/2006 at 00:48 LT** | | | | | |
| **Cargo ops completed with docs on board on 18/2/2006 at 18:00 LT** | | | | | |
| | | | | | |
| **Demurrage time** | | | Hours | Days | |
| 07/2/06 from 00:48 to 24:00 | | | 23.20 | 0.9666 | |
| 8th +9th +10th +11th +12th +13th Feb. 06 | | | | 6.0000 | |
| 14th +15th + 16th + 17th Feb. 06 | | | | 4.0000 | |
| 18/2/06 from 00:00 to 18:00 | | | 18.00 | 0.7500 | |
| | | | Total | 11.7166 | days |
| | | | | | |
| **Time not to count as per c/p provisions** | | | | | |
| moving from anchor up to hatches opening | | | 1.42 | 0.0592 | |
| time spent on the first shift | | | 0.83 | 0.0347 | |
| **Time prta not to count due to gear breakdown** | | | | | |
| 21/1/06: crane 3  from 10:30 to 12:10 | | | 0.42 | 0.0174 | |
| 24/1/06: cranes 4/5 from 13:15 to 13:50 | | | 0.29 | 0.0122 | |
| 08/2/06: crane 2 from 14:55 to 17:00 | | | 0.52 | 0.0217 | |
| 09/2/06: cranes 2/3 from 08:10 to 18:30 | | | 5.17 | 0.2153 | |
| 10/2/06: crane 3 from 08:10 to 18:00 | | | 2.46 | 0.1024 | |
| 11/2/06: crane 3 from 08:10 to 19:00 | | | 2.71 | 0.1128 | |
| | | | | | |
| **Demurrage balance time** | | | Total | 11.1411 | days |
| | | | | | |
| **Demurrage amount** | | | | | |
| 11.1411     days x usd       8,000.00 | | | | 89,128.80 | usd |
| Less 5% total commission | | | | 4,456.44 | usd |
| | | | Total | 84,672.36 | usd |

**( Eighty four thousand six hundred seventy two USD and 36 cents ).**

2.20

| MV AIN OUSSERA  A/C IGEAN SEA SHIPPING.  C/P 07-11-2005 | | | | | |
|---|---|---|---|---|---|
| **Revised** | **DEMURRAGE AT 2ND DISCHARGE PORT TAKORADI** | | | | **11/10/06** |
| | | | | | |
| Cargo | Bgd Rice | | saturdays | sundays | holidays |
| Disch. Port | Takoradi | | 4/3/06 | 5/3/06 | |
| Gr weight | 8,862 mt | | 11/3/06 | 12/3/06 | |
| Disch. Rate | 1,000.00 mt | pwwd shex eiu | 18/3/06 | 19/3/06 | |
| Dich. Time | 8,862 days | | 25/3/06 | 26/3/06 | |
| NOR given | 27/02/06 | 14:15 LT | | | |
| Time to count | 28/02/06 | 14:15 LT | | | |
| Demur. Rate | 8,000,00 usd | pdpr hdwtsbe | | | |
| | | | | | |
| **Time used** | | | Hours | Days | |
| 28/2/06 from 14:15 to 24:00 | | | 9.75 | 0.4063 | |
| 1st + 2nd + 3rd March 06 | | | | 3.0000 | |
| 04/3/06 from 00:00 to 12:00 | | | 12.00 | 0.5000 | |
| 06/3/06 from 08:00 to 24:00 | | | 16.00 | 0.6666 | |
| 7th + 8th + 9th + 10th March 06 | | | | 4.0000 | |
| 11/3/06 from 00:00 to 06:56 | | | 6.94 | 0.2891 | |
| | | | Total | 8.8620 | days |

**Vessel on demurrage from 11/3/06 at 06:56**
**Discharging completed on 26/3/2006 at 12:00**

| **Demurrage time** | | | Hours | Days | |
|---|---|---|---|---|---|
| 11/3/06 from 06:56 to 24:00 | | | 17.07 | 0.7111 | |
| 12th +13th +14th +15th +16th March 06 | | | | 5.0000 | |
| 17th +18th +19th + 20th +21st March 06 | | | | 5.0000 | |
|  22nd + 23rd +24th +25th March 06 | | | | 4.0000 | |
| 26/3/06 from 00:00 to 12:00 | | | 12.00 | 0.5000 | |
| | | | Total | 15.2111 | days |
| | | | | | |
| Laytime not to count due to Eng breakdown | | | | | |
| from 17/3/06 00:55 to 18/3/06 23:50 | | | | 1.9549 | |
| | | | | | |
| Demurrage balance time | | | Total | 13.2562 | days |

| **Demurrage amount** | | | | | |
|---|---|---|---|---|---|
| 13.2562 | days x usd | 8,000.00 | | 106,049.60 | usd |
| | Less 5% total commission | | | 5,302.48 | usd |
| | | | Total | 100,747.12 | usd |

**( One hundred thousand seven hundred forty seven USD and 12 cents ).**

2.21

DHL EXPRESS - 05-03 - P4 - UNITED KINGDOM

**Shipper's copy**

377 8327 232

Track this shipment via the DHL Web Site: http://www.dhl.com

**Shipment Air Waybill**
(Non responsible)

**1 Payer account number and insurance details**

Charge to ☐ Shipper ☐ Receiver ☐ 3rd party

Payer Account No. _____

Shipment Insurance see reverse

☐ Cash ☐ Cheque ☐ Credit Card

☐ Yes Insured value (in local currency)

**2 From (Shipper)**

Shipper's account number: 13097 8595

Shipper's reference (up to 32 characters but only first 12 will be shown on invoice)
TAX / JOK / C-94

Company name
SHAH & CROFT

Address
115 HOUNDSDITCH
LONDON

Postcode/Zip Code (required)
EC3A 7BR

Contact name
T MOISLEM

Phone, Fax or E-mail (required)
020 7643 9000

**3 To (Receiver)**

Company name
COTTON EXCHANGE BUILDING

Delivery address
11 KARACHI
KARACHI 6TH FLOOR

Postcode/Zip Code (required)    Country
PAKISTAN

Contact person
MR AZIZ

**8 Products & Services**

DHL Express

**Dimensional/Chargeable Weight**

**4 Shipment details**

**5 Full description of contents**
CORRESPONDENCE

**6 Dutiable shipments only (WPX) (Customs Requirement)**

**7 Shipper's agreement (Signature required)**

Date 02/11/06

ORIGIN LHR

DESTINATION CODE

PARAGON TRANSACTION - DG 29683/2003

2.22

**SHAW and CROFT**
115 HOUNDSDITCH
LONDON EC3A 7BR

Telephone +44 (0) 20 7645 9000
Fax +44 (0) 20 7645 9001
DX 824 London City
E-Mail: ShawandCroft@btinternet.com
Website: www.shawandcroft.com



Hassan Ali Rice Export Co. Ltd and
Igen Sea Shipping
1st Floor,
Cotton Exchange Building,
I.I. Chundrigar Road,
Karachi,
Pakistan

Your Ref.     **Please advise**

Our Ref.     TAM/JRK/C1-94

2nd November 2006

<u>DHL Courier</u>

Dear Sirs,

"AIN OUSSERA" c/p dd 7.11.05 with Igen Sea Shipping<br>
Owners claim for outstanding demurrage in an amount of US$271,790.44<br>
<u>net of commission and claim for damages for detention in an amount of US$26,800</u>

We have been instructed by owners in relation to the above matter. As you are aware, owners appointed Mr. David Farrington as their arbitrator and you have appointed Mr. William Packard as yours. A third arbitrator will have to be appointed by the two arbitrators nominated by the parties in order to complete the tribunal in accordance with rider clause 58.

Having reviewed this matter, we find that you, as charterers, owe owners demurrage in the sum of US$271,790.44 net of commission. After taking into account all payments between owners and charterers, the balance owed to owners is US$221,930.24 as is shown on owners' final statement of account, a copy of which is attached. We also find that owners have a good claim against you for damages for detention arising out of your failure to give voyage instructions to the master after completion of loading at Karachi, thus obliging the vessel to wait at Karachi outer anchorage from 0130 hours on 8th December 2005 until 10:00 hours on 11th December 2005.

We attach owners' revised demurrage calculations together with a full set of the supporting documents, that is to say the Notice of Readiness, Statements of Facts and supporting time sheets for each of the three ports. We now call upon you to pay the outstanding demurrage within fourteen days of receipt of this letter by transfer to the owners' bank account, details of which were given below:

Account No:    000.200.000.0 USD
IBAN:    CH 23083460002000000US
Banque Algerienne du Commerce Exterieur,
Talacker 41 – CH 8001
Zurich,
Switzerland.

**2.23**

Richard Coles  Nicholas Taylor  Hamish Edgar  Jonathan Kenyon
Roger Colton  Michael Moon  Ben Browne

This firm is regulated by the Law Society and does not accept service by e-mail

in favour of CNAN Group SpA.

We also call upon you to pay the owners the sum of US$27,360 as damages for detaining their vessel after completion of loading at Karachi. You, as charterers, are under an obligation in English law to give voyage orders promptly following completion of loading and in breach of that implied term of the charterparty you failed to do so. We have calculated the loss suffered by owners in consequence of your breach by reference to the agreed demurrage rate of US$8,000 per day or pro rata and using that as the measure of owners' loss the damages are calculated to be 3.42 days X US$8,000 per day or US$27,360. We now call upon you to pay this sum into the same bank account as the outstanding demurrage.

In the absence of payment of US$249,150.44 (i.e. US$271,790.44 plus US$27,360 – 50,000) within fourteen days of the date of this letter, claim submissions will be served on you without further notice and owners' claim in the arbitration will be increased by a claim for interest and for the costs of the reference. In order to avoid increasing your liability unnecessarily, we urge you to pay the outstanding amounts due to owners immediately.

Yours faithfully,

*Shaw and Croft*

2.24

# EXHIBIT 3

**[1983] Vol. 1**                    **Lloyd's Rep.**                                    **514**

QUEEN'S BENCH DIVISION
(COMMERCIAL COURT)

Oct. 6, 1982

———————————

TRADAX EXPORT S.A.
v.
ITALCARBO SOCIETA DI
NAVIGAZIONE S.p.A.

(THE "SANDALION")

Before Mr. Justice LLOYD

**Arbitration - Limitation of time - Centrocon arbitration clause - Whether charterers' claims for off-hire and disbursements time barred - Whether judgment under R.S.C., 0. 14, should be given - Arbitration Act, 1950, s. 27 - New York Produce Exchange form.**

By a charter-party dated May 11, 1979, the owners let their vessel *Sandalion* to the charterers. There was a sub-charter dated Aug. 7, 1979, between the charterers and V/O Sovfracht and the terms of both charters were substantially the same. The charters were in the New York Produce Exchange form and provided inter alia:-

17. That should any dispute arise between owners and the charterers the matter shall be referred to arbitration in London in accordance with the attached amended Centrocon Arbitration clause.

The amended Centrocon arbitration clause provided that:

All disputes from time to time arising out of this contract shall . . . be referred to the final arbitrament of two arbitrators . . . one to be appointed by each of the parties . . . Any claim must be made in writing and claimant's arbitrator appointed within 12 months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred.

The vessel was delivered to the charterers on Aug. 5, 1979. She was ordered to go in ballast from Odessa to Freemantle in Australia and in the course of that voyage the vessel called at Augusta in Sicily to take on bunkers and supplies and to make certain crew changes.

On Jan. 29, 1980, the master sent the following off hire statement to Sovfracht:-

This is to certify that M.V. Sandalion went off-hire when got charterer's cable instructions to change her course to Australia on January 24th, 1980 at 0940 hours and was back on-hire on January 27th at 0800 hours when she regained her course . . . to proceed to Australia. Total time off-hire 2 days 22 hours 40 minutes.

That off-hire statement was signed by the master and chief engineer.

i-law.com
Case 1:08-cv-01201-PAC    Document 13-4    Filed 07/10/2008    Page 3 of 9
Page 2 of 8

The vessel arrived in Freemantle in February, 1980, and loaded a cargo for discharge in Europe. Discharge was completed on Apr. 19, 1980, and on July 4, 1980, the charterers appointed Mr. Barclay as their arbitrator in respect of a claim relating to the cost of cleaning holds in Australia.

On Nov. 29, 1980, the vessel sank and the charterers put forward a further claim for loss of bunkers on board. The charterers now wished to make two further claims, the first for off-hire amounting to $30,166 and the second for disbursements amounting to $9094.

The owners contended that the claims were time barred by virtue of the amended Centrocon arbitration clause. Final discharge took place on Apr. 19 but no claim in writing in respect of the off-hire was made until Jan. 14, 1982, when the charterers submitted invoices for the amount of hire alleged to have been over-paid. The charterers were therefore out of time.

The charterers argued that there was no dispute in relation to the alleged off-hire and that the time limit did not apply. They relied on the master's letter of Jan. 29, 1980 as an admission of liability. In the alternative the charterers submitted that their claim had been made within time since Mr. Barclay had been appointed arbitrator on July 4, 1980, in general terms; or alternatively that the time limit never expired since the vessel sank before her final voyage. As a last resort, they applied for an extension of time under s. 27 of the Arbitration Act, 1950.

The owners submitted that the Court had no jurisdiction to extend the time for making a claim under the Centrocon arbitration clause.

-*Held*, by Q.B. (Com. Ct.) (LLOYD, J.), that (1) although the off-hire statement looked like a clear admission of the charterers' claim, there was evidence that the master had no authority to make any such admission (*see* p. 517, cols. 1 and 2);

(2) the clause required the claim to be made within 12 months; it was clear both on the language of the clause and also by reason of the commercial purpose which it was intended to serve, that the claim had to be identified in terms precise enough to enable the other party to know what claims he had to meet; if the appointment of an arbitrator in respect of all disputes arising under a charter-party were sufficient in itself to cover all claims past present and future, it would deprive the Centrocon arbitration clause of almost all its commercial purpose; here the charters had no knowledge of any claim arising out of the alleged off-hire when they appointed their arbitrator and in these circumstances the claim was not made in writing within the meaning of the amended Centrocon arbitration clause when Mr. Barclay was appointed (*see* p. 517, col. 2, p. 518 col. 1;

-*A/S Rendal v. Arcos*, (1948) 58 LL.L.Rep. 287, applied

(3) the submission by the charterers that the time for making the claim never expired because the vessel sank before "final discharge" within the meaning of the clause would be rejected; in a time

charter incorporating the Centrocon arbitration clause, the time limit ran from the discharge of the cargo at the end of a voyage not from the redelivery of the vessel at the end of the time charter; "final discharge" here could not be postponed beyond the discharge of the cargo at the end of the first loaded voyage at the latest and whether one took the ballast voyage or the first loaded voyage the claim had not been made within 12 months (*see* p. 518, col. 2);

(4) in each case, it was a question of construction whether the requirement to make a claim in writing or any other requirement was properly to be regarded as a step in the commencement of the arbitration; in the Centrocon arbitration clause the appointment of the arbitrator and the making of the claim in writing were so inextricably bound together that both provisions should be regarded as part of the same process of commencing arbitration and therefore both were a step to commence arbitration proceedings within the meaning of s. 27 (*see* p. 519 col. 1);

-*The Oltenia*, [1982] 2 Lloyd's Rep. 99, distinguished.

(5) the Court therefore had jurisdiction to extend the time under s. 27 (*see* p. 519, col. 1);

(6) on balance, the time would be extended; there was here an absence of any very serious prejudice to the owners and if the time were not extended undue hardship would be caused to the charterers (*see* p. 520, cols. 1 and 2);

(7) this was not a proper case to give judgment under R.S.C., O. 14, since a clear issue to be tried was disclosed and the O. 14 summons in relation to the off-hire claim would be dismissed (*see* p. 520, col. 2);

(8) the claims in respect of the disbursements were also time barred; the time would be extended and since no defence had been disclosed there would be summary judgment in the sum of $9094 for the charterers (*see* p. 520, col. 2).

---

The following cases were referred to in the judgment:

*Angeliki*, The, [1973] 2 Lloyd's Rep. 226;
*Aristokratis*, The, [1976] 1 Lloyd's Rep. 552;
*Aspen Trader*, The, [1981] 1 Lloyd's Rep. 273;
Atlantic Shipping & Trading Co. v. Louis Dreyfus & Co., (H.L.) (1922) 10 Ll.L.Rep. 707, [1922] 2 A.C. 250;
Babanaft International Co. S.A. v. Avant Petroleum Inc. (The *Oltenia*), (C.A.) [1982] 2 Lloyd's Rep. 99;
Denny, Mott & Dickson Ltd. v. Lynn Shipping Co. Ltd., [1963] 1 Lloyd's Rep. 339;
*Jocelyne*, The, [1977] 2 Lloyd's Rep. 121;

Nestle Co. Ltd. v. E. Biggins & Co. Ltd., [1958] 1 Lloyd's Rep. 398;

Panchaud Freres S.A. v. Etablissements General Grain Co., [1970] 1 Lloyd's Rep. 53;

*Pegasus*, The, [1967] 1 Lloyd's Rep. 302; [1967] 2 Q.B. 86;

Rendal (A/S) v. Arcos, [1948] 58 Ll. Rep. 287; 43. Com. Cas. 1;

*Simonburn*, The, [1973] 2 Lloyd's Rep. 355; (C.A.) [1973] 1 Lloyd's Rep. 392;

Tradax Internacional S.A. v. Cerrahogullari (The *M. Eregli*), [1981] 2 Lloyd's Rep. 169.

———————————————

This was inter alia an application by the charterers, Tradax Export S.A. for an extension of time under s. 27 of the Arbitration Act, 1950 in respect of their off-hire claim and disbursement claims against the owners, Italcarbo Societa di Navigazione S.p.A. if it were found that such claims had not been made within time.

Mr. R. Jacobs (instructed by Messrs. Sinclair Roche & Temperley) for the charterers; Mr. Jonathan Gaisman (instructed by Messrs. Middleton Potts & Co.) for the owners.

The further facts are stated in the judgment of Mr. Justice Lloyd.

Judgment was delivered in open Court.

## JUDGMENT

**Mr. Justice LLOYD:** There are three interrelated summonses before the Court. One of them involves an important question as to the application of s. 27 of the Arbitration Act, 1950, to the amended Centrocon arbitration clause. For that reason the parties asked me to give judgment in open Court, which I accordingly do.

The disputes between the parties arise out of a charter-party dated May 11, 1979, on the New York Produce Exchange form between the defendants, Italcarbo Societa Di Navigazione S.p.A. as owners of *Sandalion*, and the plaintiffs, Tradax Export S.A. as charterers. There was a sub-charter entered into on the same form dated Aug. 7, 1979, between Tradax and V/O Sovfracht. The terms of the two charters are substantially the same. The vessel was delivered to Tradax on Aug. 5, 1979. She was ordered to go in ballast from Odessa to Freemantle in Australia, in circumstances to which I shall have to return later. She arrived at Freemantle in February, 1980. She loaded a cargo for discharge in Europe. Discharge was completed on Apr. 19, 1980. On July 4,

1980, Tradax appointed Mr. Barclay their arbitrator, "in all disputes arising under the charter-party". They duly gave notice of that appointment to the owners. At that stage the only dispute between the parties related to the cost of cleaning holds in Australia. On Nov. 29, 1980, the vessel unfortunately sank. The charterers thereupon put forward a further claim for loss of the bunkers on board. The arbitrator has not yet determined either of those claims.

The charterers now wish to make two further claims. The first is for off-hire amounting to $30,166. The second is for disbursements amounting to $9094.

I will deal first with the claim for off-hire. It arises in this way. In the course of the voyage from Odessa to Freemantle, the vessel called at Augusta in Sicily to take on bunkers and supplies and to make certain crew changes. The charterers say that by calling at Sicily the vessel deviated. They say that a total of two days 22 hours and 20 minutes were thereby lost between Jan. 24 and 27, 1980, and that the vessel was off-hire during that period.

The owners say that that claim is time barred by virtue of the terms of the amended Centrocon arbitration clause. Clause 17 of the charterparty provides:

That should any dispute arise between owners and the charterers the matter shall be referred to arbitration in London in accordance with the attached amended Centrocon Arbitration Clause.

The amended Centrocon arbitration clause provides, as is well known, as follows:

All disputes from time to time arising out of this contract shall . . . be referred to the final arbitrament of two arbitrators . . . one to be appointed by each of the parties . . . . Any claim must be made in writing and claimant's arbitrator appointed within twelve months of final discharge and where this provision is not complied with the claim shall be deemed to be waived and absolutely barred . . .

The owners say that final discharge took place on Apr. 19, 1980, but no claim in writing in respect of the off-hire was made until Jan. 14, 1982, when the charterers submitted invoices for the amount of hire alleged to have been overpaid. Thus, according to the owners' case, the claim was made at least nine months out of time.

Mr. Jacobs, on behalf of the charterers, makes a number of submissions in answer to that defence. In the first place he submits that there is no dispute in relation to the alleged

off-hire, and therefore the time limit in the amended Centrocon arbitration clause does not apply. A similar question was considered by Mr. Justice Kerr in *Tradax Internacional S.A. v. Cerrahogullari, (The M. Eregli)*, [1981] 2 Lloyd's Rep. 169. In that case, Mr. Justice Kerr dealt with a submission very much the same as that advanced by Mr. Jacobs as follows:

> Where an arbitration clause contains a time limit barring all claims unless an arbitrator is appointed within the limited time, it seems to me that the time limit can only be ignored on the ground that there is no dispute between the parties if there is an admission that the claim has been admitted to be due and payable. Such an admission would, in effect, amount to an agreement to pay the claim, and there would then clearly be no further basis for referring it to arbitration or treating it as time barred if no arbitrator is appointed.

Mr. Jacobs submitted that there was just such an admission of liability in the present case. He relies on a letter sent by the master to Messrs. Sovfracht, the sub-charterers, dated Jan. 29, 1980, enclosing a so-called off-hire statement. The off-hire statement, also dated Jan. 29, 1980, reads:

> This is to certify that the M.V. Sandalion went off-hire when got charterers cable instruction to change her course to Australia on January 24th, 1980, at 09 40 hrs. and was back on-hire on January 27th at 08 00 hrs. when she regained her course . . . to proceed to Australia. Total time off-hire 2 days 22 hours 20 minutes.

That off-hire statement is signed by the master and the chief engineer.

At first sight that off-hire statement looks like a clear admission of the charterers' claim. But the matter receives a different complexion from an affidavit sworn by Mr. Charles Lucas on behalf of the owners for the purpose of these proceedings. He says that the charterers kept on changing their minds whether they wished the vessel to sail in ballast to Australia, as she eventually did, or to proceed to the United States Gulf via Augusta. By the time the charterers finally made up their mind that they wished the vessel to proceed to Australia, it was too late to change the arrangements which had already been made for her to call at Augusta. If the matter were to go to arbitration, the owners would wish to submit that they were justified in calling at Augusta, and that the vessel did not deviate. Even if she did, it would not have the effect of the vessel being off-hire. According to Mr. Lucas, it is easy to understand how the master, not being a lawyer, could make such a mistake. He had no authority, actual or ostensible, to make any admission.

In view of what is stated in Mr. Lucas' affidavit, I cannot hold that there was here such an admission of the charterers' claim that the time bar in the Centrocon arbitration clause has no application. Indeed Mr. Jacobs in the end did not press the point.

Mr. Jacobs' second submission assumes, against his first, that the charterers were obliged to make their claim within 12 months of final discharge. But he says that this is what they did when they appointed Mr. Barclay on July 4, 1980. That appointment was in general terms. It appointed him arbitrator in respect of all disputes arising under the charter-party. Accordingly, it was, so it is said, a good appointment in relation to the claim now made.

I cannot accept that submission. The clause requires the claim to be made in writing within 12 months, and continues-

> . . . where this provision is not complied with the claim shall be deemed to be waived and absolutely barred.

It seems to me clear, both on the language of the clause, and also by reason of the commercial purpose which it was intended to serve, that the claim must be identified in terms precise enough to enable the other party to know what claim it is he has to meet. In the present case it is common ground that the charterers had no knowledge of any claim arising out of the alleged off-hire when they appointed their arbitrator. Although the facts had already occurred, the claim itself lay in the future. In those circumstances *this* claim was not made in writing within the meaning of the amended Centrocon arbitration clause when Mr. Barclay was appointed. If authority is needed for the above conclusion it is to be found in the decision of the House of Lords in *A/S Rendal v. Arcos*, [1948] 81 Ll. L. Rep. 287; 43 Com. Cas. 1. Although the language of the clause there was somewhat different, since it required notice of any claim to be given, rather than the claim itself to be made in writing, the point is precisely the same. In that case Lord Wright said at p. 292:

> Notice of claim . . . does not mean a precisely formulated claim with full details, but it must be such a notice as will enable the party to whom it is given to take steps to meet the claim by preparing and obtaining appropriate evidence for that purpose.

See also *Panchaud Freres S.A. v. Etablissements General Grain Co.*, [1970] 1 Lloyd's Rep. 53, per Lord Denning, M.R., at p. 58. If the appointment of an arbitrator in respect of all disputes arising under a charter-party were sufficient in itself to cover all claims past

present and future, it would deprive the Centrocon arbitration clause of almost all its commercial purpose.

Next, Mr. Jacobs argued that the time for making the claim in the present case has never expired, because the ship sank before "final discharge" within the meaning of the Centrocon arbitration clause. There was therefore never a terminus a quo from which the 12 months could run. He relies in that connection on the decision of Mr. Justice Megaw in *Denny, Mott & Dickson Ltd. v. Lynn Shipping Co. Ltd.*, [1963] 1 Lloyd's Rep. 339. In that case the vessel sank as it did here. Mr. Justice Megaw held that the time limit had no application.

I cannot accept that argument either. The *Denny, Mott & Dickson* case concerned a voyage charter. The only event which could properly be described as final discharge would have been the final discharge of the goods carried on that voyage, had the vessel arrived. But the present case concerns a time charter. In *The Simonburn*, [1972] 2 Lloyd's Rep. 385; [1973] 1 Lloyd's Rep. 392, Mr. Justice Mocatta and the Court of Appeal held that where the Centrocon arbitration clause is incorporated in a multiple voyage time-charter the time limit should run from the discharge of the cargo at the end of each voyage. In *The Aristokratis*, [1976] 1 Lloyd's Rep. 552, Mr. Justice Mocatta applied that decision to the case of a single round voyage time charter. In other words the time limit runs from the discharge of the cargo on such a voyage, not from redelivery of the vessel at the end of the time charter. Mr. Jacobs sought to distinguish that case on the ground that here the alleged off-hire occurred in the course of a ballast voyage. But that is no good reason for postponing the amendment of "final discharge" to the last loaded voyage under the charter. It may have to be argued in another case whether "final discharge" in the case of a ballast voyage means the date when the vessel would have discharged if she had carried cargo. Be that as it may, "final discharge" could not, on any view, be postponed beyond the discharge of the cargo at the end of the first loaded voyage. Whether one takes the ballast voyage or the first loaded voyage, the claim in this case was not made within 12 months.

I now come to the main point in the case. Are the charterers entitled to an extension under s. 27 of the Arbitration Act, 1950, on the ground that they will suffer undue hardship if their claim is barred? Mr. Gaisman takes the preliminary point that I have no jurisdiction to extend the time under s. 27, because the failure to make a claim in writing within 12 months was not "a step to commence arbitration proceedings". He relies on the recent decision

of the Court of Appeal in *Babanaft International Co. S.A. v. Avant Petroleum Inc (The Oltenia)*, [1982] 2 Lloyd's Rep. 99. If he is right, then the gap in the law which Lord Justice Donaldson described in that case as serious, is even more serious than had been supposed. For the Centrocon arbitration clause, in its amended and unamended form, is, of course, extremely common. It is because of the importance of the consequences, if Mr. Gaisman's submission is correct, that I was asked to give judgment in open Court.

Mr. Gaisman's argument in a nutshell is that the Centrocon arbitration clause contains two discrete requirements which have to be fulfilled by the claimants within 12 months, namely, (1) the making of a claim in writing, and (2) the appointment of an arbitrator. The claim in writing, whether it comes before or after the appointment of the arbitrator is not, he submits, in itself a step in the commencement of the arbitration. The only step in the commencement of the arbitration is the appointment of the arbitrator. He concedes that in *The Oltenia* the requirement for the claim to be made in writing within 90 days from completion of the discharge (as it was in that case) was contained in a separate clause from the arbitration clause. But he submits that the same principle should apply. The making of a claim was only a condition precedent to the commencement of the arbitration, not a step in the commencement of the arbitration itself.

In order to do justice to Mr. Gaisman's argument it is necessary to set out the passage from Lord Justice Donaldson's judgment in full. After referring to the decision of the Divisional Court in *Nestle Co. Ltd. v. Biggins & Co. Ltd.*, [1958] 1 Lloyd's Rep. 398, he continued at p. 108 as follows:

. . . The concept of "claiming arbitration" is well known in the commodity trades. Telex messages fly to and fro and at some stage one party or the other says "We claim arbitration". The arbitration rules of the trade concerned then provide the steps to be taken by each party. I would therefore accept that in such cases "claiming arbitration" may be regarded as a step to commence arbitration proceedings within the meaning of s. 27. I would also accept that under that particular contract [he is there referring to the contract in *Nestle Co. v. Biggins*] the claim for quality or condition had to precede or accompany the claim for arbitration, since arbitration cannot be claimed in vacuo - it has to be linked to a specific dispute. Where I have much more difficulty is in seeing why the making of a claim for quality or condition is a step to commence arbitration proceedings. It is a

i-law.com
Case 1:08-cv-01201-PAC    Document 13-4    Filed 07/10/2008    Page 7 of 9
Page 6 of 8

condition precedent to such proceedings, but it does not of itself commence the proceedings or necessarily lead to their being commenced. The claim may be conceded or settled amicably. In my judgment, the decision of the Divisional Court was wrong and should be overruled.

In essence s. 27 empowers the Court to extend the time fixed for giving notice to appoint an arbitrator, appointing an arbitrator or taking some other step to commence arbitration proceedings, if doing so will prevent a claim becoming time barred. It does not empower the Court to extend any other time limits. In parenthesis I would add that it does not empower the Court to extend a time limit for commencing arbitration if, in the absence of such an extension, the claim would remain alive and could be litigated as was the case, for example, in *Pinnock Brothers v. Lewis & Peat Ltd.*, [1923] 1 K.B. 690.

In the instant case there is no time limit for commencing arbitration proceedings.

I feel the force of Mr. Gaisman's submission, but I cannot accept it. It seems to me that in each case it is a question of construction whether the requirement to make a claim in writing, or any other requirement, is properly to be regarded as a step in the commencement of the arbitration. Nothing in *The Oltenia* decides that a claim in writing *cannot* be a step in the commencement of an arbitration if the parties so agree. In *The Oltenia* the arbitration clause, and the clause requiring claims to be made within 90 days, were separate and distinct clauses. In *Nestle v. Biggins*, the decision overruled in *The Oltenia*, the time limit for making claims for quality or condition was a separate and distinct provision in the same clause. By contrast in the Centrocon arbitration clause, the appointment of the arbitrator and the making of the claim in writing go hand in hand; both provisions are so inextricably bound together that they should, in my judgment, be regarded as part of the same process of commencing arbitration, and therefore both are a step to commence arbitration proceedings within the meaning of s. 27.

I dislike narrow distinctions between the language of different charter-parties as much as anyone, but the language of the Centrocon arbitration clause seems to me to justify, and indeed compel, a different result from that reached by the Court of Appeal in *The Oltenia*.

I am glad to reach that result, because otherwise, as I have already mentioned, the gap in the law would indeed be serious.

The history of s. 27 of the Arbitration Act points in the same direction. The section was originally enacted as s. 16 of the 1934 Act as a result of such decisions as *Atlantic Shipping & Trading Co. v. Louis Dreyfus & Co.*, [1922] 10 Ll.L.Rep. 307; [1922] 2 A.C. 250, itself a case on the old Centrocon arbitration clause: see the history of the section set out in *The Angeliki*, [1973] 1 Lloyd's Rep. 226 at p. 229. If it was the potentially harsh consequences of the Centrocon arbitration clause which led to the enactment of s. 27 and its predecessor, it would be strange indeed if the section had altogether failed to achieve its main objective.

I mention in passing, that since the hearing of the argument in this case, I have been informed by Counsel that Mr. Justice Staughton has reached the same conclusion as I have in an application which was heard in Chambers.

Having rejected Mr. Gaisman's preliminary objection, I must now return to the main question. Is this a case where I ought to exercise my discretion under s. 27? I regard this as the only difficult question in the case.

The proper approach under s. 27 has been laid down in *The Pegasus*, [1967] 1 Lloyd's Rep. 302; [1967] 2 Q.B. 86, *The Jocelyne*, [1977] 2 Lloyd's Rep. 121, and most recently by the Court of Appeal in *The Aspen Trader*, [1981] 1 Lloyd's Rep. 273.

Turning to the facts of the present case the period of delay was, as I have said, nine months, or if one takes the date of the summons, 12 months. The amount at stake, just over $30,000 is substantial, but in no way out of the ordinary. The fault lay entirely within the charterers' office in Geneva. The charterers accept that they received documents from the sub-charterers showing a deduction from sub-charter hire of the amount of the off-hire in question. But the document was overlooked or mislaid. The claim was never passed on as it should have been. The charterers frankly accept responsibility. They do not seek to lay any of the blame on the owners. But they say that it is the sort of mistake which can easily occur in any busy office. As for prejudice, the owners say first that the master, whom they would wish to call as a witness, left their employment in April, 1980. Secondly, they rely on the fading of memories, particularly of those in their own office who made the decision that the vessel should call at Augusta. The crucial issue of fact in the case will be why that decision was made.

Finally Mr. Gaisman submits that this is a case where the plaintiffs have brought any hardship they have suffered on themselves. For

they could have taken the same time bar point against the sub-charterers that the owners have taken against them. The fact that they did not choose to do so for commercial reasons, that is to say because of the good relationship which they wished to maintain with an important customer, is no ground for now seeking to pass the claim on to the owners.

In *The Aspen Trader* I took the view, without much difficulty, that I should exercise my discretion to extend the time in relation to three of the foul disputes, but not the fourth. In relation to the fourth dispute I was held to have been wrong by the Court of Appeal.

The present case seems to me more evenly balanced.

The delay of nine months is longer than the delay in *The Aspen Trader* but is not excessive. In *The Aspen Trader* the delay was two and a half months in relation to a three months provision time limit; here it is nine months in relation to a 12 months time limit. The amount at stake is substantial, but nothing like so large as it was in *The Aspen Trader*. The fault was if anything more venial. It consisted in the over-looking of a single document. Once over-looked, it is easy to see how it remained over-looked, until the matter was brought back to the charterers' attention much later.

As to prejudice there will undoubtedly be some prejudice to the owners. But the prejudice should not be exaggerated. On the questions of law that are likely to arise at the hearing, there will be no prejudice at all. On the questions of fact, the case is going to turn, as Mr. Gaisman accepted, not so much on the master's evidence as the evidence of those in the owners' office. In any event the master had left the owners' employment *before* the time limit had expired. It is not clear that it will be any more difficult to obtain his evidence now than it would have been if the notice had been given in time. As for those in the owners' office, it is of course true that memories fade, and that for that reason the delay of nine months may well cause some prejudice. In *The Aspen Trader* it was conceded that there was no prejudice at all.

It is not, I think, desirable, even if it were possible, to make precise comparisons between the facts of different cases. I have to decide the matter as it strikes me, bearing the various factors which I have mentioned, in mind. I have come to the conclusion that I ought, on balance, to extend the time. The matters which have weighed most heavily with me are on the one hand the absence of any very serious prejudice to the owners, though I accept there will be some, and on the other the comparatively venial nature of the fault. The fact that the

plaintiffs did not choose to take any time bar defence against the sub-charterers, assuming it to have been available, though an important point, is not in my view conclusive. Nor is it, in my view, a strong argument the other way that the claim was at one stage admitted, in the sense which I have mentioned.

For the reasons which I have given, I would hold that undue hardship would be caused in this case if the time were not extended under s. 27 of the Act.

That brings me to the question whether this is a proper case to give judgment under R.S.C., O. 14 for the amount claimed. The affidavit of Mr. Lucas discloses, as I have already mentioned, a clear issue to be tried. Towards the end of his argument Mr. Jacobs conceded that this was so. Accordingly the O. 14 summons in relation to the off-hire claim is dismissed.

I now turn to the claim for disbursements. There are four items in all making up the total of $9094. Three of the items were incurred on the voyage from Australia to Europe which terminated on Apr. 19, 1980. The fourth was incurred on a subsequent voyage which terminated on Aug. 15, 1980. The claims are all now time barred for the reasons which I have mentioned in relation to the off-hire claim. Should I extend the time under s. 27? The arguments in favour of extending the time are stronger than they were in relation to the off-hire claim, first, because there can be no dispute that the amounts are due, and secondly, because Mr. Gaisman concedes that there is no prejudice to the owners. In those circumstances, it follows from what I have said earlier, that it would be undue hardship not to extend the time, and I accordingly do so.

Then comes the last question of all. Should I give judgment under O. 14 in relation to this part of the claim? The affidavit filed on behalf of the defendants in response to the summons under O. 14 does not seek to raise any defence to the claim for disbursements. Mr. Gaisman does not suggest that there is a defence. Having "gone through the hoop" of s. 27 of the Arbitration Act (I use the language of Mr. Justice Kerr in *The M. Eregli*) the case becomes a straight forward application for summary judgment. Since no defence is disclosed, the consequence must be that the charterers are entitled to judgment forthwith in the sum of $9094.

*[After discussion as to costs]*

Mr. Justice LLOYD: Well, as so often happens, the question of costs is really in some ways almost the most difficult thing I have to decide. Mr. Gaisman says that the practice now on these s. 27 applications, is for the Court to

[1983] Vol. 1                                    Lloyd's Rep.                                    521
Q.B. (Com. Ct.)                                The "Sandalion"                                Lloyd, J.

order that the applicant should pay the costs in any event. Mr. Jacobs submits that is a poor practice because it does not encourage the matter to be dealt with in advance of the Court hearing because the respondent has nothing to lose by arguing it out. I see the force of that, but on this particular case, it seems to me that the respondents should get the costs, that is to say the owner should get the costs of the whole of the hearing; firstly, because it seems to me, as I have already indicated, a difficult case under s. 27; secondly, because, on the O. 14 summons, the charterers have failed on the main part of the application, though they have succeeded on a small part in relation to the disbursements. So it seems to me that the owners should get their costs of the whole hearing, including all three summonses which were heard together.

EXHIBIT 4

FROM : MB                    FAX NO. : 021 42 31 15         Oct. 16 2006 12:02PM P2

[ SENDING REPORT ]

Feb. 22 2006 03:44PM

| NO. | OTHER FACSIMILE | START TIME | USAGE TIME | MODE | PAGES | RESULT |
|-----|-----------------|------------|------------|------|-------|--------|
| 01 | +33 4 67 58 95 03 | Feb. 22 03:42PM | 01'41 | SND | 03 | OK |

ALGER LE  22/02/2006

## TELEFAX MESSAGE

**FROM**    : CNAN / Group / ASMC / D.F.  FAX NBR: (021) 42.31.15
**TO**      : HELMGALE SRL/ ATT PAUL H.
            Fax N° 00.33.4.67.58.95.03
**SUBJECT** : M/V Ain Oussera / IGEAN SEA SHIPPING C/P 07/11/05
**PAGES**   : 03

PLS FORWARD THE ATTACHED DOCUMENTS TO CHARTS:
Mssrs IGEAN SEA SHIPPING.

**DEMURRAGE AT CONAKRY  INVOICE N° 08/06  AS PER ATTACHED STATEMENT**

( 13.0839 Days ) X US$ 8.000 less 5% Com. ...............US$   99.437.64

We kindly request you to arrange remittance of USD 99,437.64 ( Ninety
nine thousand and four hundred thirty seven US  Dollars 64 Cts) to
owners account
- Account N°000.200.000.0 USD
- IBAN: CH 2308346000200000US
- Bank Name Adress : BANQUE ALGERIENNE DU COMMERCE EXTERIEUR
TALACKER 41 – CH 8001, ZURICH SUISSE
In favour of CNAN / Group / Spa.

**BEST REGARDS.**

Le Directeur Frétement

M. BELABED

na au capital social de 100.000.000 DA                   Tél. : 021.67.04.09
ège Social : 74, Bd Mohamed V ALGER                      Fax : 021.67.32.78
ège Administratif : 243 Bd Mohamed Belouizdad, El Annasser - ALGER

4.1

FROM : MB                    FAX NO. : 021 42 31 15          Oct. 16 2006 12:03PM P3

# CNAN Group Spa

## ALGERIAN SHIP MANAGEMENT COMPANY Spa
### DIRECTION FRETEMENT

Fax (213 21 ) 42.31.15

ALGER LE :        21-févr-06

Doit   IGEAN SEA SHIPPING

**INVOICE N°**      **08/06**

**DEMURRAGE INVOICE AS PER ATTACHED STATEMENT**

| | | US Dollars | US Dollars |
|---|---|---|---|
| | | DEBIT | CRÉDIT |
| VSL NAME | AIN OUSSERA | | |
| CODE | 083.11.05 | | |
| C/P DATE | 07-nov-05 | | |
| TRADING | KARACHI / OUEST AFRICA | | |
| **TOTAL DEMURRAGE  CONAKRY** | | | |
| TIME | 13,0839 | Days | 104 671,20 | |
| RATE | 8 000,000 | US$ | | |
| COMM. TTL. | 5% | US$ | | 5 233,! |
| **TOTAL AMOUNT** | | | 104 671,20 | 5 233,! |
| NINTY NINE THOUSAND AND FOUR HUNDRED THIRTY SEVEN US Dollars | | | | |
| 64 Cts. | | TOTAL | 99 437,64 | |

PAYABLE TO OWNER ' S BANK :
BANQUE ALGERIENNE DU COMMERCE EXTERIEUR TALACKER 41-CH 8001 , ZURICH SUISSE
ACCOUNT N° 000.200.000.0 USD IN FAVOUR OF CNAN Group / ASMC

LE CHEF DE DEPARTEMENT GESTION
FINANCIERE EXTERNE

B.HADDOU-HADJ



S/DIRECTEUR FRETEMENT

A.SAHNOUNI

4.2

FROM : MB                           FAX NO. : 021 42 31 15           Oct. 16 2006 12:03PM P4

## M/V AIN OUSSERA C/P 07/11/2005 / IGEAN SEA SHIPPING

**ALGER LE 21/02/2006**

| | |
|---|---|
| CARGO: | BGD RICE |
| 1 ST DISPORT | CONAKRY |
| Gr WEIGHT | 16,2000 MT |
| DISCHARGE RATE  1,000 mt/Day  PWWD SHEX EIU | |
| NOR GIVEN | 14/01/06   11:07 LT |
| TIME TO COUNT | 15/01/2006   11:07 LT |
| DEMURRAGE  RATE US$  8 000,00  PDPR  HDWTSBE | |

**TIME USED:**

| | |
|---|---|
| fm 16/01/06 00:00 to 21/01/06 24:00 | 6,0000 Days |
| 23/01/06 00:00 to 28/01/06 24:00 | 6,0000 Days |
| fm 30/01/06 00:00 to 31/01/06 24:00 | 2,0000 Days |
| fm 01/02/06 00:00 to 03/02/06 04:48 | 2,2000 Days |
| **Total  N° 1** | **16,2000 Days** |

Vessel on demurrage 03 FEB 2006 04:48
Disch ops completed with docs on board 18 FEB 06 18:00

| | |
|---|---|
| fm 03/02/06 04:48 to 03/02/06 24:00 | 0,8000 Days |
| 04+06+07+08+09+10 FEB 2006 | 6,0000 Days |
| 11+13+14+15+16+17 FEB 2006 | 6,0000 Days |
| fm 18/02/06 00:00 to 18/02/06 18:00 | 0,7500 Days |
| **Total  N° 2** | **13,5500 Days** |

**Laytime prorata not to count due to gear breakdown**

| | |
|---|---|
| 24/01/06 : cranes N° 4 & 5 from  13:15 to 13:50 | 0,0122 Days |
| 08/02/06 : cranes N° 2    from 14:55 to 17:00 | 0,0234 Days |
| 09/02/06 : cranes N° 2 & 3 from  08:10 to 18:30 | 0,2153 Days |
| /02/06 : cranes N° 3    from  08:10 to 18:00 | 0,1024 Days |
| /02/06 : cranes N° 3    from  08:10 to 19:00 | 0,1128 Days |
| **Total  N° 3** | **0,4661 Days** |

**TOTAL DEMURRAGE = Tot N° 2 - Tot N° 3 = Total N° 4** **13,0839 Days**

| | |
|---|---|
| 13,0839 Days x US$  8,000,00 | 104 671,20 US$ |
| Less 5% TTL COMM. | 5 233,56 US$ |
| **Total  N° 4** | **99 437,64 US$** |

**NINTY NINE THOUSAND AND FOUR HUNDRED THIRTY SEVEN US DOLLARS 64 Cts .**

4.3

FROM : MB                        FAX NO. : 021 42 31 15          Oct. 16 2006 11:41AM P2

〔 SENDING REPORT 〕

Dec. 18 2005 11:55AM

| NO. | OTHER FACSIMILE | START TIME | USAGE TIME | MODE | PAGES | RESULT |
|-----|-----------------|------------|------------|------|-------|--------|
| 01 | +33 4 67 58 95 03 | Dec. 18 11:53AM | 01'37 | SND | 03 | OK |

# TELEFAX MESSAGE

**FROM**      : CNAN / Group / ASMC / D.F.  FAX NBR: (021) 42.31.15
**TO**      : HELMGALE SRL/ ATT PAUL H.
Fax N° 00.33.4.67.58.95.03
**SUBJECT** : M/V Ain Oussera / IGEAN SEA SHIPPING C/P 07/11/05
**PAGES**    : 03

PLS FORWARD THE ATTACHED DOCUMENTS TO CHARTS:
Mssrs IGEAN SEA SHIPPING.

DEMURRAGE INVOICE AS PER ATTACHED STATEMENT N° 144/05

( 15.8750 Days) X US$ 8.000 less 5% Com. ...............US$   120.650.00



We kindly request you to arrange remittance of USD 120,650.00 ( One
hundred twenty  thousand and six hundred fifty US Dollars ) to
owners account
- Account N°000.200.000.0 USD
- IBAN: CH 2308346000200000US
-Bank Name Adress : BANQUE ALGERIENNE DU COMMERCE EXTERIEUR
TALACKER 41 – CH 8001, ZURICH SUISSE
In favour of CNAN / Group / Spa.

BEST REGARDS.

Le Directeur Frétement

M. BELABED

Spa au capital social de 100.000.000 DA
Siége Social : 74, Bd Mohamed V ALGER
Agence : 2 Quai N° 9 Nouvelle gare Maritime Alger Gare
BP 200 Alger Gare

Tél : 021.42.32.17
Fax : 021.42.31.23

4.4

FROM : MB                    FAX NO. : 021 42 31 15         Oct. 16 2006 11:42AM P3

# CNAN Group Spa

## ALGERIAN SHIP MANAGEMENT COMPANY Spa
### DIRECTION FRETEMENT

Fax (213 21 ) 42.31.15                                    ALGER LE :      18-déc-05

Doit   IGEAN SEA SHIPPING

INVOICE N°                      144/05

DEMURRAGE INVOICE AS PER ATTACHED STATEMENT

| | | | | US Dollars | US Dollars |
|---|---|---|---|---|---|
| | | | | DÉBIT | CRÉDIT |
| SL NAME | | AIN OUSSERA | | | |
| CODE | | 083.11.05 | | | |
| C/P DATE | | 07-nov-05 | | | |
| TRADING | | KARACHI / OUEST AFRICA | | | |
| DEMURRAGE | FM | 25/11/05 13:00 | | | |
| VSL SAILED KARACHI | TO | 11/12/05 10:00 | | | |
| TIME | | 15,8750 | Days | | |
| RATE | | 8 000,000 | US$ | 127 000,00 | |
| COMM. TTL. | | 5% | US$ | | 6 350,00 |
| TOTAL AMOUNT | | | | | |
| ONE HUNDRED TWENTY THOUSAND AND SIX HUNDRED FIFTY Dollars | | | TOTAL | 120 650,00 | |

PAYABLE TO OWNER ' S BANK :
BANQUE ALGERIENNE DU COMMERCE EXTERIEUR TALACKER 41-CH 8001 , ZURICH SUISSE
ACCOUNT N° 000.200.000.0 USD IN FAVOUR OF CNAN Group / ASMC

LE CHEF DE DEPARTEMENT GESTION
FINANCIERE EXTERNE                                      S/DIRECTEUR FRETEMENT

B.HADDOU-HADJ                                          A.SAHNOUN

4.5

| | | | |
|---|---|---|---|
| VSL | | | |
| CODE | **M/V AIN OUSSERA C/P 07/11/2005** | | |
| C/P DATE | 083.11.05 | | |
| TRADING | 07/11/2005 | | |
| | KARACHI/OUEST AFRICA | | |
| CARGO: | | | |
| GROSS WEIGHT: | BGD RICE | | |
| FRT RATE : | 25,062 MT | | |
| LOADING PORT KARACHI ( PAKISTAN ) | 42,00 US$ | | |
| DISCHARGE PORT ( S): W.C AFRICA (1-3 SBPA) | | | |
| DEMURRAGE RAT : | | | |
| LAYTIME FOR LOADING: | 8,000,00 US$ | /PDPR HDWTSBE | |
| LAYTIME FOR DISCHARGINGLOADING: | 2,000 MT | PWWD SHEX EIU | |
| N.O.R GIVEN | 1,000 MT | PWWD SHEX EIU | |
| TIME COUNTING: | 07/11/2005 | 09:00 | |
| LOADING RATE | 08/11/2005 | 09:00 | |
| LOADING TIME | **2,000 MT/Dy** | | |
| | 12,50 | | |

| **TIME USED:** | | | |
|---|---|---|---|
| fm 08/11/05 0900 to 08/11/05 0000 | | | |
| +11 NOV 2005 | 15 hrs | 0,6250 Days | |
| 11/05 fm 0000 to 1200 | 2 Days | 2,0000 Days | |
| 14/11/05 fm 0800 to 2400 | 12 hrs | 0,5000 Days | |
| 15+16+17+18 NOV 2005 | 16 hrs | 0,6667 Days | |
| 19/11/2005 fm 0000 to 1200 | 4 Days | 4,0000 Days | |
| 21/11/05 fm 0800 to 2400 | 12 hrs | 0,5000 Days | |
| 22+23+24 NOV 2005 | 16 hrs | 0,6667 Days | |
| 25/11/85 fm 0000 to 1300 | 3 Days | 3,0000 Days | |
| | 43 hrs | 0,5417 Days | |
| TOTAL | **12,50 Days** | **12,5000 Days** | |

| **DEMURRAGE fm 25/11/2005 1300** | | | |
| **VSL SAILED KARACHI ON 11/12/05 1000** | | | |
|---|---|---|---|
| 25/11/05 fm 1300 to 2400 | 11 hrs | 0,4583 Days | |
| 26+27+28+29+30 NOV 2005 | 5 Days | 5,0000 Days | |
| 01+02+03+04+05+06+07+08+09+10 DEC 05 | 10 Days | 10,0000 Days | |
| 11/12/05 fm 0000 to 1000 | 10 hrs | 0,4167 Days | |
| TOTAL | **15,8750 Days** | **15,8750 Days** | |

| **Demurrage Amount** | | | |
|---|---|---|---|
| 5,8750 Days x US$ 8,000,00 | 127 000,00 US$ | | |
| Less 5% TTL COMM. | 6 350,00 US$ | | |
| TOTAL | **120 650,00 US$** | | |

| **TOTAL** | **ON HUNDRED TWENTY THOUSAND AND SIX HUNDRED FIFTY US Dollars** | | |
|---|---|---|---|

4.6

# EXHIBIT 5

| De | helmgale@helmgale.fr |
|---|---|
| Objet | ain oussera |
| Date | Mar 14 mars 2006 3:26 |
| À | helmgale@helmgale.fr |

```
    Date:      14/03/2006 10:26:21
 RefNum:   PAUL4597792
 Att:

 Good Day from Helmgale Sarl, Montpellier. France.
 Ph: 33 (0)4 6758 4600 Fax 33 (0)4 6758 9503 e-mail: helmgale@helmgale.fr

 recvd from iss
 ain oussera


 WITHOUT PREJUDICE

 1) WE AGAIN CONFIRM THT NO FRAUDULENT B/L WERE ISSUED
     AND THAT LOI HAVE BEEN ISSUED IN ACCORDANCE WITH C/P
     TERMS AND CONDITIONS.

 2 & 3) IN THIS CONNECTION WE QUOTE BUYER'S E-MAIL DATED
         13-3-2006 TO SUPERMARITIME GHANA.

 QTE

 TO: Supermaritime Ghana
 Attn: Mr. Pobee

 Dear Sir,

 Reference is made to our various correspondances and to our MV Ain Oussara
 presently at anhcorage in Takoradi.

 Please note that our bank (SG New York) has sent to your attention,
 original
 BLs
 covering 6800 MT of cargo loaded on board the above mentioned vessel. Same
 was
 sent on Friday, March 10th 2006 with DHL n° 826 5673 496 and should be
 delivered to your offices latest tomorrow Tuesday, March 14th 2006.

 Please note that original BLs covering 2000 MT of rice cargo in favour of
 ESTF are
 already available at discharge port and will be presented to master upon
 request.

 Please advise vessel master accordingly and confirm to him that berthing
 shall take
 place now. Kindly let us kow if master still refuses to bring vessel at
 quay
 enabling
 immediate discharge of cargo.

 Looking forward to hearing from you.

 Best Regards

 Amr Kana

 UNQTE
```

PLEASE NOTE THAT ALL TIME LOST, COSTS AND LOSSES WILL BE
AT OWNERS ACCOUNT.

BEST REGARDS.

IGEN SEA SHIPPING

. .

Télécharger en tant que fichier

# EXHIBIT 6



## helmgale

Courtier d'Affrètement, Vente et Achat de Navires, Chartering brokers

Le Gambetta Bt B - 26 cours Gambetta - 34000 Montpellier - France
Tel. +33 (0)4.67.58.46.00  Fax +33 (0)4.67.58.95.03
e-mail : helmgale@helmgale.fr
VAT : FR 26 430 291 239



Date:       20/10/2006 12:40:57
RefNum:     PAUL5064891
Att:

tom/paul


ain oussera/iss


cfm that we have been able to send your fax both by fax and email to
our co brokers in pakistan. we have asked them to confirm that they
have recvd it and delivere dit to iss but they have not replied.


we recvd demurraghe calculations from mr belabed and these have also
been passed to our cobrokers by email. we have not yet been able to
send them by fax also


for good orders sake pls note that the final accounts from owners
show a balance in owners favour of usd 221930.24  and this inludes
demurrage karachi usd 86370.96 net demurrage conakry 84672.36 net and
demurrage takoradi usd 100747.12 net.

if at this stage it is possible to claim the gross amount we would
appreciate , because we are having difficulty at moment recovering our
commission on freight which was retained by iss.


fyg our pandi in london (messrs itic - thomas miller)are trying to
recover unpaid brokerage from iss at moment - think they to owere told
that iss not at address we had provided and finally they are
discussing via their karachi representatives who are indemnis marine
 capt mujtaba) who were actually also involved in this matter on
loading survey and then on bl difficulties. indemnis marine therefore
know how to speak or get in touch with iss.

there is a certain mr noor as the person in chrage at iss we
understand

our co brokers are oceanic karachi and the agents in karachi were
messrs oceanworld

we have noted with interest that recently these same brokers have been
quoting similar cargoes for account 'oceanworld '. also have noted
that the broker with whom we fixed the ain oussera has recently opened
an affiliated office in uae - company called crestocean marine - and
they are quoting these rice cargoes on the market for account 'fcpc'


seems that agents , shippers , chtrs and brokers all in it together!

also fyg the freight and da at discharge seems to have bene paid by
shippers who are hassan ali rice export company of karachi who are
apparently one of the biggest rice exporting companies in pakistan


we also noted that in a despatch calculation iss asked for despatch to
be paid to hasan ali account.

rgds

EXHIBIT 7



**DELIVERY SHEET**

*311006KHISVCKH03801*

DELIVERY DATE: 31/10/2006   TIME: 15:04   ROUTE: KH03   B COURIER: 0646   SANAWAR   Service Area: KHI / SVC / PK06

Sheet: 1 of 2

| NO | A/C No. | | | Pieces | Weight/Date | Name/Signature | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 3237492845 | RUH D | | 1 | 0.5 KG 30/10/06 | | | |
| | NDLC IFIC BANK LTD | | | | NDLC IFIC BANK | | | 15:18 |
| 2 | 1118528751 | SIN D | | 1 | 0.5 KG 30/10/06 | | | 15:18 |
| | NISHAT MILLS LTD | | | | MR ZULFIQAR | | | |
| 3 | 2111749802 | DXB D | | 1 | 0.5 KG 30/10/06 | | | 15:48 |
| | NISHAT MILLS LIMITED | | | | MR.ZULFIQAR | | | |
| 4 | 2111710230 | DXB D | | 1 | 0.5 KG 30/10/06 | | | |
| | ZULFIQAR | | | | ZUFIQAR | | | |
| 5 | 3250411990 | SIN D | | 1 | 0.5 KG 30/10/06 | | | |
| | BANK AL HABIB LTD. | | | | IMPORT | | | |
| 6 | 1014943613 | SIN D | | 1 | 0.5 KG 30/10/06 | | | |
| | BANK AL HABIB LTD | | | | IMPORT BILLS DEPT | | | |
| 7 | 1111186904 | SIN D | | 1 | 0.5 KG 30/10/06 | | | 15:33 |
| | BANK AL HABIB LTD | | | | BANK AL HABIB LTD | | | 1/11/06 |
| 8 | 2772677036 | WUH D | | 1 | 0.5 KG 28/10/06 | | | 15:57 |
| | BANK AL HABIB LTD | | | | NIL | | | |
| 9 | 1366879264 | SIN D | | 1 | 0.5 KG 30/10/06 | | | 15:24 |
| | HAJI KHUDABUX | | | | MR MAQBOOL SADIQ | | | |
| 10 | 3778326591 | LHR D | | 1 | 0.2 KG 13/10/06 | | | 15:41 |
| | IGEN SEA | | | | AAA | | | 31/10/06 |
| 11 | 1007691436 | SIN D | | 1 | 0.5 KG 30/10/06 | | | |
| | YAKSR (PRIVATE) LIMITED | | | | PERSON IN CHARGE | | | |

31/10/2006 16:04:55

Cash Total: 0.00

FAX NO :4547671

_____

# EXHIBIT 8

_____

```
   Date:      02/11/2005 10:41:39
RefNum:    PAUL4348374
Att:
```

Good Day from Helmgale Sarl, Montpellier. France.
Ph: 33 (0)4 6758 4600 Fax 33 (0)4 6758 9503 e-mail: helmgale@he
lmgale.fr


M BELABED


AVONS PU CONCLURE COMME SUIVANT



RE MV AIN OUSSERA
==================

PLEASED TO PREARE HEREIN FIXTURE RECAP:

=ALL NEGOS/SUBSEQUENT FIXTURES T/B KEPT STRICTLY PANDC=

MV. AIN OUSSERA
sltrm sd bc / 1983 built
class bureau veritas p&i club: american steamship
loa: 174.00 m.     lbp:165.00 m. breadth:26.00 m.    depth:14.80
 m.
deadweight / draft      summer:30,197 mt / 10.660 m.    tpc: 40.
2.
holds / hatches:  05 / 05.    (hatch covers: mac gregor folding
).
grain / bale capacities     38,464.8/37,630.5
speed / consumption at sea: 13 knts / 27 t. ifo180 / 2.0 mdo at
 sea.
gears / swl: 04 cranes x 25 t.


(PLS ADV FULL DETAILS)

Disp Owners: PLS ADV

P+I Club : PLS ADV

BEST ETA KARACHI : PLS ADV

=OTHER VSLS OWNED/UNDER CONTROL OF OWNS/MANAGERS :
=NAME OF PNI CLUB OF HEADOWNERS :
=NAME OF HNM U/W, WHERE PLACED AND HNM VALUE:
=PRESENT POSITION/LAST DISCH PORT/AGENTS FULL STYLE=ETA KARACHI
=
=LAST THREE CARGOES WITH C/P DATES :

OWNS CONFIRM:

=VSL IS HIGHEST CLASSED LLOYDS 100A1 OR EQUIV, P+I COVERED
=VSL HAS NOT SUFFERED ANY GA DURING LAST TWO YEARS
=VSL WAS NOT DETAINED BY PORT STATE CONTROL IN LAST 2 YEARS DUE
 TO
NEGLIGENCE OR BAD MAINTENANCE.
=VSL IS NOT SOLD/WILL NOT BE SOLD FOR SCRAP DURING THIS VOYAGE
=VSL IS NOT CONTROLLED/OWNED/MANAGED BY ISRAELI INTERESTS

OWNS TO PROVIDE BY FAX COPY OF FLWG CERTIFICATES:

=CLASS
=PNI
=HNM
=CARGO GEAR

WITHOUT HAVING ABOVE CERTS, VESSEL WILL NOT BE TREAT AS CLEAN F
IXED


FOR

// ALL NEGOTIATIONS AND EVENTUAL FIXTURE TO REMAIN STRICTLY P&C
 //


- A/C IGEN SEA SHIPPING
- FULL LOAD BGD RICE SF MAX 52' AND BSS 9.75 M SAILING DRAFT FR
OM KARACHI
(ABOUT 25,000 MT)
- LOAD 1-2SB(S) 1SP KARACHI, PAKISTAN
- DISCH 1-3SBPA WEST AFRICA DOULA - DAKAR RANGE INTN DOULA A/O
TEMA A/O
ABIDJAN A/O LOME A/O CONAKRY A/O COTONOU A/O
   FREETOWN A/O MONROVIA
- LOAD RATE 2,000 MT PWWD SHEX EIU
- DISCH RATE 1,000 MT PWWD SHEX EIU
- TIME FROM 12:00HRS SATURDAY OR ON A DAY PRECEDING HOLIDAY TO
08:00
   HRS MONDAY OR A DAY FOLLOWING HOLIDAY NOT TO COUNT EVEN IF US
ED, BOTH END
- LAYTIME NON-REVERSIBLE.
- NOR TO BE TENDERED DURING OFFICE HOURS, HRS MON-FRI 0900-1700
 HRS & SAT
0900-1200 HRS.. TIME
   TO COMMENCE COUNTING 24 RUNNING HOURS AFTER TENDERING
- LAYCAN 7/10 NOVEMBER 2005
- FIRST SHIFTING BETWEEN BERTH(S) IF ANY TO BE FOR OWNERS EXPEN
SES AND TIME
NOT TO COUNT. BEYOND FIRST SHIFTING

   (IF ANY) PORT SHIFTING CHARGES TO BE FOR CHARTERERS ACCOUNT A
ND TIME TO
COUNT. ANY SHIFTING DUE TO PORT CONVENIENCE
   TO BE FOR CHARTERERS ACCOUNT AND TIME NOT TO COUNT.
- FRT USD 42.00 PMT FIOS BASIS 1/3
- FREE D/A AT ALL PORT
- PAYMENT CLAUSE :
   100 PCT FREIGHT LESS ADCOM / BROKERAGE / LOAD PORT DESPATCH T
O BE PAID
WITHIN 5 BANKING DAYS UPON
   COMPLETION OF LOADING AND SIGNING / RELEASING BILLS OF LADING
MARKED
"FREIGHT PAYABLE AS PER C/P"
- FREIGHT RATE TO BE BASED UPON THE GROSS WEIGHTG QUANTITY AS P
ER B/L.
- DEM/DES,IF ANY, TO BE SETTLED W/IN 20 DAYS UPON SUBMISSION OF
OWNS
LAYTIME CALCULATION
   WITH  SUPPORTING DOCUMENTS DULY SIGNED BY MASTER AND AGENTS A
T BOTH ENDS
AND AGREEMENT THEREOF.
- DEM/DES USD 8,000/PDPR HDWTSBE
- UNDISPUTED DESPATCH (IF ANY) AT LOADPORT TO BE DEDUCTED FROM
95% OCEAN
FREIGHT
- CHARTS AGENTS BENDS
- PLASTIC ROLLS / KRAFT PAPER TO BE FOR CHARTERES ACCOUNT, OWNE
RS TO
CONTRIBUTE USD 2,500
- OAP IF ANY TO BE FOR CHARTERES A/C, OWNERS TO CONTRIBUTE USD
2,500
- ALL TAXES AND/OR DUES ON CARGO TO BE FOR CHARTERERS ACOUNT.
- ALL TAXES/DUES ON VESSEL/FLAG/OWNERSHIP/FREIGHT TO BE FOR OWN
ERS ACCOUNT

- IN THE EVENT VESSEL ARRIVES AT THE LOAD PORT PRIOR TO COMMENC
EMENT OF HER
LAYDAYS IT IS
   UNDERSTOOD THAT SHE CAN ONLY TENDER HER NOR ON THE FIRST LAYD
AY UNLESS
OTHEREWISE AGREED
   BY CHARTERES.
- TIME TAKEN FROM ANCHORAGE TO DISCHARGE BERTH SHALL BE CONSIDE
RED PART OF
THE VOYAGE AND SALL
   NOT COUNT AS LAYTIME EVEN IF THE VESSEL IS ALREADY ON DEMURRA
GE. TIME
TAKEN STEAMING TO
   COUNT FROM ANCHOR UP.
- CHARTERES TO BE KEPT WELL ADVISED ABOUT ANY ALTERATIONS OF VS
L'S POSITION
AND OWNERS/MASTER

~me0000f.txt

```
     TO COMMUNICATE TO CHARTERERS THE DATE WHEN VESSEL LEAVES THE
PREVIOUS
PORT OF CALL
- BIMCO ISM CLS TO APPLY
- COMM 5% INCL ADCOM ON F/D/D TO DEDUCTED AT SOURCE
- OWISE AS PER CHARTS PROFORMA C/P BASED ON GENCON
- SUB CHARTERERS / SHIPPERS / APPROVAL WITHIN 24 HOURS AFMT

END FIXTURE RECAP


THANKS & BEST REGARDS
```

EXHIBIT 9

Case 1:08-cv-01201-RJC Document 13-10 Filed 07/10/2008 Page 2 of 3
Incoming Message Printed at 05/04/2006 16:20:32 by PAUL    RefNum: Q637093
From/To: Oceanic Karachi

ReplyTo: "Farooq Chaudhary" <farooq@ostc-group.com>
From: "Farooq Chaudhary" <farooq@ostc-group.com>
To: <helmgale@helmgale.fr>
Subject: FW: MV AIN OUSSERA - LOAD PORT KARACHI
Date: Wed, 5 Apr 2006 13:14:51 +0500

TO HELMGALE FRANCE

RE MV AIN OUSSERA
----

RECEIVED BELOW FROM CHARTS

----- Original Message -----
From: "Igen Sea Shipping"
To: "Oceanic Shipping & Trading Co." <ostc-group@fascom.com>; "Farooq
Chaudhry" <farooq@ostc-group.com>
Sent: Wednesday, April 05, 2006 1:14 PM
Subject: MV AIN OUSSERA - LOAD PORT KARACHI


TO: OCEANIC SHIPPING & TRADING CO.,       (PAGES 1+1)

REF YOURS E-MAIL DATED 4 APRIL 2006.

REF # PAUL 4633953 DATED 04/04/2006.

PLEASE REFER TO C/P CLAUSE 29 WHICH STATES

"NOR AT LOAD PORT TO BE TENDERED BY TLX OR CABLE OR IN
WRITING PROVIDED VESSEL HAS ARRIVED AT CUSTOMARY PLACE
DURING OFFICE HOURS". YOU STATE THAT VESSEL TENDERED
LAYCAN ON 5TH AT 17.30 WHILST VESSEL ONLY ARRIVED AT
CUSTOMARY WAITING PLACE KARACHI ROADS ON 07/01/05 AT
18.15 HOURS. IN THIS CONNECTION, WE ATTACH A COPY OF OUR
E-MAIL DATED 16-01-2006. OUR LAYTIME CALCULATIONS IN
KARACHI ARE THEREFORE CORRECT.

YOUR REF NUM: PAU  4634029 - DISCHARGE IN CONAKRY

AS PER S.O.F. SATURDAY 14/01/2006 WAS A HOLIDAY AT CONAKRY.
OUR DISCHRGE PORTS TIME SHEET HAS THEREFORE BEEN CORRECTLY
PREPARED.

WE SHALL BE OBLIGED IF OWNERS REMIT US$ 99,382.30 TO US,
CHARTERERS, THROUGH

THRU FEDERAL RESERVE BANK OF NEW YORK

FOR CREDIT TO HABIB BANK LTD., NEW YORK
ACCOUNT ABA NO: 026007869

FOR FURTHER CREDIT TO HABIB BANK LIMITED,

CORPORATE CENTRE, A/C NO: 050005

HABIB BANK PLAZA, KARACHI - PAKISTAN

BENEFICIARY: HASSAN ALI RICE EXPORT CO.

ACCOUNT NO. 51095388


REGARDS.

IGEN SEA SHIPPING


----- Original Message -----
From: "Igen Sea Shipping" <igensea@igenseashipping.com>
To: "Farooq Chaudhry" <chartering@ostc-group.com>
Cc: "Oceanic Shipping & Trading Co." <ostc-group@fascom.com>
Sent: Monday, January 16, 2006 5:22 PM
Subject: Re: MV AIN OUSSERA

```
> TO: OCEANIC SHIPPING & TRADING CO.,
>
> REF YOURS E-MAIL DATED SATURDAY 14 JAN 2006.
>
> PLEASE REFER TO C/P CLAUSE 30 WHICH READS:-
>
> "OWNERS / MASTER TO SERVE NOTICE OF FIXING THEN FOLLOWED
> TO 24 HOURS DEFINITE NOTICE OF READINESS TO LOAD TO BE GIVEN
> TO CHARTERERS. IF 24 HOURS DEFINITE NOTICE OF READINESS NOT
> GIVEN THEN LAYTIME WILL BE DELAYED BY 24 HOURS".
>
> MASTER ADVISED THAT VESSEL HAS ARRIVED KARACHI OUTER
> ANCHORAGE AT 1730 HOURS ON 05 NOVEMBER 2005.
>
> AS PER ATTACHED KARACHI PORT TRUST PRINT OUT AIN OUSSERA
> ONLY ARRIVED AT KARACHI ON 07 NOVEMBER 2005 AT 18.15 HOURS.
> THEREFORE THE NOTICE SERVED BY MASTER IS ONLY THE NOTICE OF
> FIXING. THE MASTER DID NOT SERVE 24 HOURS DEFINITE NOTICE OF
> READINESS AND NOTICE OF READINESS AFTER ARRIVAL AT KARACHI
> OUTER ANCHORAGE.
>
> THUS AS PER C/P CLAUSE 36, TIME NOT TO COUNT AS LAYTIME UNTIL
> VESSEL COMMENCES LOADING OR EXPIRY OF 24 HOURS AFTER
> TENDERING N.O.R., WHICHEVER LATER.
>
> THEREFORE LAYTIME COMMENCED AS PER C/P CL. 31 WHICH READS
> AS FOLLOWS:-
>
> "AT LOADING PORT VESSEL TO BE TENDERED WITH CLEAN, DRY AND
> SWEPT HOLDS FREE FROM RESIDUES OF PREVIOUS CARGOES AND FROM
> OBJECTIONABLE SMELLS. IF THIS IS NOT DONE, TIME STARTS TO COUNT
> 24 RUNNING HOURS AFTER SURVEYORS PASS HOLDS".
>
> REGARDS.
>
> IGEN SEA SHIPPING

END

THANKS & BEST REGARDS
OCEANIC SHIPPING & TRADING CO.
AS AGENTS / BROKERS ONLY
TEL: +92-21-587-3157 / 58 / 59
FAX: +92-21-583-4785
EML: chartering@ostc-group.com / ostc-group@fascom.com
MSN: ostcgroup@hotmail.com / ostc_group@hotmail.com
SKYPE: ostc-group


       --------------------- End Of Message ---------------------
```

# EXHIBIT 10

mv ain oussera @ Conakry

De      "MONNIER Laurent" <l.monnier@getma.fr>
Objet   mv ain oussera @ Conakry
Date    Lun 16 janvier 2006 3:26
À       belabed@cnan-dz.com
Copie   n.zeimer@transafrica-gn.net,m.sylla@transafrica-gn.net,"elhadj Kahn" <el.kahn@transafrica-
à       gn.net>,helmgale@helmgale.fr,harec@hashgroup.com

---

Dear M. Belabed,

Thanks yours. We would like to thank you very much for having nominated TRANSAFRI
to act as agent of your good vessel Ain Oussera due to berth at Conakry on the 16
inst. agw/wp.

We do confirm that our proforma D/A for a/m vessel will be covered in totality by
Mrs Hassan Ali Rice Export prior to vessel's departure from Conakry and vessel's
owners will not be responsible for our proforma D/A for port charges.

Please inform urgently Master in order to berth asap.

We remain at your disposal

Kind regards

Laurent Monnier

-----Message d'origine-----
De : elhadj Kahn [mailto:el.kahn@transafrica-gn.net]
Envoyé : vendredi 13 janvier 2006 11:34
À : MONNIER Laurent
Cc : n.zeimer@transafrica-gn.net; m.sylla@transafrica-gn.net
Objet : Fw: mv ain oussera

----- Original Message -----
From: <belabed@cnan-dz.com>
To: <el.kahn@transafrica-gn.net>
Cc: <helmgale@helmgale.fr>
Sent: Friday, January 13, 2006 10:16 AM
Subject: mv ain oussera

> From: CNAN GROUP ASMC
> To: EL HADJ KAHN M/S TRANSAFRICA / CONAKRY Re:MV AIN OUSSERA / IGEN
> SEA SHIPPING.
>
> We are Owners of MV Ain Oussera chartered by Messrs Igean Sea Shipping
> / Karachi. As per Charter party terms, D/A are to be settled by
> charterers ISS. Therefore, we kindly request you to confirm urgently
> and before vessel will proceed to berth that D/A has been remitted by
> charterers to your account. Pls be advised that Master is instructed
> by Head Owners not to proceed for berthing untill such confirmation id received
Owners.
> Pls be guided accdly.
>
> Best Regards
>
> CNAN ASMC
>
>

http://www.cnan-dz.com/webmail/src/printer_friendly_bottom.php?passed_ent_id=0...   16/01/2006