Keith W. Heard (KH-8578)
Michael J. Walsh (MW-6578)
Burke & Parsons
100 Park Avenue
New York NY 10017-5533
(212) 354-3800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<div style="border:1px solid">

**CNAN GROUP S.P.A.,**

                              **Plaintiff,**

    -against-

**HASSAN ALI RICE EXPORT CO. d/b/a
IGEN SEA SHIPPING,**

                              **Defendant.**

</div>

**08 CV 1201 (PAC)**

**Electronically filed**

**PLAINTIFF CNAN GROUP S.P.A.'s MEMORANDUM
OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO VACATE THE ATTACHMENT.**

**TABLE OF CONTENTS**

Industry background on chartering transactions ................................................................ 2

Other disputes involving HAREC ....................................................................................... 3

The reality of HAREC's relationship with "Igen" ............................................................. 7

The merits of the dispute .................................................................................................... 13

POINT I – The Significant Weight of Authority in the Southern District of New York
After *AQUA STOLI* Rejects "Reasonable Grounds" as the Test for Sustaining Rule B
Attachments ........................................................................................................................ 13

POINT II – The Evidence Overwhelmingly Demonstrates an Alter Ego Relationship
Between Igen and HAREC ................................................................................................. 17

POINT III – The Evidence Equally Demonstrates That HAREC is Liable as an Undisclosed
Principal on the CNAN / Igen Contract ............................................................................ 21

CONCLUSION – For the Reasons Set Forth Herein and in the Accompanying Papers,
This Honorable Court Should Deny Defendant's Motion and Should Allow the
Attachment to Remain In Place .......................................................................................... 25

Keith W. Heard (KH-8578)
Michael J. Walsh (MW-6578)
Burke & Parsons
100 Park Avenue
New York NY 10017-5533
(212) 354-3800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CNAN GROUP S.P.A.,**

                               **Plaintiff,**

          **-against-**

**HASSAN ALI RICE EXPORT CO. d/b/a
IGEN SEA SHIPPING,**

                               **Defendant.**

**08 CV 1201 (PAC)**

**Electronically filed**

### PLAINTIFF CNAN GROUP S.P.A.'s MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE THE ATTACHMENT.

Plaintiff CNAN Group S.p.a. submits this Memorandum of Law in opposition to

defendant Hassan Ali Rice Export Company's motion to vacate a Rule B maritime attachment of

defendant's funds in the amount of $443,032.79.  Plaintiff obtained the attachment at Habib Bank

Ltd. on April 4, 2008 pursuant to an *Ex Parte* Order for Process of Maritime Attachment issued

by this Honorable Court on February 11, 2008.

### Industry background on chartering transactions

Companies charter ships as part of their efforts to turn a profit.  Often, as in this case, a cargo seller will charter a vessel to transport goods to a location where they can be sold at a higher value.  Rice is plentiful in Pakistan but not in West Africa.  Therefore, HAREC enters into transactions to sell Pakistani rice to West African buyers.  That transaction will, of course, be structured to earn HAREC a profit, taking into account what it must pay to purchase the rice from growers in Pakistan and what it costs to charter a vessel.

The probable cost of securing a vessel of a certain size can be determined before the vessel is actually chartered by reviewing the rates at which other, similar vessels are being fixed in the market.  Thus, knowing the cost of purchasing the rice and the approximate cost of chartering the vessel, a charterer such as HAREC can determine the amount for which the rice must be sold to earn a profit on the transaction.  In other words, there is a certain amount of pre-transaction predictability.

However, a charterer's pre-transaction calculations can be thrown askew if the vessel is delayed at the loading or discharging ports.  If that happens, the charterer must pay the shipowner a penalty for delaying the vessel, known as "demurrage".[1]  If the delays are substantial, the demurrage can put a serious dent in the charterer's profit on the underlying sales transaction and may, in some cases, wipe out the profit.  As a result – and perhaps not surprisingly – many charterers resist paying demurrage and some go to great lengths to avoid

---

[1]  Demurrage is "a penalty imposed on a charterer of a vessel, or in some instances the consignee of the vessel's goods, for delays in loading or unloading the ship's cargo."  *Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Company*, 804 F.2d 773, 774 n. 1 (1st Cir. 1986).

paying altogether.[2]  This case illustrates how one charterer, HAREC, has tried to avoid paying demurrage to various shipowners, including plaintiff CNAN.

## Other disputes involving HAREC

To obtain a proper understanding of what HAREC did in this case, it is useful to review what they have done in other cases.

HAREC once chartered ships in its own name.  For example, in January 1999, HAREC chartered the vessel JUNIOR M from its owner, Flame Maritime Ltd., to carry Pakistani rice from Karachi to the port of Moroni in the Comoros Islands.  *See* Judge Pauley's Memorandum and Order in *Flame Maritime Limited v. Hassan Ali Rice Export Co.*, 07 Civ. 4426 (S.D.N.Y. August 31, 2007)(Heard declaration, Exhibit A)[3].  HAREC paid the freight needed to move the cargo to destination but failed and refused to pay approximately $60,000 in demurrage.  Pursuant to the charter party, Flame demanded arbitration in London and obtained an award in the amount of $55,988.77 plus interest.  HAREC refused to pay the award, forcing Flame to commence legal enforcement proceedings in Karachi in February 2000.  Nearly six years later, the Pakistani High Court entered a decree on January 23, 2006 enforcing the arbitration award in the amount of $55,988.77 plus £4,800.[4]  When Flame filed an application to execute the judgment in Pakistan, HAREC appealed it.  Flame then filed a Rule B attachment action in this Court to obtain security in connection with the proceedings in Pakistan.  *Id.*  Flame attached over $120,000, which was

---

[2]  This summary is based on the knowledge and experience of plaintiff's lead attorney, whose signature appears on this brief, having worked on demurrage and other charter party disputes throughout his 28-year career as a maritime lawyer in New York, a leading center for the resolution of maritime charter party disputes.

[3]  References to "Heard declaration" appear hereinafter as "Heard decl."  References to an exhibit or paragraph appear hereinafter as "Exh." and "para."

[4]  "The Pakistani Court did not confirm the award of interest because it was contrary to Islamic law."  *Flame Maritime Limited v. Hassan Ali Rice Export Co.*, *supra* at 2.

subsequently reduced upon motion by HAREC because it exceeded the amount of the Pakistani judgment. *Id.*

At some point after chartering the JUNIOR M from Flame Maritime (and incurring direct liability for demurrage), HAREC changed the way it did business. Mr. Abdullah Hashwani or someone else in the company had one of HAREC's employees pretend that he had a separate company known as "Igen Sea Shipping" ("Igen"). Rather than have HAREC itself charter vessels to transport rice, HAREC had Igen pose as a vessel charterer.

In January 2005, Speybridge Shipping Company Ltd. chartered the vessel LE SHENG to what was identified as Igen for a voyage to transport rice from Karachi to West Africa. *See* Complaint attached as Exh. B to the Heard declaration. However, Speybridge insisted that HAREC guarantee Igen's obligations in the charter party. The vessel proceeded to perform the contractual voyage but Igen and HAREC failed to pay nearly $530,000 in demurrage and/or detention incurred at the two West African discharge ports. In addition, the delays at the two ports allegedly caused the vessel to miss the cancelling date on its next employment, resulting in the loss of that business, for which Speybridge sought to recover an additional $377,000 in damages. With interest, attorneys' fees and an additional item of damage, Speybridge alleged that it had claims against Igen and HAREC totaling more than $3,000,000. *See* Heard decl., Exh. B at para. 19. Despite its guarantee of Igen's obligations, HAREC apparently failed to pay any part of Speybridge's claim, prompting Speybridge to file a Rule B attachment action in this Court on August 23, 2005. Certain amounts were attached as a result of that action, after which HAREC posted alternate security in exchange for being dismissed from the action. *See* Heard decl., Exh. C.

In November 2005, Salam International Transport & Trading chartered the vessel FARAH 3 to what was identified as Igen for a voyage to carry bagged rice from Karachi to Madagascar and a port in West Africa.  Over $114,000 in demurrage was incurred at the discharge ports, in addition to another item allegedly for Igen's account in the amount of $31,250.  Igen failed to pay these sums and, reserving the right to arbitrate its claims in London, Salam filed a Rule B attachment action in this Court in April 2006.  Salam named both Igen and HAREC as defendants, alleging that HAREC was Igen's alter ego.  *See* Heard decl., Exh. D.

Funds were attached and, as in this action, HAREC moved to vacate, contending that Igen was a separate and independent concern.  In particular, HAREC contended in its reply papers on the motion to vacate that Igen was owned by one Aziz Ashiq Ali, who submitted an affidavit in which he averred that he was "the sole proprietor" of Igen and that there was "no direct or indirect link, connection of ownership or any other relationship of whatsoever nature between Igen Sea Shipping and Hassan Ali Rice Export Co. except Igen Sea Shipping have acted as Charterer of Vessels."  *See* Heard decl., Exh. E.

HAREC also contended, as it does again in this case, that it sub-chartered the vessel from Igen "on terms identical – except for 1.25% ADCOM for Igen."[5]  *See* Heard decl., Exh. F. Plaintiff Salam argued that Igen "was a 'paper' charterer used to improperly insulate sub-charterer Hassan Ali from damages."  *Salam Int'l Transport & Trading Co. v. Igen Sea Shipping and Hassan Ali Rice Export Co.,* 06 Civ. 2841, slip op. at 2 (S.D.N.Y. May 25, 2006)(*see* HAREC Exh. 16).  Although Judge Berman was not persuaded, CNAN fully agrees with that contention.

---

[5]  "ADCOM" is an abbreviation for "address commission", a type of commission sometimes paid in charter party transactions.  *See, e.g., Companhia de Navegacao Maritima Netumar v. Armada Parcel Service, Ltd.,* No. 96 Civ. 6441, 1997 WL 16663, at *1 (S.D.N.Y.  January 17, 1997) (an address commission is "a rebate from the vessel owner to the charterer which is either paid to a broker or retained by the charterer").

Judge Berman granted HAREC's motion to vacate but it is respectfully submitted that he did not have before him many of the facts that are now being placed before this Court in CNAN's opposition to the instant motion.  In addition, the Court in *Salam v. Igen and HAREC* applied the "reasonable grounds" standard in judging the strength of plaintiff Salam's contentions when, in fact, the applicable standard is now the lesser one of "*prima facie*".  The Court wrote:

> Among other things, there is no evidence that Hassan Ali used Igen Sea for a fraudulent purpose and insufficient evidence (i.e. no *reasonable grounds* to believe) that Hassan Ali is Igen Sea's alter ego.  For example, there is no evidence that Igen Sea lacks the "formalities and paraphernalia that are part and parcel of the corporate existence;" no evidence of "inadequate capitalization;" and no evidence that there was any "overlap in ownership, officers, directors, and personnel" between Igen Sea and Hassan Ali.  [Emphasis added.]

*Salam v. Igen and HAREC*, at 4.  With respect, this analysis is fundamentally flawed because the evidence before the Court was that both Igen and HAREC were sole proprietorships, not corporations.  Thus, *ipso facto*, there would have been no "formalities and paraphernalia that are part and parcel of the corporate existence," no evidence of "inadequate capitalization;" and no evidence that there was any "overlap in . . . officers [and] directors" between the two entities (if, in fact, Igen is actually an "entity" at all).  Judge Berman further concluded that "Plaintiff offers only conclusory allegations that Hassan Ali is Igen Sea's alter ego." *Id*. at 4.  In fact, however, plaintiff Salam provided the Court with evidence *inter alia* that Igen's "office" was a sham[6] and that it made no sense whatsoever for Igen to sub-charter Salam's vessel to HAREC on identical terms without charging a higher rate to make a profit on the transaction.[7]

---

[6] According to a declaration Salam submitted to the Court, Iftikar Chambers is "a dilapidated, run-down building" and when the site was visited by a Pakistani attorney hired by Salam, he learned that none of the tenants at that modest location had ever heard of Igen Sea Shipping.  *See* Heard decl., Exh. G.

[7] On the latter point, Salam submitted a detailed affidavit from Klaus Mordhorst, president of New York's Society of Maritime Arbitrators and an experienced charter party broker, to the effect that it was "extraordinary and unusual" for a sub-charter (between Igen and HAREC) to contain the same freight rate (i.e., rate of compensation) as

**The reality of HAREC's relationship with "Igen"**

The facts clearly and overwhelmingly indicate that HAREC and Igen are not separate entities but are, in fact, indistinguishable alter egos.

First of all, the notion that Igen has its own office is simply farcical. Several investigators have been to Iftikhar Chambers on different occasions and there has never been any sign of activity at the small 6' x 4' space in that building which is alleged to be Igen's office. The space attributed to Igen is fronted by a heavy, roll-down metal door that has never been open when any of the investigators visited. At one time there was a small metal nameplate next to the door with the name "Igen Sea Shipping" on it but even that is now gone. *See* Rahman decl., Exh. 6. Inquiries to the building's caretaker and tenants indicated that no one there had ever heard of Igen Sea Shipping nor had they ever seen any activity in the space Igen allegedly occupies. *See* Rahman decl., paras. 9-10. The sketch prepared by Mr. Abdul Rahman, an accountant who works with the Karachi law firm Abraham & Sarwana, shows that Iftikhar Chambers is a small building with only a few longstanding tenants – none of which were Igen. *See* Rahman decl., Exh. 4 and paras. 6-9. Clearly, if Igen had a legitimate office at that location from which it conducted business, the other tenants would have been aware of that. Their ignorance of the company is just further evidence that it simply does not exist at that location – if anywhere.

Secondly, the building in which Igen's office allegedly exists is owned by a company owned and controlled by the Hashwani family. Coronet Enterprises Pvt. Ltd., the owner of the building and the company that would serve as Igen's landlord had it truly leased space there, *see*

---

the head charter (between Salam and Igen) and "most extraordinary and unusual" for the sub-charterer HAREC to leapfrog the allegedly intermediate charterer (Igen) and pay freight directly to the shipowner, Salam. Mr. Mordhorst concluded that Igen's role in the Salam transaction was more like that of a broker than of a principal. Heard decl., Exh. H. Of course, if Igen was just a broker, then the contract would have been between Salam, as owner, and HAREC, as charterer, justifying Salam's assertion of a claim against HAREC.

Rahman decl., Exh. 2, has its registered office at 1st Floor, Cotton Exchange Building, I.I. Chundrigar Road, Karachi, *which is the same location as HAREC's office,* and has members of the Hashwani family as its shareholders.  *See* Rahman decl., Exh. 8.  This is the same Hashwani family that controls Hassan Ali Rice Export Company.  *See* Rahman decl., para. 13.  In addition, Coronet's official filings with the Pakistani government show that it has the same telephone number as HAREC.  *See* Rahman decl., Exh. 9, p. 1.  Clearly, Coronet and HAREC are run out of the same office.

Thirdly, prior to any formal proceedings in connection with this matter, plaintiff's London solicitors attempted to send a demand letter, with supporting documentary exhibits, to Igen.  DHL was unable to deliver the letter to Igen's alleged address at Iftikhar Chambers.  DHL ultimately proceeded to HAREC's office where a man named "Aziz" accepted delivery and signed for the letter.  *See* Moisley declaration, paras. 27-31.  HAREC has previously contended in the *Salam* case that Igen is owned by Mr. Aziz Ashiq Ali.  Thus, there is certainly a name similarity between Igen's alleged proprietor and the man who signed for delivery at HAREC's office.

Fourthly, Mr. Aziz Ashiq Ali works for HAREC and that is where he can be reached. CNAN established this by having its London solicitors attempt to reach Mr. Aziz Ashiq Ali at HAREC's office.  The receptionist who answered the telephone at HAREC's office in December 2007 did not deny that Mr. Aziz Ashiq Ali worked there; the receptionist simply said he was not there at the time of the call.  When the caller, Mr. Vivek Jain, then spoke to someone else at HAREC about Mr. Aziz Ashiq Ali, the caller was told that "had gone to the bank and therefore he was not in the office at that moment."  *See* Jain decl., para. 7.  On January 10th of this year, Mr. Jain again called HAREC's office in search of Mr. Aziz Ashiq Ali.  Mr. Jain's call was transferred

to someone else in the company who advised that Mr. Aziz Ashiq Ali was "was not in at that time." However, the person who answered the telephone proceeded to give Mr. Jain the mobile telephone number for Mr. Ali, which Mr. Jain did not call at that time. *Id.* at para. 8. On January 15th, Mr. Jain again called HAREC's office and this time a different person also gave him Mr. Aziz Ashiq Ali's mobile or cell phone number. *Id.* at paras. 9-10. Mr. Jain proceeded to call the number and reached Mr. Ali, who confirmed his identity and also confirmed that he worked for HAREC. *Id.* at paras. 13-14.

More recently, Mr. Jain telephoned Ocean World (Pvt.) Ltd., the company that served as the Karachi port agent on the voyage of the M/V AIN OUSSERA which is at issue in the underlying substantive dispute. (If Igen had, in fact, been the vessel's charterer, then Ocean World would have been appointed by Igen.) Mr. Jain asked the person with whom he spoke at Ocean World how he could reach Igen Sea Shipping and, in response, was given a telephone number. When Mr. Jain called that number, the following transpired:

> I shared greetings with a male voice on the telephone number + 92-21- 241-2871. I told this man that I wished to speak to someone in relation to Igen Sea Shipping. He exhibited no verbal reaction or surprise when I requested to speak to him in relation to Igen Sea Shipping. The gentlemen asked me to state the reason why I was seeking to speak to Igen Sea Shipping. I told him that I wished to speak to some one from Igen Sea Shipping and in particular Mr. Aziz Ashiq Ali in relation to a matter pertaining to a shipment of rice.
>
> I noticed that there was a sudden change in the gentleman's tone and he replied back that the telephone number on which I was speaking was in fact a residential telephone number of Mr. Ahmed Ali. I put to him as to why a few moments previously he kept on asking me questions and was willing to discuss about Igen Sea Shipping and also why suddenly was now asserting that he was speaking from a residential telephone number. At this point I

9

> noticed that he was provoked and I noticed a sudden change in tone.  I ended
> the telephone call after saying politely "good-bye" in Urdu.

*See* Jain decl., paras. 18-19.  Upon further investigation, it turned out that the telephone number

Ocean World gave to Mr. Jain was not a number for Igen at all but was instead a number for

HAREC, which Mr. Jain determined through Internet research.  In particular, Mr. Jain found a

directory on the website of a Pakistani consulate which listed the telephone number he had

obtained from Ocean World (+ 92-21- 2412871) in front of the name "Hassan Ali Rice Export

Company" under the heading of "Rice Exporters from Pakistan."  He also found the number

listed as one for HAREC in an on-line business telephone directory for Pakistan.  *See* Jain decl.,

para. 20.

Thus, when Mr. Jain attempted to reach Mr. Aziz Ashiq Ali in Karachi, he found him

through HAREC, where Mr. Ali clearly worked, and when Mr. Jain tried to find Igen, he was

instead given a telephone number for HAREC.  This simply reinforces the conclusion that Igen is

simply part of HAREC and has no separate existence from HAREC.

As a fifth point, if Igen had a separate legal existence in Pakistan, it would have to have its

own National Tax Number ("NTN"), as a matter of Pakistani law.  This is abundantly clear from

information set forth in the accompanying declaration of Mr. Rahman, a highly experienced

Pakistani accountant who does work for the Abraham & Sarwana law firm.  Mr. Rahman states

quite clearly that "a proprietary business like Igen Sea Shipping is required to register and obtain

an NTN" and that "[a] business cannot be registered as a national tax assessee ('taxpayer')

without a National Tax Number ("NTN")."  *See* Rahman decl., paras. 19 and 21.  However, as

alleged in paragraph 18 of the Verified Complaint, Igen does not have such a number.  In his

declaration, Mr. Hashwani of HAREC simply declares that "[t]he government of Pakistan does

not require national tax numbers as an income tax assessee."[8]  Hashwani decl., para. 17.  Mr.

Hashwani attempts to defend Igen on this point by arguing that an NTN is not required.  By

implication, he cannot show that Igen does, in fact, have an NTN or he would have done so.

Thus, Igen lacks a basic requirement for a sole proprietorship under Pakistani law.

A corollary of this point is that Igen has undoubtedly never paid tax to the Pakistani

authorities.  Either Igen does not earn sufficient income to require tax payment, which is

extremely unlikely for a shipping company, or Igen has decided not to honor its tax obligations,

in violation of Pakistani law.  *See* Butt decl., para. 4.

As a sixth point, HAREC has treated what otherwise might be regarded as Igen's money

as HAREC's funds.  In particular, HAREC has made very significant payments on Igen's behalf

under the charter party with plaintiff and has instructed plaintiff to make payments allegedly

owed to Igen directly to HAREC's bank account.  *See* Moisley decl., paras.34.1 – 34.2.  There is

no evidence whatsoever that Igen has a bank account of its own.

HAREC also bypassed Igen in making substantial freight payments to the shipowner

when the vessel FARAH 3 was chartered from Salam in the case before Judge Berman several

years ago.  Heard decl., Exh F.  HAREC contends these unusual arrangements were required

because, at least in the case of the AIN OUSSERA charter, Igen was in financial difficulty and had

---

[8]  In addition, HAREC has attached as Exhibit 13 to its memorandum of law a Karachi newspaper article dated April 16, 2008 which reports simply that the National Tax Number may be replaced *in the future* for individuals by a Computerized National Identity Card number, while the NTN would be retained for corporations.  What the article clearly implies, of course, is that *currently* both individuals (which would include sole proprietorships) and corporations must continue to have an NTN *until there is a change in the Pakistani system*.

to sub-charter the vessel on identical terms to HAREC.[9]  However, Igen and HAREC also utilized a back-to-back charter arrangement "on terms identical" in the *Salam* case, without arguing as a predicate that Igen was in financial difficulty.  *Id.* at Exh. G, paras. 5 and 12.  In that case, as noted above, plaintiff Salam submitted the declaration of a leading New York arbitrator and charter party broker to the effect that it was "extraordinary and unusual" for a sub-charter (between Igen and HAREC) to contain the same freight rate (i.e., rate of compensation) as the head charter (between Salam and Igen) and "most extraordinary and unusual" for the sub-charterer HAREC to leapfrog the allegedly intermediate charterer (Igen) and pay freight directly to the shipowner, Salam.  *Id.* at Exh. J.  In this case, plaintiff has obtained a declaration from an experienced London charter party broker who shares Mr. Mordhorst's astonishment and skepticism over these questionable arrangements.  *See* Blum declaration.

As a seventh point, Getma International, a French-based company that provides port agents in various West African countries, has confirmed that HAREC was its principal with respect to the voyage of the AIN OUSSERA here at issue, not Igen.  *See* Moisley decl., para. 34.3.

In short, the evidence shows that Igen does not really have an office or an independent legal existence.  The man who offered sworn testimony in the *Salam* case that he owns Igen is, in fact and by his own admission, a HAREC employee.  HAREC pays Igen's debts and receives the payments that are allegedly due to Igen.  Thus, it is no surprise that when Mr. Jain asked Ocean

---

[9]  As plaintiff's London solicitor points out in his accompanying declaration, HAREC's contention that it was a sub-charterer on back-to-back from Igen is a new factual allegation that was not made during the events in question (i.e., the voyage of the AIN OUSSERA) and is based on highly questionable documents and economic arrangements.  In his opinion, as an experienced English charter party lawyer and shipping professional, "the Court should view with apprehension the suggestion that there was such a fixture" between Igen and HAREC.  *See* Moisley decl., para. 32.

World, the Karachi load port agent, for Igen's telephone number, he was given a number that belonged to HAREC. Nor is it any surprise that HAREC, not Igen, gives the instructions to the West African discharge port agents that were provided through Getma. Igen is just a front or façade erected by HAREC to shield the latter from the debts it owes as the true charterer of the AIN OUSSERA (and other vessels in other cases that have been filed in this Court). Accordingly, the attachment should not be vacated but should instead be maintained.

### The merits of the dispute

The charter party between plaintiff and Igen is governed by English law and all disputes thereunder are to be referred to arbitration in London. *See* HAREC's Memo of Law, Exh. 1, Cl. 58. Without offering any evidence of the applicable English law, HAREC contends that plaintiff's substantive claims are invalid. With respect, HAREC's attorneys have not established that they are admitted to practice in English and Wales and, accordingly, are in no position to opine or argue the merits of plaintiff's claims. Going beyond that, however, HAREC's "defences" on the merits have absolutely no substance or validity, as is thoroughly demonstrated in the detailed and well-argued disposition on the applicable English law found in paragraphs 3 through 26 of the accompanying declaration of Thomas Moisley, plaintiff's London solicitor in this matter.

## POINT I

### THE SIGNIFICANT WEIGHT OF AUTHORITY IN THE SOUTHERN DISTRICT OF NEW YORK AFTER *AQUA STOLI* REJECTS "REASONABLE GROUNDS" AS THE TEST FOR SUSTAINING RULE B ATTACHMENTS.

HAREC contends that the evidentiary standard to be applied at a Rule E(4)(f) hearing to determine whether a Rule B attachment should be sustained is whether "reasonable grounds" exist to support the attachment. HAREC's Memo of Law in Support of Motion to Vacate, Point II.

However, the significant weight of authority in the Southern District of New York to have considered this issue after the Second Circuit's decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith*, 460 Fed.3d 434 (2d Cir. 2005), has almost uniformly disavowed the stricter test of "reasonable grounds" in favor of *Aqua Stoli's* prima facie standard. As Judge Sweet recently noted in great detail:

> The majority of courts in this district to have considered the issue have interpreted *Aqua Stoli* to require the application of the prima facie standard when considering the adequacy of the claim in a maritime vacatur motion. *See SPL Shipping, Ltd. v. Gujarat Cheminex, Ltd.,* 2007 WL 831810, *3, 2007 U.S. Dist. LEXIS 18562, at *8 (S.D.N.Y. Mar. 15, 2007); *Fesco Ocean Mgmt., Ltd. v. High Seas Shipping, Ltd.,* 2007 WL 766115, **2-3, 2007 U.S. Dist. LEXIS 19970, at *9 (S.D.N.Y. Mar. 12, 2007) (dicta); *Secil Martima U.E.E. v. Malev Shipping, et al.,* No. 06 Civ. 6345 (S.D.N.Y. Oct. 10, 2006) (transcript of Rule E(4)(f) hearing denying vacatur motion); *Route Holding Inc. v. Int'l Oil Overseas, Inc.,* No. 06 Civ. 3428 (S.D.N.Y. Sept. 29, 2006) (order denying vacatur of maritime attachment); *Tide Line, Inc. v. Eastrade Commodities, Inc.,* No. 06 Civ.1979, 2006 WL 4459297 (S.D.N.Y. Aug. 15, 2006) (order vacating attachment); *but see Wajilam Exps. (Singapore) Pte. Ltd.v. ATL Shipping Ltd.,* 475 F.Supp.2d 275 (S.D.N.Y. 2006) (holding that the applicable standard for establishing the *Aqua Stoli* factors is "reasonable grounds" for an attachment). The Court agrees with the weight of authority in this district, and will apply the prima facie standard, as it more closely comports with the Second Circuit's rejection of the "broader Rule E(4)(f) inquiry" that the reasonable grounds test would necessarily include. *Aqua Stoli,* 460 F.3d at 436; *see also SPL Shipping,* 2007 WL 831810, *3, 2007 U.S. Dist. LEXIS 18562 at *8-*10; *Tide Line,* No. 06 Civ.1979, 2006 WL 4459297, Aug. 15, 2006 Order at 17."

14

*Dolco Inv., Ltd. v. Moonriver Development, Ltd.*, 486 F. Supp. 2d 261, 266-7 (S.D.N.Y. 2007).

*See also Wilhelmsen Premier Marine Fuels AS v. UBS Provedores PTY Ltd.*, 519 F. Supp. 2d 399, 408-9 (S.D.N.Y. 2007) (rejecting a proposed standard of "fair probability" as contrary to the findings of a majority of courts in this district); *Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V.*, No. 07 CV 3076, 2007 WL 1989309, *3-4 (S.D.N.Y. July 6, 2007) (rejecting the "reasonable grounds" standard as against the weight of the decisions by "many district courts" after *Aqua Stoli*); *OGI Oceangate Transp. Co. Ltd. v. RP Logistics PVT. Ltd.*, No. 06 Civ. 9441, 2007 WL 1834711, at *4 (S.D.N.Y. June 26, 2007) ("Of the courts in this district that have considered the issue, the majority have interpreted *Aqua Stoli* to require the application of the prima facie standard when considering the adequacy of the claim asserted in the context of a maritime attachment.").

Similarly, Judge Buchwald has had opportunity to consider this specific issue on three separate occasions.  In the second of her three decisions addressing this point, she clearly suggested that the standard articulated in *Ullises Shipping Corp. v. FAL Shipping Co. Ltd.*, 415 F. Supp 2d 318, 323 (S.D.N.Y. 2006), which is the pre-*Aqua Stoli* opinion that articulated the "reasonable grounds" test and is one of three cases upon which HAREC relies (see HAREC Memo of Law, p. 8), is "no longer good law on this point."  *World Reach Shipping Ltd. v. Industrial Carriers, Inc.*, No. 06 Civ. 3756, 2006 WL 3316828, at *3 (S.D.N.Y. Nov. 9, 2006); *see also, Fesco Ocean Management Ltd. v. High Seas Shipping, Ltd.*, No. 06 Civ. 01055, 2007 WL 766115, at *2 (S.D.N.Y. March 12, 2007) ("after *Aqua Stoli* it appears that courts should simply consider whether a plaintiff seeking to maintain as maritime attachment has pled a prima facie case justifying that attachment under Rule B"); *Hawknet Ltd. v. Overseas Shipping Agencies*, No. 07 Civ. 5912, 2008 WL 1944817, *2 n.4 (S.D.N.Y. April 29, 2008) ("we read

Aqua Stoli as 'strongly suggest[ing] that courts should limit their Rule B inquiries to whether the plaintiff has stated a prima facie basis for the maritime attachment at issue'" (quoting *Fesco Ocean Management, Ltd.*, at *2)).

As further support for its proposed "reasonable grounds" standard, HAREC cites Judge Berman's unpublished Order in *Salam International Transport & Trading Co. v. Igen Sea Shipping and Hassan Ali Rice Export Co.*, 06 Civ. 2841 (RMB) (S.D.N.Y. May 25, 2006). As noted above, *Salam* was an earlier Rule B maritime attachment proceeding in which both HAREC and Igen Sea Shipping were involved as defendants and alter ego claims were alleged.

After considering more limited evidence than that which is being submitted here, Judge Berman vacated the attachment at issue there, finding that the "[p]laintiff had not presented enough evidence of *reasonable grounds* for piercing the corporate veil." *Id.* at 4 (emphasis added). However, Judge Berman issued his Order on May 25, 2006, more than two months before the Second Circuit decided *Aqua Stoli* on July 31, 2006. As such, Judge Berman had neither the benefit of the Second Circuit's precautionary language rejecting broad-based inquiries at Rule E(4)(f) hearings, nor the significant weight of the post-*Aqua Stoli* decisions rendered by judges in the Southern District described above. Accordingly, *Salam* is no longer authority for applying the more stringent standard of "reasonable grounds."

Finally, HAREC cites *Williamson v. Recovery Ltd. Partnership*, No. 06 Civ.5724, 2007 U.S. Dist. LEXIS 4438, at *4-5 (S.D.N.Y. January 16, 2007), as support for the "reasonable grounds" test. Although Judge Swain issued her opinion almost six months after *Aqua Stoli* was decided, she cited only *Ullises* as support for application of a "reasonable grounds" standard. She failed even to address, much less consider, the more substantial line of post-*Aqua Stoli* decisions which reject the "reasonable grounds" test. For this reason, plaintiff respectfully

submits that the *Williamson* decision is simply out-of-step with the majority view expressed in the better-reasoned cases decided in the Southern District after *Aqua Stoli*.

## POINT II

### THE EVIDENCE OVERWHELMINGLY DEMONSTRATES AN ALTER EGO RELATIONSHIP BETWEEN IGEN AND HAREC.

The alter ego evidence connecting HAREC and Igen Sea Shipping in this proceeding is significantly more extensive than that which was submitted to Judge Berman in *Salam*. Regardless of whether the standard of proof is the lower *prima facie* one, or the more stringent one of "reasonable grounds", CNAN submits that there is more than sufficient evidence to sustain a finding that HAREC is the alter ego of Igen Sea Shipping.

In support of its petition to vacate, HAREC has alleged that Igen Sea Shipping and HAREC are separate sole proprietorships -- each controlled by different sole proprietors. However, by citing so many cases involving corporate veil-piercing principles, HAREC appears to accept the proposition that, although more typically used in the context of shareholders and corporate entities, alter ego analysis nonetheless applies also to sole proprietorships. Indeed, the thrust of HAREC's argument is not that the factors articulated in corporate-context cases, such as *MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC,* 268 F.3d 58 (2d Cir. 2001), are inapplicable to sole proprietorships. In fact, in a remarkable slip, given its contention that Igen Sea Shipping and HAREC are not corporate entities at all but are simply separate sole proprietorships owned by different sole proprietors,

17

HAREC claims that CNAN "has not established a basis upon which the *corporate veil* may be pierced in this case." HAREC's Memorandum of Law, p. 10 (emphasis added). Thus, HAREC has fully accepted application of alter ego analysis in the context of sole proprietorships. Its argument to vacate the attachment is simply that CNAN has failed to demonstrate sufficiently the typical alter ego factors identified in the *MAG Portfolio* decision.

Lest the Court be troubled theoretically by applying corporate veil-piercing principles to sole proprietorships, there is ample authority for finding a sole proprietorship to be the alter ego of another party. In *LiButti v. U.S.*, 107 F.3d 110 (2d Cir. 1997), the Court of Appeals vacated and remanded a decision by the district court which had found, in effect, that alter ego analysis applied only to corporations. In the absence of clear New Jersey authority on point, the district court had refused to extend corporate veil-piercing principles to a sole proprietorship. The Second Circuit, however, while recognizing that the traditional factors used in veil-piercing analysis may not apply in a non-corporate context, nonetheless determined that, under certain conditions, a sole proprietorship can be held to be the alter ego of an individual taxpayer/defendant. If the individual taxpayer dominated and controlled the sole proprietorship at issue, which was nominally controlled by the taxpayer's daughter (the *alleged* sole proprietor), then the sole proprietorship could be deemed the taxpayer's alter ego. The Court reasoned as follows:

> Nonetheless, it should be patently obvious that if Robert [the individual taxpayer] dominated and controlled Lion Crest [the sole proprietorship] he should not be able to escape his tax liabilities simply because it was not

incorporated, and he chose instead, to constitute his daughter [the alleged sole proprietor] as his unincorporated business' nominee. In either event, "we must avoid an over-rigid 'preoccupation with questions of structure,'" *id.* [i.e., *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 18 (2d Cir. 1996)] (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)) and "apply the preexisting and overarching principle 'that liability is imposed to reach an equitable result.'" *Id.* (quoting *Brunswick Corp v. Waxman, 599 F.2d 34, 36 (2d Cir. 1979)).*

107 F.3d at 119. *See generally, In re Maghazeh,* 310 B.R. 5 (E.D.N.Y. 2004) (applying alter ego

theory outside the context of a corporation in order to pierce the veil of a trust). Therefore,

regardless of whether the *prima facie* test or "reasonable grounds" is the proper evidentiary

standard, CNAN will demonstrate below that, applying the *MAG Portfolio* factors, HAREC is

clearly the alter ego of Igen Sea Shipping:

(1) **Disregard of corporate formalities**. Since neither Igen nor HAREC is a corporation, there are no "corporate formalities" for them to observe. There is a requirement under Pakistani law that every tax assessee must have a National Tax Number, which Igen has disregarded. Not having an NTN, it is entirely possible that Igen has never paid any tax to the Government of Pakistan, presumably resulting in a further violation of Pakistani law.

(2) **Inadequate capitalization**. There is no evidence that Igen even has a bank account since all payments made in its name are made by HAREC, who directs that amounts owed to Igen be paid to HAREC. If Igen has no bank account – which appears to be the case -- it is difficult to say that it has any capital at all.

(3) **Intermingling of funds**. HAREC pays Igen's debts and instructs creditors such as plaintiff to pay to HAREC funds that are owed to Igen. There is no evidence that Igen has any funds of its own.

(4) **Overlap in ownership, officers, directors, and personnel**. Mr. Aziz Ashiq Ali, who has previously testified in another action that he is Igen's sole proprietor, is employed by HAREC and works in their office. Thus, HAREC's office is Igen's office (to the extent, if any, that an entity known as "Igen" even exists) and HAREC's employee is the only person who has claimed ownership of Igen. The "overlap" is obvious.

(5) **Common office space, address and telephone numbers of corporate entities**.  As stated, Igen's alleged sole proprietor sits in HAREC's office.  Therefore, Igen and HAREC share office space and address.  Also, Mr. Aziz Ashiq Ali can be reached by telephoning HAREC's office and, when a company described as Igen's port agent in Karachi was asked for Igen's telephone number, the number provided turned out to be one of HAREC's telephone numbers.

(6) **The degree of discretion shown by the allegedly dominated corporation**.  Since Igen's alleged sole proprietor is a HAREC employee, it does not appear that he has *any* discretion to act on his own behalf or otherwise independently of HAREC's instructions.

(7) **Whether the dealings between the entities are at arms length.**  HAREC and Igen are about as close together as two entities can possibly be, with Igen's alleged sole proprietor working for and sitting in Igen's office.

(8) **Whether the corporations are treated as independent profit centers**.  It strongly appears that HAREC does not allow Igen to make a profit since HAREC, as an alleged sub-charterer, only agrees to pay Igen the same compensation (known as "freight") that the latter owes to shipowners such as CNAN.  In fact, Igen never collects freight from HAREC because the latter simply leapfrogs Igen and pays the shipowners directly.  The sub-charter does provide that Igen is entitled to an address commission but there is no evidence that such a commission has ever been paid to Igen in this or any other case.  In addition, as happened in this case, Moisley decl., para. 34.2, Igen instructs the shipowners to make any payments allegedly due to Igen directly to HAREC.  This is classic evidence that Igen and HAREC do not operate at arm's length and that Igen is not treated as an "independent profit center."[10]

(9) **Payment or guarantee of the corporation's debts by the dominating entity**.  This has indeed happened.  In *Speybridge Shipping Company Ltd. v. Igen and HAREC*, Igen's charter party obligations to Speybridge were guaranteed by HAREC.  Heard decl., Exh.B.

(10) **Intermingling of property between the entities**.  It is not clear that Igen owns anything that does not belong to HAREC.  Since Igen's sole proprietor sits in and works out of HAREC's office, one can assume that everything he uses in his work (e.g., desk, office supplies, postage, telephone, etc.) belongs to HAREC.  Even the space that Igen allegedly

---

[10]  Similar conduct occurred in *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275 (S.D.N.Y. 2006), where two companies in a position similar to Igen's told third parties to make payments to "Via Sistina", another company in the group.  The Court wrote that "[t]he allegation that ATL-BVI and ATL-Shanghai encouraged third parties to pay debts owed to them directly to Via Sistina is highly relevant to a veil-piercing theory, because it implicates a number of these factors, including disregard of corporate formalities, intermingling of funds, transactions not at arm's length, and failure to treat the corporations as independent profit centers.  If ATL-BVI and ATL-Shanghai were independent companies, one would expect them to receive the revenues owed to them and then disburse those revenues as other agreements required, rather than to allow the other parties involved to simply ignore their independent existence."  *Id.* at 284-85.

leases at Iftikhar Chambers belongs to a company run by the same Hashwani family that controls HAREC.

Taking the law as stated by HAREC, it is clear that the facts strongly support plaintiff's contention that HAREC is the alter ego of Igen and vice versa.  Indeed, it is virtually impossible to identify Igen as an entity with any existence apart from its status as part of HAREC.

**POINT III**

**THE EVIDENCE EQUALLY DEMONSTRATES
THAT HAREC IS LIABLE AS AN UNDISCLOSED
PRINCIPAL ON THE CNAN / IGEN CONTRACT.**

HAREC contends that it made payments (which were owed by Igen) directly to plaintiff because Igen sub-chartered the AIN OUSSERA to HAREC on terms which were essentially identical to those found in the CNAN / Igen charter, except for a provision requiring payment of a 1.25% address commission to Igen.  Normally, in vessel charter arrangements, if there is a sub-charter, it is negotiated and agreed at a higher freight rate so the "man in the middle" (in this case, Igen) can make a profit on the transaction.  *See* Blum decl. and Heard decl., Exh. J.  Here, however, the freight rate was oddly the same in both charters (assuming *arguendo* that the Igen / HAREC charter is even valid).  Thus, although Igen had full contractual responsibility to plaintiff under the charter dated November 7, 2005, all Igen allegedly received for accepting that risk and exposure was an entitlement to collect a small address commission if, in fact, HAREC paid the freight.  For those familiar with vessel charter arrangements, this is indeed a bizarre arrangement,

21

as shown in the declaration Mr. Mordhorst submitted in *Salam* and in the declaration Mr. Blum

has submitted in this action. *Id.*

Nevertheless, assuming *arguendo* that the sub-charter was valid, it actually raises the

question whether Igen was nothing more than an agent for an undisclosed principal, thereby

making HAREC liable to plaintiff on the CNAN / Igen charter party.  Longstanding principles of

agency law establish that an undisclosed principal is liable on contracts made by its agent acting

within the scope of the agent's actual or apparent authority.  *Dietrich v. U.S. Shipping Board*

*Emergency Fleet Corporation*, 9 F.2d 733, 739 (2d Cir. 1925).  As further explained by the Court

of Appeals in *Dietrich:*

> No principle of the law is more thoroughly established than that an agent, who
> enters into contractual relations on behalf of an undisclosed principal, binds the
> principal, and an action can be maintained against the latter for acts done by the
> agent within the scope of his authority and in the course of his employment.  In
> such cases the person with whom the contract has been made may sue either the
> agent or his principal as he may elect.

9 F.2d at 739.

Federal maritime law embraces the foregoing principles of agency law, including the

doctrine that an undisclosed principal is bound by the contracts made on the principal's account

by an agent acting within the agent's authority.  *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d

Cir. 1980); *Sidarma Societa Italiana Di Armamento Spa, Venice v. Holt Marine Industries, Inc.*,

515 F. Supp. 1302, 1308 (S.D.N.Y. 1981), *aff'd,* 681 F.2d 802 (2d Cir. 1981) (Table).

It is inescapable that, if Igen is in fact an entity separate and apart from HAREC, as the

latter contends, Igen is HAREC's agent for purposes of arranging vessel charters.  The chartering

transactions in *Salam* and in the instant case were set up so that the charter parties from the

22

shipowners to Igen and from Igen down to HAREC were on what Mr. Hashwani of HAREC has

described as "terms identical" in *Salam* (Heard decl., Exh. G, paras. 5 and 12) and what HAREC's

counsel have described as "a back-to-back basis . . . [where] the terms of the Fixture Recap

[between Igen and HAREC] were almost identical to the terms of the charter party" between

plaintiff and Igen "with the exception that HAREC agreed to pay Igen Sea a commission of 1¼%

on freight" (HAREC's Memo of Law at 2).  Mr. Mordhorst reviewed the back-to-back charter

parties in *Salam* and concluded that "Igen Sea's compensation is at most as a broker" (Heard

decl., Exh. J, para. 11).  Similarly, in this case, Mr. Blum reviewed the back-to-back charter parties

(and related correspondence) and concluded that Igen Sea "were acting as a 'front' as agents or

brokers of HAREC" (Blum decl., para. 3(M)).[11]

Going further, evidence that HAREC itself offered to the Court in *Salam* also shows that

Igen was at least its agent if not its alter ego.  In *Salam*, HAREC's attorneys (the same ones as in

this action) filed with the Court a declaration of Aziz Ashiq Ali in which he averred that "I am

the sole proprietor of Igen Sea Shipping."  *See* Heard decl., Exh. E.  That is very interesting since,

in fact, Mr. Aziz Ashiq Ali works for HAREC and sits in their office in the Cotton Exchange

Building on I.I. Chundrigar Road in Karachi.  Mr. Aziz Ashiq Ali himself confirmed to Mr. Jain,

a London solicitor acting for plaintiff (before this action was filed), that Mr. Ali *worked for*

*HAREC* (Jain decl., paras. 13-14) and this was confirmed by other HAREC employees with

whom Mr. Jain spoke when trying to reach Mr. Ali (*id.* at paras. 4, 7, 8 and 10).  Since, as the

---

[11]  Under the law of Pakistan, which presumably governs the affairs of Igen and HAREC *inter se*, the relationship between Igen and HAREC is such that HAREC would be liable for debts incurred by Igen.  *See* the opinion rendered by Mr. Abdul Rahman Butt, a solicitor with the leading firm of Abraham & Sarwana, submitted as part of plaintiff's opposition to the motion to vacate.  In addition, under Pakistani law, Igen would be regarded as "acting as an agent for HAREC."  *See* Butt decl., para. 8.

evidence indicates, Mr. Aziz Ashiq Ali is a HAREC employee, he is also an agent of the company. Restatement (Second) of Agency § 1 cmt. c, § 2(2) ("a servant is an agent employed by a master").

The only remaining question is whether, when chartering ships in the name of "Igen Sea Shipping", Mr. Aziz Ashiq Ali was acting "within the scope of his authority and in the course of his employment." *Dietrich v. U.S. Shipping Board, supra* at 739. Clearly, when Mr. Ali was chartering the AIN OUSSERA from plaintiff he was acting "within the scope of his authority and in the course of his employment" because he did the same thing in Igen and HAREC's earlier transaction with Salam International Transport & Trading and HAREC had ratified his actions by shipping cargo on Salam's vessel and paying the ocean freight for the use of the ship. When Mr. Ali, acting as Igen, did the same thing in this case, he was just acting in accordance with his role in a prior charter party transaction that HAREC had ratified and used to its benefit. Thus, it is inescapable that Mr. Ali, acting under the name "Igen Sea Shipping", had HAREC's authority to charter vessels to transport rice for HAREC and, in fact, that was part of his job at HAREC, where he works.

Since, as Messrs. Mordhorst and Blum have concluded, Igen's role in ship charter transactions is essentially to serve as nothing more than a broker, which is a form of agent[12], and HAREC was the actual (but undisclosed) principal in those transactions, making the payments and receiving the benefit of the transactions, Igen acted as an agent for an undisclosed principal and HAREC, as that principal, is liable for breach of the contracts, including the charter party of

---

[12] "A broker who is authorized by the owner or charterer to negotiate and fix a charter will be deemed an agent of that party." M. Wilford et al. *Time Charters* at § 2.58 (5th ed. 2003). *See also*, Restatement (Second) of Agency § 1, cmt. e ("the attorney-at-law, the broker . . . and other similar persons employed either for a single transaction or for a series of transactions, are agents").

the AIN OUSSERA, that Igen concluded on HAREC's behalf.  With HAREC having direct

liability on the CNAN / Igen charter party, CNAN has direct claims against HAREC and is

legally entitled to obtain security for those claims under Rule B.


**CONCLUSION**

**FOR THE REASONS SET FORTH HEREIN AND IN
THE ACCOMPANYING PAPERS, THIS HONORABLE COURT
SHOULD DENY DEFENDANT'S MOTION AND SHOULD
ALLOW THE ATTACHMENT TO REMAIN IN PLACE.**


Dated:     New York, NY
           July 10, 2008

                              BURKE & PARSONS
                              Attorneys for Plaintiff
                              CNAN Group S.p.a.


                              By    s/ Keith W. Heard

                                 Keith W. Heard (KH-8578)
                                 100 Park Avenue
                                 New York NY  10017-5533
                                 (212) 354-3800




TO:    LENNON, MURPHY & LENNON, LLC
       Attorneys for Defendant
       Hassan Ali Rice Export Co..
       The GrayBar Building
       420 Lexington Avenue, Suite 300
       New York NY  10170
       (212) 490-6050


25